**No. 26-5013**

## UNITED STATES COURT OF APPEALS
## FOR THE TENTH CIRCUIT

MUSCOGEE (CREEK) NATION,

*Plaintiff/Appellant*,

v.

STEVE KUNZWEILER, et al.,

*Defendants/Appellees*.

Appeal from the United States District Court
for the Northern District of Oklahoma,
Case No. 4:25-cv-00075-GKF-JFJ (Hon. Gregory K. Frizzell)

## APPELLANT'S OPENING BRIEF

### *Oral Argument Requested*

| | |
|---|---|
| Geraldine Wisner | Riyaz A. Kanji |
| Deputy Attorney General | David A. Giampetroni |
| MUSCOGEE (CREEK) NATION | Joshua C. Handelsman |
| P.O. Box 580 | KANJI & KATZEN, P.L.L.C. |
| Okmulgee, OK 74447 | P.O. Box 3971 |
| | Ann Arbor, MI 48106 |
| O. Joseph Williams | (734) 769-5400 |
| O. JOSEPH WILLIAMS LAW OFFICE, PLLC | rkanji@kanjikatzen.com |
| The McCulloch Building | |
| 114 N. Grand Avenue, Suite 520 | Philip H. Tinker |
| P.O. Box 1131 | KANJI & KATZEN, P.L.L.C. |
| Okmulgee, OK 74447 | 12 N. Cheyenne Avenue, Suite 220 |
| | Tulsa, OK 74103 |

*Counsel for Appellant Muscogee (Creek) Nation*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................................iv

STATEMENT OF RELATED CASES ................................................................xi

GLOSSARY ......................................................................................................xi

INTRODUCTION .............................................................................................1

JURISDICTIONAL STATEMENT ....................................................................2

STATEMENT OF THE ISSUES........................................................................3

STATEMENT OF THE CASE ...........................................................................3

I.      The Nation Maintains a Well-Resourced Criminal Justice System that
        Is Fully Capable of Exercising Criminal Jurisdiction over Indians on
        the Reservation. .....................................................................................3

II.     Tulsa County Has Chosen to Assert Criminal Jurisdiction over Non-Member
        Indians....................................................................................................7

III.    Procedural Background ..........................................................................9

SUMMARY OF ARGUMENT ........................................................................10

ARGUMENT ...................................................................................................13

I.      Standard of Review...............................................................................13

II.     The State and Its Political Subdivisions and Their Officers Lack
        Criminal Jurisdiction over All Indians in Indian Country Absent
        Congressional Authorization. ..............................................................14

        A.      States Lack Authority Within Traditional Domains of Tribal
                Sovereignty Absent Congressional Assent. .................................15

B.    Longstanding Tradition Recognizes Criminal Jurisdiction over Indians as a Core Domain of Tribal Sovereignty that Is Immune from State Interference. ...................................................18

    1.    Early American History ...........................................18

    2.    Late Nineteenth and Early Twentieth Century ........................22

    3.    Congressional Grants of Authority to States ...........................26

    4.    *Duro* and the *Duro* Fix...........................................29

    5.    Modern-Day Decisions ...........................................32

III.    The District Court Improperly Balanced Interests Instead of Applying the Longstanding Presumption Against State Jurisdiction............................36

A.    The District Court Misunderstood the Presumption to Apply Only to MCA Crimes. ...........................................36

B.    The District Court Misinterpreted *Castro-Huerta* to Require *Bracker* Balancing in Assessing All Assertions of State Authority. ..37

C.    The District Court's Decision Illustrates the Perils of Subjective Judicial Balancing. ...........................................45

IV.    The District Court Erred in Holding that the Other Injunction Factors Weigh Against an Injunction. ...........................................52

V.    The District Court Improperly Dismissed the Claims Against Sheriff Regalado. ...........................................54

CONCLUSION...........................................56

ORAL ARGUMENT STATEMENT ...........................................56

CERTIFICATE OF SERVICE

CERTIFICATE OF COMPLIANCE

STATUTORY ADDENDUM

ATTACHMENT A – Order, United States District Court for the Northern District of Oklahoma, 4:25-cv-00075, Dkt. 75 (Aug. 7, 2025)

ATTACHMENT B – Opinion and Order, United States District Court for the Northern District of Oklahoma, 4:25-cv-00075, Dkt. 87 (Nov. 7, 2025)

ATTACHMENT C – Judgment, United States District Court for the Northern District of Oklahoma, 4:25-cv-00075, Dkt. 90 (Dec. 30, 2025)

## TABLE OF AUTHORITIES

**Cases**

*Brown v. City of Tulsa,*
  124 F.4th 1251 (10th Cir. 2025)........................................................................14

*Bryan v. Itasca County,*
  426 U.S. 373 (1976) ........................................................................28

*California v. Cabazon Band of Mission Indians,*
  480 U.S. 202 (1987) ........................................................................41

*Cheyenne-Arapaho Tribes of Oklahoma v. Oklahoma,*
  618 F.2d 665 (10th Cir. 1980) .................................................... 17, 33

*Chickasaw Nation v. Oklahoma ex rel. Oklahoma Tax Commission,*
  31 F.3d 964 (10th Cir. 1994) ....................................................... 16, 17

*City of Tulsa v. O'Brien,*
  Case No. S-2023-715, 2024 WL 5001684 (Okla. Crim. App. Dec. 5, 2024)........7

*County of Yakima v. Confederated Tribes and Bands of the Yakima Indian Nation,*
  502 U.S. 251 (1992) ........................................................................17

*DeCoteau v. District County Court,*
  420 U.S. 425 (1975) ........................................................................33

*Department of Revenue of Kentucky v. Davis,*
  553 U.S. 328 (2008) ........................................................................51

*Does 1-11 v. Board of Regents of University of Colorado,*
  100 F.4th 1251 (10th Cir. 2024)........................................................14

*Duro v. Reina,*
  495 U.S. 676 (1990) .................................................................... 29, 30

*Ex parte Cross,*
  30 N.W. 428 (Neb. 1886) ................................................................24

*Ex parte Crow Dog,*
  109 U.S. 556 (1883) .................................................................... 22, 37

iv

*Haaland v. Brackeen*,
599 U.S. 255 (2023) .................................................................. 15, 17, 43

*Hagen v. Utah*,
510 U.S. 399 (1994) ................................................................. 32, 34, 36

*Herndon v. Anderson*,
25 P.2d 326 (Okla. 1933) ..................................................................14

*In re Blackbird*,
109 F. 139 (W.D. Wis. 1901) ................................................... 25, 37

*In re Lincoln*,
129 F. 247 (N.D. Cal. 1904) .................................................... 26, 37

*Kennerly v. District Court*,
400 U.S. 423 (1971) ........................................................................28

*Large v. Fremont County*,
670 F.3d 1133 (10th Cir. 2012) ......................................................14

*McClanahan v. State Tax Commission*,
411 U.S. 164 (1973) ......................................................... 16, 36, 38, 40

*McGirt v. Oklahoma*,
591 U.S. 894 (2020) ..................................... 1, 3, 7, 33, 34, 36, 37, 42, 43, 44, 55

*Means v. Navajo Nation*,
432 F.3d 924 (9th Cir. 2005) ..........................................................34

*Michigan v. Bay Mills Indian Community*,
572 U.S. 782 (2014) ........................................................................51

*Murphy v. Royal*,
875 F.3d 896 (10th Cir. 2017) ........................................................33

*Muscogee (Creek) Nation v. City of Henryetta*,
809 F.Supp.3d 1317 (E.D. Okla. 2025) ........................................1, 34

*Navajo Nation v. Dalley*,
896 F.3d 1196 (10th Cir. 2018) ......................................................18

*Negonsott v. Samuels*,
507 U.S. 99 (1993) ..........................................................................26

v

*New Mexico v. Mescalero Apache Tribe*,
    462 U.S. 3246 (1983) ................................................................................40, 48

*Oklahoma v. Castro-Huerta*,
    597 U.S. 629 (2022) ......................... 12, 15, 16, 19, 34, 36, 37, 38, 40, 41, 42, 45

*Oliphant v. Suquamish Indian Tribe*,
    435 U.S. 191 (1978) ....................................................................................42

*Olson v. North Dakota Department of Transportation*,
    909 N.W.2d 676 (N.D. 2018) ........................................................................35

*Prairie Band Potawatomi Nation v. Wagnon*,
    476 F.3d 818 (10th Cir. 2007) ............................................................. 14, 40, 52

*Rice v. Rehner*,
    463 U.S. 713 (1983) ............................................................... 16, 36, 41, 43

*Seminole Tribe of Florida v. Florida*,
    517 U.S. 44 (1996) ......................................................................................43

*Skiriotes v. Florida*,
    313 U.S. 69 (1941) ......................................................................................42

*Solem v. Bartlett*,
    465 U.S. 463 (1984) ....................................................................................32

*State v. Allan*,
    607 P.2d 426 (Idaho 1980) ..........................................................................35

*State v. Big Sheep*,
    243 P. 1067 (Mont. 1926)...................................................................... 25, 37

*State v. Campbell*,
    55 N.W. 553 (Minn. 1893) .................................................................. 24, 25, 37

*State v. Jackson*,
    16 N.W.2d 752 (Minn. 1944) ...................................................................... 26, 37

*State v. Klindt*,
    782 P.2d 401 (Okla. Crim. App. 1989) ............................................................37

*State v. Rufus*,
    237 N.W. 67 (Wis. 1931) ..............................................................................25

*The Kansas Indians*,
　72 U.S. 737 (1866) .................................................................................20

*The New York Indians*,
　72 U.S. 761 (1866) .................................................................................20

*United States v. Comstock*,
　560 U.S. 126 (2010) ...............................................................................42

*United States v. Hopson*,
　150 F.4th 1290 (10th Cir. 2025)................................................ 22, 43, 48

*United States v. Kagama*,
　118 U.S. 375 (1886) ...............................................................................23

*United States v. Lara*,
　541 U.S. 193 (2004) ......................................................................... 15, 18

*United States v. Little*,
　119 F.4th 750 (10th Cir. 2024).................................................................55

*United States v. McBratney*,
　104 U.S. 621 (1881) ...............................................................................22

*United States v. Patterson*,
　Case No. CR-20-71-RAW, 2021 WL 633022 (E.D. Okla. Feb. 18, 2021) .........55

*United States v. Sands*,
　968 F.2d 1058 (10th Cir. 1992).................................................................33

*United States v. Wheeler*,
　435 U.S. 313 (1978) ......................................................................... 23, 48

*Ute Indian Tribe of the Uintah and Ouray Reservation v. Utah*,
　790 F.3d 1000 (10th Cir. 2015).......................................................33, 36, 53

*Ute Indian Tribe of the Uintah and Ouray Reservation v. Lawrence*,
　22 F.4th 892 (10th Cir. 2022)....................................................................18

*Wagnon v. Prairie Band Potawatomi Nation*,
　546 U.S. 95 (2005) .......................................................................... 16, 39

*Washington v. Confederated Bands and Tribes of Yakima Indian Nation*,
　439 U.S. 463 (1979) ...............................................................................27

*Washington v. Confederated Tribes of the Colville Indian Reservation*,
447 U.S. 134 (1980) ................................................................ 17, 43, 49

*White Mountain Apache Tribe v. Bracker*,
448 U.S. 136 (1980) ................................... 16, 37, 38, 39, 40, 41, 43, 50

*Whitman v. American Trucking Associations*,
531 U.S. 457 (2001) ...........................................................................39

*Williams v. Lee*,
358 U.S. 217 (1959) ...........................................................................48

*Worcester v. Georgia*,
31 U.S. 515 (1832) .............................................................................20

*Wyandotte Nation v. Sebelius*,
443 F.3d 1247 (10th Cir. 2006) ..................................................... 14, 52

**Constitutional Provisions & Statutes**

18 U.S.C. § 1151 ........................................................................... 15, 25

18 U.S.C. § 1152 (General Crimes Act) ........................................... 21, 29

18 U.S.C. § 1153 (Major Crimes Act) ...................................................23

18 U.S.C. § 3243 ...............................................................................26

25 U.S.C. § 1301 ........................................................ 30, 32, 45, 49, 50

28 U.S.C. § 1291 ................................................................................2

28 U.S.C. § 1331 ................................................................................2

28 U.S.C. § 1362 ................................................................................2

Act of July 22, 1790, ch. 33, 1 Stat. 137...............................................19

Act of Mar. 3, 1817, ch. 92, 3 Stat. 383............................................19, 20

Act of June 30, 1834, ch. 161, § 25, 4 Stat. 729.....................................21

Act of Mar. 27, 1854, ch. 26, § 3, 10 Stat. 269.......................................21

Act of May 31, 1948, ch. 279, 60 Stat. 229............................................27

Act of June 30, 1948, ch. 759, 62 Stat. 1161 ........................................................27

Act of July 2, 1948, ch. 809, 62 Stat. 1224 ..........................................................27

Act of Oct. 5, 1949, ch. 604, 63 Stat. 705............................................................27

Act of Aug. 15, 1953, Pub. L. No. 83-280, ch. 505, 67 Stat. 588 .................... 27, 28

Act of Apr. 11, 1968, Pub. L. No. 90-284, 82 Stat. 73 ...........................................28

Act of Oct. 27, 1986, Pub. L. No. 99-570, § 4217, 100 Stat. 3207 ........................30

Okla. Stat. tit. 19, § 108.61 ..................................................................................54

Okla. Stat. tit. 19, § 516 .......................................................................................54

Okla. Stat. tit. 51, § 24A.3(5)................................................................................54

Tribal Code of Muscogee (Creek) Nation tit. 14 .....................................................6

U.S. Const. amend. X............................................................................... 42, 43

## Legislative Materials

*Hearing on S. 962 and S. 963 Before the S. Comm. on Indian Affairs*,
102d Cong. (1991).................................................................................................31

H.R. Conf. Rep. No. 101-938, 1990 WL 201576 (1990) .......................... 30, 31, 44

H.R. Rep. No. 23-474 (1834)...............................................................................21

H.R. Rep. No. 76-1999 (1940)..............................................................................27

H.R. Rep. No. 83-848 (1953).................................................................................28

H.R. Rep. No. 102-61, 1991 WL 83785 (1991) ................................................ 31, 44

S. Rep. No. 102-153, 1991 WL 195174 (1991).....................................................30

## Rules

Fed. R. Civ. P. 12(b)(6)........................................................................................14

**Other Authorities**

Brief for the Petitioner, *Oklahoma v. Castro-Huerta*, 597 U.S. 629 (2022) (No. 21-429),
  2022 WL 628282 (Feb. 28, 2022).......................................................................42

Conference of Western Attorneys General, *American Indian Law
  Deskbook* § 4:16 (May 2024 Update) ..............................................................28

Gregory Ablavsky, *Beyond the Indian Commerce Clause*,
  124 Yale L. J. 1012 (2015) ................................................................................19

Petitioner's Brief, *Hagen v. Utah*, 510 U.S. 399 (1994) (No. 92-6281), 1993 WL
384821 (July 1, 1993) .........................................................................................34

Restatement of the Law of American Indians § 71 (A.L.I. Mar. 2024 Update)......35

The Federalist No. 42 (C. Rossiter ed. 1961) ........................................................ 18

William C. Canby, Jr., *American Indian Law in a Nutshell* (8th ed. 2025) ............35

## STATEMENT OF RELATED CASES

Appeals were previously taken from the district court's denial of two individuals' motions to intervene in the proceedings below. The individuals subsequently voluntarily dismissed their appeals. *See* Tenth Circuit Appellate Case Nos. 25-5062; 25-5064.

## GLOSSARY

| Term | Definition |
|---|---|
| District Attorney | Tulsa County District Attorney Steve Kunzweiler |
| *Duro* fix | 25 U.S.C. § 1301(2) (defining tribal "powers of self-government" to include "the inherent power of Indian tribes … to exercise criminal jurisdiction over all Indians") |
| GCA | General Crimes Act (18 U.S.C. § 1152) |
| MCA | Major Crimes Act (18 U.S.C. § 1153) |
| Nation | Muscogee (Creek) Nation |
| P.L. 280 | Act of Aug. 15, 1953, Pub. L. No. 83-280, ch. 505, 67 Stat. 588 |
| Sheriff | Tulsa County Sheriff Vic Regalado |

**INTRODUCTION**

In *McGirt v. Oklahoma*, 591 U.S. 894 (2020), the Supreme Court affirmed that in treaties entered between 1832 and 1866, Congress established a federally protected Indian reservation for the Muscogee (Creek) Nation in what is now Eastern Oklahoma, *id.* at 899-902, and that because Congress has never disestablished the Reservation, it remains Indian country today, *id*. at 902-913. Accordingly, *McGirt* held that the settled rules governing the allocation of criminal jurisdiction within Indian country govern within the Creek Reservation. These include the cardinal principle that "a clear expression of the intention of Congress" is required before states or their political subdivisions "may try Indians for conduct on their lands." *Id*. at 929 (citation omitted). *McGirt* held, moreover, that "Oklahoma cannot come close" to establishing that Congress has authorized it to exercise criminal jurisdiction over Indians within the Creek Reservation. *Id.*

The *McGirt* Court was hardly writing on a blank slate. "Th[e] principle … that States lack criminal jurisdiction over Indians in Indian country absent congressional authorization … was not new in 2020, and it was not born in Oklahoma. It was already binding federal law." *Muscogee (Creek) Nation v. City of Henryetta*, 809 F.Supp.3d 1317, 1320 (E.D. Okla. 2025). A deeply rooted course of congressional legislation and case law (both federal and state, and including precedent from both the Supreme Court and this Court) has long established that

1

criminal jurisdiction over all Indians within Indian country constitutes a traditional domain of tribal sovereignty, one that states cannot intrude on absent Congress's blessing. And Congress has made plain that states cannot acquire such jurisdiction without complying with a carefully delineated set of procedures that includes obtaining tribal consent.

Certain (though by no means all) district attorneys and sheriffs in Oklahoma have sought to sidestep this well-established legal architecture, arguing that trial courts may engage in a balancing of interests to confer jurisdiction on them even where Congress's specifications have not been met. The court below accepted that invitation, and its entirely cursory and subjective analysis of the tribal, federal and state interests at stake in this matter evidences well the importance of honoring Congress's design and the tradition of tribal sovereignty in this area.

## JURISDICTIONAL STATEMENT

The district court had subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1362 because this case arises under federal law and was brought by an Indian tribe. This Court has jurisdiction because the district court's final judgment on December 30, 2025, disposed of the Nation's claims and was final and appealable under 28 U.S.C. § 1291. App.286. The Nation timely filed its Notice of Appeal on January 28, 2026. App.288.

## STATEMENT OF THE ISSUES

(1)    Whether Tulsa County officials' exercise of criminal jurisdiction over Indians within the Nation's Reservation violates federal law and should have been enjoined by the district court.

(2)    Whether the district court properly dismissed Defendant Sheriff Regalado from this action even though the Sheriff exercises criminal law enforcement authority over Indians within the Creek Reservation.

## STATEMENT OF THE CASE

**I.    The Nation Maintains a Well-Resourced Criminal Justice System that Is Fully Capable of Exercising Criminal Jurisdiction over Indians on the Reservation.**

The Creek Nation is the fourth most populous Indian nation in the country, and exercises robust governance throughout the Reservation for the benefit of Indian and non-Indian residents alike. In *McGirt*, the Supreme Court observed that "[t]oday the Nation is led by a democratically elected Principal Chief, Second Chief, and National Council; operates a police force and three hospitals; commands an annual budget of more than $350 million; and employs over 2,000 people." 591 U.S. at 912.

The Nation's governmental capabilities have only increased since *McGirt* was decided, with an especial emphasis on criminal law enforcement. With the confirmation of its jurisdictional footprint, the Nation has steadily increased the funding and reach of all three of its law enforcement arms. In fiscal year 2025, the

3

Nation expended over $7 million on its Office of Attorney General, App.391, with a budgeted staff for fiscal year 2026 that includes thirteen full-time prosecutors and twenty-two support staff, including criminal investigators, App.386, numbers that compare favorably to Tulsa County's on a per capita basis, App.387.

The Nation also operates a fully modernized court system, with district court expenditures of more than $7 million in fiscal year 2025, App.389. The district court has seven judges, App.363, a figure that again compares favorably to Tulsa County's on a per capita basis, App.364; App.313-314 (Tr.50:9-53:8). The Nation is constructing a new $30 million state-of-the art courthouse in its capital in Okmulgee, App.317-318 (Tr.54:21-55:22), and it recently opened a satellite traffic court in Tulsa to lessen any travel burden on defendants and police officer witnesses, App.311-312 (Tr.48:14-49:10). *See also* App.366-370 (photos of Nation's courtrooms); App.371-380 (design drawings of new court building).[1] Police officers from other jurisdictions routinely testify in the Nation's courts, App.317 (Tr.54:5-7); App.333 (Tr.88:9-15), and local police chiefs describe those courts as the equivalent of their state counterparts, App.332 (Tr.87:13-17) ("What I saw in the courtroom was exactly like what it would be in any courtroom, the

---

[1] The district court noted that the Nation's court in Tulsa County is only a traffic court. App.277. But to be clear, the Nation adjudicates non-traffic criminal cases arising throughout its Reservation at its main courthouse in Okmulgee, which is less than forty-five minutes south of Tulsa.

judge is there to preside, you got a prosecuting attorney, … the laws are basically the same. There's really no difference in what goes on in theirs and people are held accountable."). In 2025 the district court handled more than 1,000 felony charges, over 550 misdemeanor charges, and over 2,000 traffic citations, App.381-384, with the number of traffic citations set to increase substantially now that both the City of Tulsa and the City of Okmulgee have joined other jurisdictions in transferring tickets involving Indians to the Nation, App.323-324 (Tr.60:19-61:1).

Finally, the budget for the Nation's Lighthorse Police Department has increased from $4.6 million in 2019 to $21.4 million in 2025, App.393-394, with this substantial commitment of resources enabling Lighthorse to deploy equipment and expertise that many local police departments in the Reservation lack. City of Coweta Police Chief Michael Bell, for example, testified as to his department's reliance on Lighthorse's sophisticated SWAT (Special Weapons and Tactics) team and investigators. App.333-334 (Tr.88:16-89:3); App.336-337 (Tr.91:16-92:7).

The cooperation attested to by Chief Bell is characteristic of the Nation's law enforcement activities. The Nation is party to Intergovernmental Cross-Deputization Agreements with the United States and virtually all the counties and municipalities within the Reservation, including both the City and County of Tulsa. *See, e.g.*, App.54, 57-71. Under such agreements, all cross-deputized officers, tribal and non-tribal, possess stop or arrest authority within the Reservation over all

5

persons within their respective jurisdictions, Indian and non-Indian alike. App.64-65. If an arrest or stop is made by a cross-deputized officer of a jurisdiction without ultimate prosecutorial authority, the case is then referred to the jurisdiction possessing that authority. App.329-331 (Tr.84:4-86:21).

Numerous jurisdictions within the Reservation transfer cases involving both Creek citizens and non-citizen Indians to the Nation pursuant to these agreements. *See, e.g.*, App.345 (Tr.125:20-24) (Hughes County); App.337 (Tr.92:8-23) (Wagoner County); App.341-343 (Tr.121:12-123:5) (City of Tulsa). Chief Bell testified that the cross-deputization agreements work well in practice, such that his department has arrested and transferred more than fifty Indians to the Nation in the past year, App.331 (Tr.86:18-21). He further testified that the process of making arrests is no more complicated for an Indian defendant than it is for a non-Indian one because his department can write up a citation under State law, with Nation prosecutors then bringing charges under the corresponding Nation law. App.330 (Tr.85:7-86:17). That process works seamlessly because the Nation's criminal code incorporates State law to fill any interstices, App.349-351 (Tr. 134:25-135:18), and the Nation has adopted a Traffic Code that mirrors that of the State.[2] Finally, Chief

---

[2] Tribal Code of the Muscogee (Creek) Nation tit. 14, ch. 2, subch. 1, §2-114, Supplemental Crimes Act, https://law.muscogeenation.com/mvskokelaw/title-14/title-14-chapter-2-criminal-offenses?hg=22; Tribal Code of the Muscogee (Creek) Nation tit. 14, ch. 3, Muscogee (Creek) Nation Traffic Code,

Bell testified that he has "a very good working relationship" with the Nation's prosecutors, App.332-333 (Tr.87:25-88:5), that they are committed to public safety, App.333 (Tr.88:6-8), and that he has been satisfied "with how cases that [Coweta has] referred have been prosecuted," App.332 (Tr.87:18-20).

While opponents of the Nation's rights often seek to ground their opposition in claims that *McGirt* and its aftermath have posed a threat to public safety, the facts tell a different story. In Wagoner County, for example, where the District Attorney does not assert concurrent jurisdiction over non-member Indians, "crime rates … have dropped significantly…. With the work that we do with the Wagoner County Sheriff's Department, the Coweta Police Department, Wagoner PD, and then, of course, Lighthorse altogether, it's really a bad place for bad guys to show up." App.337 (Tr.92:13-23).

## II.     Tulsa County Has Chosen to Assert Criminal Jurisdiction over Non-Member Indians.

The District Attorney and Sheriff for Tulsa County have charted a different course. On January 6, 2025, District Attorney Kunzweiler announced that the County would rely on the Oklahoma Court of Criminal Appeal's decision in *City of Tulsa v. O'Brien*, Case Number: S-2023-715, 2024 WL 5001684 (Okla. Crim. App. Dec. 5, 2024), to prosecute defendants who are Indians but not members of

---

https://law.muscogeenation.com/mvskokelaw/title-14/title-14-chapter-3-muscogee-creek-nation-traffic-code.

7

the tribe in whose Indian country the charged conduct occurred. App.357 (Tr.192:9-21); *see also* App.16. Sheriff Regalado additionally instructed his department that going forward, "tribal members will be charged by tribal courts only if they are a member of the tribe in which the criminal offense took place…. Any other tribal citizens will not be booked or charged into tribal courts but rather STATE court and booked into [the Tulsa County Jail] as any other citizen." App.54-55, 73. The Sheriff's new policy hence seeks not only to facilitate the District Attorney's exercise of purported jurisdiction over non-member Indians within the Creek Reservation but to deny the Nation's authority over those same Indians, notwithstanding that such jurisdiction is, as explained below, plainly guaranteed by federal law.

While the OCCA in *O'Brien* and the District Attorney and Sheriff have sought to distinguish between Creek citizens and non-member Indians, the distinction is not nearly as neat as they would have it. Many non-member Indians are deeply enmeshed in the Muscogee Creek community by virtue of factors including family ties, residence, historical relationships between tribes, and employment with or receipt of services from the Creek government that are available to all Indians. App. 292-310 (Tr.15:16-33:1).

Exemplary of the new policy, the Tulsa County District Court held hearings on January 31, 2025, in five prosecutions brought by the District Attorney against

8

non-member Indians for conduct on the Creek Reservation. App.431; App.352-355 (Tr.137:5-140:4). In each case, the defendant challenged the County's jurisdiction based on his or her Indian status and the Indian country status of the Reservation. App.17, 399, 404, 413, 419, 425. In each case, the County opposed the jurisdictional challenge, and in each case the Tulsa County District Court allowed the prosecutions to proceed. *Id.*

The District Attorney consulted with the Nation in none of the cases before bringing charges in state court. App.353-355 (Tr.138:14-140:2); App.358-360 (Tr.196:13-198:8). There was hardly a public safety exigency to justify this course of action. The cases involved charges such as shoplifting, App.353 (Tr.138:14-18), and in each the District Attorney either failed to obtain a conviction or agreed to a plea deal with a suspended sentence, App.431. Not a single case resulted in incarceration. *Id.*

## III.   Procedural Background

The Nation brought this lawsuit on February 13, 2025, seeking a declaratory judgment that "the County lacks criminal jurisdiction over Indians for conduct occurring within the Creek Reservation," as well as a temporary restraining order and preliminary and permanent injunctive relief. App.19. On April 23, 2025, the district court denied the restraining order, stating that the Nation had not yet shown

9

that the State's assertion of jurisdiction over non-member Indians caused irreparable harm to the Nation or harmed the public interest. App.198.

On August 7, 2025, the district court granted Sheriff Regalado's motion to dismiss, reasoning that he "is not a proper party to this action" because he "does not make the decision to prosecute any defendant." App.257. The district court then held a hearing on the Nation's motion for a preliminary injunction on October 9, 2025, at which the Nation presented witnesses who testified about the extent to which non-member Indians are intertwined in the Creek community, the effectiveness of the Nation's criminal justice system, and how concurrent state jurisdiction interferes with that system. App.289-361 (excerpts of hearing transcript); App.362-431 (hearing exhibits).

On November 7, 2025, the district court denied the Nation's motion for preliminary injunction. App.270-281. At the court's invitation, App.282, the parties then stipulated that "the Court's ruling decided the controlling issue in this case," App.283, after which the district court entered final judgment, App.286-287. This appeal followed.

## SUMMARY OF ARGUMENT

Longstanding precedent prohibits states from acting within traditional domains of tribal sovereignty, except where Congress has authorized them to do so. *Infra* pp. 15-18. Criminal jurisdiction over Indians epitomizes such a domain.

10

Since the Constitution's ratification, Congress has recognized that the power to try and punish Indians (including non-member Indians) in Indian country is an important facet of tribal self-government, and that concurrent jurisdiction interferes with that sovereign power. *Infra* pp. 18-22. Accordingly, Congress has legislated against the backdrop of exclusive tribal authority, carefully choosing when to extend federal or state criminal jurisdiction into Indian country. *Infra* pp. 18-26. This course of legislation has culminated in statutes making clear that tribes enjoy criminal jurisdiction over all Indians within their Indian country as an aspect of their inherent sovereign authority, and that states may not assume jurisdiction over Indians within Indian country unless they follow a carefully delineated set of procedures, including obtaining the consent of the affected tribes. *Infra* pp. 26-32.

Consistent with this course of legislation, the Supreme Court, this Court, and other courts across the country (both federal and state) have long held that states presumptively lack criminal jurisdiction over Indians in Indian country absent Congress's blessing. *Infra* pp. 23-26, 32-35. The district court disregarded this presumptive rule, and the two centuries' worth of legislation and case law that it reflects. It instead deemed itself to possess the authority to define and then balance state, federal, and tribal interests to determine whether Tulsa County officials can exercise criminal jurisdiction over Indians on the Creek Reservation.

The district court ventured down this path based on two fundamental errors of law. First, it misunderstood the presumptive rule against state criminal jurisdiction over Indians as applying only to crimes enumerated in the Major Crimes Act ("MCA")—a position that cannot be reconciled with the large number of decisions (issued over many decades) applying the presumption in non-MCA settings. *Infra* pp. 36-37.

Second, it misinterpreted *Oklahoma v. Castro-Huerta*, 597 U.S. 629 (2022), as requiring a balancing of interests with respect to any assertion of state authority in Indian country, even when such authority would interfere with a traditional area of tribal self-government. *Infra* pp. 37-38. But the balancing test is principally used (as in *Castro-Huerta*) to assess state assertions of authority in Indian country over *non*-Indians and, on rare occasions, in domains *without* a tradition of tribal sovereignty (e.g., liquor sales). *Infra* pp. 15-19, 38-41. *Castro-Huerta* does not authorize the wholesale substitution of balancing for long-accepted jurisdictional principles. *Infra* pp. 41-45.

The district court's opinion demonstrates well the pitfalls of such substitution. In just two pages of cursory analysis, the district court rewrote long-settled rules of Indian country jurisdiction based on its highly subjective assessment of interests—all while ignoring Congress's considered judgment and the record evidence that concurrent jurisdiction improperly interferes with tribal

12

self-governance. *Infra* pp. 45-52. The district court then further erred in its treatment of the non-merits factors bearing on injunctive relief, disregarding record evidence making clear that the assertion of jurisdiction by Tulsa County officials is not necessary for public safety, as well as precedent from this Court holding that unlawful assertions of state criminal jurisdiction substantially harm tribal sovereignty and the public interest and accordingly warrant an injunction. *Infra* pp. 52-54.

Finally, the district court erred by dismissing the Nation's claims against Sheriff Regalado on the basis that he does not make prosecutorial decisions. While that is true, the Sheriff exercises other forms of important criminal authority, including holding Indian detainees for prosecution by state rather than tribal authorities, that violate federal law and merit relief. *Infra* pp. 54-56.

## ARGUMENT

### I.    Standard of Review

This appeal is taken from the district court's final judgment, App.286-287, which denied the Nation's request for declaratory and permanent injunctive relief, and from the orders denying the Nation's motion for a preliminary injunction, App.270-281, and granting Sheriff Regalado's motion to dismiss, App.255-257, both of which merged into the final judgment.

The party moving for a preliminary injunction "must show: (1) a likelihood of success on the merits; (2) a likely threat of irreparable harm to the movant; (3)

13

the harm alleged by the movant outweighs any harm to the non-moving party; and

(4) an injunction is in the public interest." *Does 1-11 v. Bd. of Regents of Univ. of Colo.*, 100 F.4th 1251, 1267 (10th Cir. 2024) (citation omitted). The same criteria

apply to a request for a permanent injunction, except that "a permanent injunction

requires showing actual success on the merits[.]" *Prairie Band Potawatomi Nation v. Wagnon*, 476 F.3d 818, 822 (10th Cir. 2007) (quotation marks omitted).

The district court's denial of injunctive relief is reviewed under an abuse of

discretion standard, and "[a] district court abuses its discretion when it commits an

error of law or makes clearly erroneous factual findings." *Wyandotte Nation v. Sebelius*, 443 F.3d 1247, 1252 (10th Cir. 2006). The district court made no factual

findings, and its decision instead hinged on legal errors.

The court's order granting Sheriff Regalado's motion to dismiss under Fed.

R. Civ. P. 12(b)(6) is reviewed de novo. *Brown v. City of Tulsa*, 124 F.4th 1251,

1263 (10th Cir. 2025).

## II.    The State and Its Political Subdivisions and Their Officers Lack Criminal Jurisdiction over All Indians in Indian Country Absent Congressional Authorization.

Oklahoma counties possess only those criminal powers that they derive from

the State. *See Large v. Fremont Cnty.*, 670 F.3d 1133, 1146 (10th Cir. 2012);

*Herndon v. Anderson*, 25 P.2d 326, 329 (Okla. 1933). Thus, if Oklahoma lacks

criminal jurisdiction over non-member Indians in Indian country, then so do Tulsa

14

County and its officers, the District Attorney and the Sheriff. The district court committed legal error in concluding under the merits prong of the injunction test that the State possesses such jurisdiction.

### A.     States Lack Authority Within Traditional Domains of Tribal Sovereignty Absent Congressional Assent.

"Congress's power to legislate with respect to the Indian tribes" is "plenary and exclusive." *Haaland v. Brackeen*, 599 U.S. 255, 272 (2023) (citation omitted) (collecting cases). That exclusive "power to legislate with respect to Indians …. includ[es] criminal law," *id*. at 275, extends to "Indians as individuals," *id*. at 278, and derives squarely from the Constitution, *see id.* at 273-74 (locating the grant of exclusive federal "authority to regulate Indians" in various constitutional provisions); *accord United States v. Lara*, 541 U.S. 193, 200 (2004).

Given the constitutional allocation of authority, state power in Indian country is far more circumscribed.[3] Not only can federal law preempt state authority in Indian country "under ordinary principles of preemption," *Castro-Huerta*, 597 U.S. at 638, but such authority is preempted "if the exercise of state jurisdiction would unlawfully infringe upon tribal self-government," *id.* at 649.

The proper framework for determining whether a state's assertion of jurisdiction "would unlawfully infringe upon tribal self-government," *id.*, depends

---

[3] Congress has defined Indian country to include, *inter alia*, all land within the exterior boundaries of an Indian reservation. 18 U.S.C. § 1151(a).

15

on the nature of the state power being asserted. In cases dealing with state power over *non*-Indians in Indian country (including *Castro-Huerta*), courts typically apply the "*Bracker* balancing test," which the Supreme Court has described as "a particularized inquiry into the nature of the state, federal, and tribal interests at stake, an inquiry designed to determine whether, in the specific context, the exercise of state authority would violate federal law," *White Mountain Apache Tribe v. Bracker*, 448 U.S. 136, 145 (1980); *see also Wagnon v. Prairie Band Potawatomi Nation*, 546 U.S. 95, 110 (2005) ("As *Bracker* itself explained, … we formulated the balancing test to address the 'difficult questio[n]' that arises when 'a State asserts authority over the conduct of non-Indians'" in Indian country. (brackets in original)); *see also infra* pp. 39-41.

By contrast, if a state attempts to assert authority in a domain in which "tradition has recognized a sovereign immunity [from state power] in favor of the Indians," balancing is not required. *Rice v. Rehner*, 463 U.S. 713, 719-720 (1983). Instead, state authority is deemed preempted "except where Congress has expressly provided that state laws shall apply." *Id.* (quoting *McClanahan v. State Tax Comm'n*, 411 U.S. 164, 171 (1973)); *see also id.* at 726 (describing "presumption of preemption" requiring "that Congress expressly provide for the application of state law"); *Chickasaw Nation v. Oklahoma ex rel. Okla. Tax Comm'n*, 31 F.3d 964, 972-73 (10th Cir. 1994) ("Where the state action conflicts with a power

16

within the traditional scope of Indian sovereign authority, preemption is presumed

in the absence of an explicit statement of congressional intent to the contrary."),

*aff'd in part, rev'd in part sub nom.*, *Okla. Tax Comm'n v. Chickasaw Nation*, 515

U.S. 450 (1995), *reaffirmed in relevant part*, 64 F.3d 577 (10th Cir. 1995);

*Washington v. Confederated Tribes of the Colville Indian Rsrv.*, 447 U.S. 134,

178-79 (1980) (Rehnquist, J., concurring in part) (explaining that areas with a

"tradition of sovereignty" are "beyond the jurisdiction of the states" unless "this

tradition of immunity ha[s] been altered by Congress" (citation omitted)).

Consistent with the Constitution's assignment of "plenary and exclusive"

authority to Congress to legislate respecting tribes and individual Indians,

*Brackeen*, 599 U.S. at 272 (citation omitted), this "presumption of preemption"

typically applies in instances where states attempt to assert authority directly over

them. For example, "[s]tates have no authority over Indians in Indian Country

unless it is expressly conferred by Congress" with respect to "state hunting and

fishing laws." *Cheyenne-Arapaho Tribes of Okla. v. Oklahoma*, 618 F.2d 665, 668-

669 (10th Cir. 1980). Nor can states tax tribal members' income or property within

their reservations. *Cnty. of Yakima v. Confederated Tribes and Bands of the*

*Yakima Indian Nation*, 502 U.S. 251, 258 (1992) ("Absent cession of jurisdiction

or other federal statutes permitting it, we have held, a State is without power to tax

reservation lands and reservation Indians." (citation modified)); *Chickasaw Nation*,

31 F.3d at 972-73 (motor fuel tax). Nor can they exercise civil jurisdiction over civil lawsuits against tribal members arising from Indian country conduct—a rule that reflects a clear understanding that haling Indians into state court for such conduct significantly interferes with tribal self-government. *See Navajo Nation v. Dalley*, 896 F.3d 1196, 1204 (10th Cir. 2018) ("It is axiomatic that absent clear congressional authorization, state courts lack jurisdiction to hear cases against Native Americans arising from conduct in Indian country."); *Ute Indian Tribe of the Uintah and Ouray Rsrv. v. Lawrence*, 22 F.4th 892, 899-900 (10th Cir. 2022) (similar). Balancing is not required in these cases, given the long-held recognition that allowance of state jurisdiction would work an impermissible interference with tribal self-governance. The same is true for the exercise of criminal jurisdiction over Indians in Indian country.

> **B.      Longstanding Tradition Recognizes Criminal Jurisdiction over Indians as a Core Domain of Tribal Sovereignty that Is Immune from State Interference.**
>
> **1.      Early American History**

The allocation of authority over Indian affairs in the Articles of Confederation "endeavored to accomplish [an] impossibilit[y]; to reconcile a partial sovereignty in the Union, with complete sovereignty in the States[.]" The Federalist No. 42, p. 269 (C. Rossiter ed. 1961). That effort gave rise to constant conflict, which the Framers sought to end by affording the federal government "broad general powers" over Indian affairs, *Lara*, 541 U.S. at 200, while

eliminating "the Articles' carveout for state power over Tribes within their borders," *Castro-Huerta*, 597 U.S. at 659 (Gorsuch, J., dissenting). The Washington Administration accordingly understood the federal government's powers in Indian affairs to be exclusive of that of the states—an understanding shared even by prominent state leaders and anti-federalists of that era. Gregory Ablavsky, *Beyond the Indian Commerce Clause*, 124 Yale L. J. 1012, 1019, 1039-1045 (2015).

Congress, too, shared in this understanding, and promptly exercised its authority in Indian affairs by passing the Trade and Intercourse Act of 1790. Act of July 22, 1790, ch. 33, 1 Stat. 137. Among other things, the law marked Congress's first foray into criminal jurisdiction in Indian country. It established that the federal courts would have jurisdiction over non-Indians who committed crimes against Indians in Indian country, *see id.* §§ 5-6, 1 Stat. at 138, while leaving criminal jurisdiction over Indians to the tribes.

In 1817, Congress went a step further and established federal criminal jurisdiction over Indians by extending the criminal laws of the United States applicable in federal enclaves to tribal territory. Act of Mar. 3, 1817, ch. 92, 3 Stat. 383. However, the 1817 Act specifically disclaimed federal jurisdiction over crimes by Indians against Indians:

> [N]othing in this act shall be so construed as to affect any treaty now
> in force between the United States and any Indian nation, or to extend

19

to any offense committed by one Indian against another, within any Indian boundary.

*Id.* § 2, 3 Stat. at 383. This exception for Indian-on-Indian crimes reflected the common-sense understanding that the assertion of concurrent criminal jurisdiction over Indians would interfere with tribal sovereignty. And notably, the 1817 Act, like all subsequent acts of Congress concerning criminal jurisdiction in Indian country, made no distinctions based on which tribe an Indian belonged to: It spoke plainly in terms of "Indian" as the relevant jurisdictional category. *Id.*

During this era, the Supreme Court likewise recognized the federal government's paramount role in Indian affairs to the exclusion of the states. In *Worcester v. Georgia*, 31 U.S. 515, 561 (1832), the Court held that "[t]he whole intercourse" between the United States and Indian tribes "is, by our constitution and laws, vested in the government of the United States." Thus, the Court explained, "the laws of Georgia can have no force" within the Cherokee Nation "but with the assent of the Cherokees themselves, or in conformity with treaties, and with the acts of congress." *Id.* The Court would go on to reaffirm this principle in the ensuing decades. In *The Kansas Indians*, 72 U.S. 737, 755 (1866), for example, the Court held that Kansas could not tax land owned in severalty by individual Indians on reservation lands, explaining that the tribe was "separated from the jurisdiction of Kansas, and to be governed exclusively by the government of the Union." *See also The New York Indians*, 72 U.S. 761 (1866) (similar).

20

Two years after *Worcester*, Congress passed legislation continuing federal criminal jurisdiction in Indian country while maintaining the exception for Indian-on-Indian crimes. Act of June 30, 1834, ch. 161, § 25, 4 Stat. 729, 733. As Congress well understood, this exception would leave such crimes within the tribes' "exclusive jurisdiction," H.R. Rep. No. 23-474, at 13 (1834). Congress explained that it could not "with any justice or propriety extend our laws to offenses committed by Indians against Indians, *at any place* within their own limits." *Id.*

In 1854, Congress further limited the role of external criminal jurisdiction in Indian country, disclaiming authority over "any Indian committing any offence in the Indian country who has been punished by the local law of the tribe[.]" Act of Mar. 27, 1854, ch. 26, § 3, 10 Stat. 269, 270. The laws of the United States applicable in federal enclaves would henceforth extend to Indians and non-Indians in Indian country, but now with two significant exceptions designed to limit interference with tribal sovereignty: Indian-on-Indian crimes, and any other crimes already punished by a tribe. This statutory scheme continues today under what is commonly referred to as the "General Crimes Act," 18 U.S.C. § 1152 (GCA). Congress has not amended it to remove either of its exceptions, which, as this Court recently underscored, "accord[] with [the] historical understanding of tribal

21

independence," *United States v. Hopson*, 150 F.4th 1290, 1299-1300 (10th Cir. 2025).

## 2.    Late Nineteenth and Early Twentieth Century

The late nineteenth century saw several changes to the law governing criminal jurisdiction in Indian country. None of these changes, however, countenanced the exercise of state criminal jurisdiction over Indians in Indian country.

In 1881, the Supreme Court allowed for states to assert authority over Indian country crimes by non-Indians against non-Indians. *United States v. McBratney*, 104 U.S. 621, 624 (1881) (holding that upon statehood, a state assumes "criminal jurisdiction over its own citizens *and other white persons* throughout the whole of the territory within its limits" (emphasis added)). Two years later, the Court made clear, however, that states continued to lack jurisdiction over Indians. In holding that the Indian-on-Indian exception in the GCA precludes the federal government from prosecuting a murder by one Indian against another, the Court observed that the GCA and its predecessor statutes had always left crimes between Indians "to be dealt with by each tribe for itself, according to its local customs." *Ex parte Crow Dog*, 109 U.S. 556, 571-72 (1883). That would clearly not be the case were the states able to exercise their own jurisdiction over those crimes.

No longer willing to leave such responsibility entirely to the tribes, Congress enacted the Major Crimes Act (MCA) in 1885. The statute extended federal jurisdiction over certain enumerated crimes by "all Indians" in Indian country. *See* Act of Mar. 3, 1885, ch. 341, § 9, 23 Stat. 362, 385 (codified at 18 U.S.C. § 1153). For those enumerated crimes, the exceptions in the GCA would not apply: The federal government could prosecute an Indian for such crimes even if the victim was an Indian and even if the tribe had already punished the offender. The Supreme Court has accordingly characterized the MCA as a "carefully limited *intrusion of federal power* into the *otherwise exclusive jurisdiction* of the Indian tribes to punish Indians for crimes committed on Indian land." *United States v. Wheeler*, 435 U.S. 313, 325 n.22 (1978) (emphases added) (citation omitted).

In *United States v. Kagama*, 118 U.S. 375 (1886), the Court upheld the MCA as a valid exercise of Congress's authority in Indian affairs. In doing so, it again reaffirmed the principle that states lack criminal jurisdiction over all Indians in Indian country. *Id.* at 383-85 (upholding Congress's power to extend federal criminal jurisdiction over Indians in Indian country where "the offending Indians shall belong to that *or some other tribe*," and reasoning that this power over Indians "never has existed" in the states and that the federal government "alone" possesses it (emphasis added)).

23

If *McBratney*'s recognition of state criminal jurisdiction over non-Indians in Indian country had given hope to some states that the courts might sanction their prosecution of Indians as well, *Kagama* put those hopes to rest. When Minnesota sought to prosecute an Indian for adultery shortly after *Kagama* was decided, for example, the Minnesota Supreme Court flatly rejected the state's claim to jurisdiction:

> There is no decision of the federal courts that a state can, even in the absence of a restriction in a treaty, or in the act admitting the state into the Union, extend its laws, either criminal or civil, over tribal Indians residing under the care of the general government upon a reservation set apart by it for that purpose.

*State v. Campbell*, 55 N.W. 553, 554 (Minn. 1893); *see also id.* at 555 (discussing relevant precedents including *Kagama*).

*Campbell* was far from the only case to so hold. State courts from the turn of the century onward agreed that they lacked jurisdiction over Indians for crimes committed in Indian country. For example, the Nebraska Supreme Court held in a case involving horse theft that "state courts have no jurisdiction over the Indians within the state, and on their reservations, for crimes committed by and against each other[.]" *Ex parte Cross*, 30 N.W. 428, 428 (Neb. 1886) (citing *Kagama*). The Montana Supreme Court held that the state lacked jurisdiction to prosecute an Indian for peyote possession, reasoning that "[t]he United States courts have always asserted jurisdiction over Indians living on and maintaining tribal relations

24

within their reservations, and, whenever the question has been presented, have denied the jurisdiction of the state courts over them." *State v. Big Sheep*, 243 P. 1067, 1071 (Mont. 1926) (citing *Kagama* and other federal cases). Shortly thereafter, the Wisconsin Supreme Court expressly overruled what appears to have been the only state supreme court decision that had allowed state prosecutions of Indians in Indian country. *State v. Rufus*, 237 N.W. 67, 75 (Wis. 1931). The court explained that "[w]hile prosecutions brought in the state courts against Indians might have beneficial results, such is not sufficient to confer jurisdiction upon state courts in the absence of legislation by Congress authorizing such jurisdiction." *Id.*; *see also id.* at 70-75 (canvassing state and federal decisions and concluding that they overwhelmingly rejected state criminal jurisdiction over Indians in Indian country for any crimes).[4]

Federal courts reached the same conclusion. *See, e.g.*, *In re Blackbird*, 109 F. 139, 145 (W.D. Wis. 1901) (state jurisdiction "would be not only inappropriate, but also practically … arrogate the guardianship over these Indians, which is exclusively vested in the general government" (quoting *Campbell*, 55 N.W. at

---

[4] To be sure, not all these courts agreed about who counted as an "Indian" and what counted as "Indian country," largely due to confusion created by federal allotment policy. The Montana Supreme Court, for example, held that lands allotted within a reservation were no longer deemed part of it. *Big Sheep*, 243 P. at 1071. In 1948, however, Congress clarified the scope of "Indian country" by defining it to include *all* lands with reservation boundaries, "notwithstanding the issuance of any patent[.]" 18 U.S.C. § 1151(a).

25

555)); *In re Lincoln*, 129 F. 247, 248 (N.D. Cal. 1904) ("[T]here can be no doubt that the [state] court was without jurisdiction" to convict an Indian in Indian country for possessing deer meat). And as with the GCA and the MCA, these state and federal cases did not distinguish between members and non-members for jurisdictional purposes, but rather between "Indians" and non-Indians.

### 3.    Congressional Grants of Authority to States

As America entered the post-war period, the presumptive bar on state criminal jurisdiction over Indians in Indian country remained firmly entrenched. *See, e.g.*, *State v. Jackson*, 16 N.W.2d 752, 754 (Minn. 1944) ("[I]t is … uniformly held that, absent a treaty or federal statute conferring it, a state's jurisdiction does not extend over the individual members of an Indian tribe maintaining their tribal relations and organization upon a reservation within the geographical limits of the state." (citing *Worcester*, *Kagama*, and other state and federal precedents)). It was against this backdrop that Congress enacted statutes allowing for the exercise of jurisdiction in Indian country by specific states and under specific conditions.

**State-Specific Statutes.** The 1940 Kansas Act was "the first major grant of jurisdiction to a State over offenses involving Indians committed in Indian country[.]" *Negonsott v. Samuels*, 507 U.S. 99, 103 (1993). It conferred concurrent criminal jurisdiction on Kansas over reservation offenses involving Indians. 18 U.S.C. § 3243. Congress enacted this law specifically because the Kansas tribes

26

did not have tribal courts and wished for the state to exercise such jurisdiction, knowing that without the law the state would have jurisdiction "only [in] situations where both the offender and the victim are white men," H.R. Rep. No. 76-1999, at 2 (1940). By 1949, Congress had enacted similar statutes conveying Indian country criminal jurisdiction over Indians to New York, Iowa, North Dakota, and California. *See* Act of July 2, 1948, ch. 809, 62 Stat. 1224; Act of June 30, 1948, ch. 759, 62 Stat. 1161; Act of May 31, 1948, ch. 279, 60 Stat. 229; Act of Oct. 5, 1949, ch. 604, 63 Stat. 705. The Supreme Court has described those statutes as "surrenders of authority to some States," *Washington v. Confederated Bands and Tribes of Yakima Indian Nation*, 439 U.S. 463, 471 n.8 (1979), a description that well reflects the presumption against state jurisdiction existing prior to their passage.

**Public Law 280.** In 1953, Congress enacted jurisdictional legislation applicable to all states. *See* Act of Aug. 15, 1953, Pub. L. No. 83-280, ch. 505, 67 Stat. 588 ("P.L. 280"). The statute transferred criminal jurisdiction within Indian country to five additional states, § 2, 67 Stat. at 588, and allowed other states to assume such jurisdiction under carefully delineated procedures, § 6, 67 Stat. at 590.

P.L. 280's text and context again reflect the presumption against state jurisdiction over Indians. As the Supreme Court has explained, Congress enacted

27

P.L. 280 because "States lack jurisdiction to prosecute Indians for most offenses committed on Indian reservations or other Indian country, with limited exceptions." H.R. Rep. No. 83-848, at 5 (1953); *Bryan v. Itasca Cnty.*, 426 U.S. 373, 379-80 (1976) (quoting report). The statute accordingly allowed for states "not having jurisdiction with respect to criminal offenses … to assume jurisdiction … by affirmative legislative action," § 7, 67 Stat. at 590, but only if they followed the procedures carefully delineated by Congress after "comprehensive and detailed congressional scrutiny," *Kennerly v. Dist. Ct.*, 400 U.S. 423, 427 (1971).

**1968 Amendments to P.L. 280.** In 1968, Congress amended P.L. 280 to require tribal consent for any further assumption of state jurisdiction. Act of Apr. 11, 1968, Pub. L. No. 90-284, §§ 401(a), 406, 82 Stat. 73, 78, 80. It further provided that states may, under certain circumstances, relinquish jurisdiction previously assumed under P.L. 280 to the United States. § 403, 82 Stat. at 79. Since 1968, seven states have retroceded jurisdiction in whole or in part, and tribes have generally declined to consent to further extensions of state criminal jurisdiction over Indians in their Indian country. Conf. of W. Att'ys Gen., *American Indian Law Deskbook* § 4:16 & n.26 (May 2024 Update).

Congress's mid-century enactments accordingly resulted in a carefully prescribed set of circumstances under which states can assume criminal jurisdiction over Indians in Indian country: Absent a state-specific conferral of

28

jurisdiction, states must follow the procedures outlined in P.L. 280, and since 1968 those procedures have included obtaining tribal consent.

### 4.     *Duro* and the *Duro* Fix

In *Duro v. Reina*, 495 U.S. 676 (1990), the Supreme Court held that "inherent tribal jurisdiction extends to tribe members only," and thus that tribal courts generally cannot prosecute non-member Indians. *Id*. at 691. Yet even then, the Court did not question the longstanding presumption against state criminal authority over Indians in Indian country. The majority recognized that its decision could leave non-member Indians free from prosecution by *any* sovereign for certain crimes, unless those "States now without jurisdiction" were to gain "the consent of the tribes" pursuant to P.L. 280. *Id.* at 697. Moreover, "[i]f the present jurisdictional scheme prove[d] insufficient to meet the practical needs of reservation law enforcement," *id.* at 698, the solution was not alteration of the background principle. Rather, "the proper body to address the problem is Congress, which has the ultimate authority over Indian affairs." *Id.*

The dissenting justices underscored that the Court's decision would create a jurisdictional void in Indian country:

> Because of the Indian-against-Indian exception in 18 U.S.C. § 1152, federal courts have no jurisdiction over such crimes…. [and] States do not have power to exercise criminal jurisdiction over crimes involving Indians on the reservation…. Thus, under the Court's holding today, the tribe, the Federal Government, and the State each lack jurisdiction to prosecute the [non-member Indian] crime involved in this case.

*Id.* at 704-05 & n.3 (Brennan, J., dissenting).

Congress promptly took up the Court's invitation to address the jurisdictional void arising out of its decision, reaffirming in tribes the inherent criminal jurisdiction over non-member Indians that *Duro* had purported to deny. It did so by defining tribal "powers of self-government" as including "the inherent power of Indian tribes, hereby recognized and affirmed, to exercise criminal jurisdiction over all Indians[.]" 25 U.S.C. § 1301(2) ("*Duro* fix").

Congress's response to *Duro* confirms both that tribal jurisdiction over non-member Indians is a traditional and important domain of tribal sovereignty and that states correspondingly lack such jurisdiction. Congress criticized the *Duro* Court for "[r]eversing two hundred years of the exercise by tribes of criminal misdemeanor jurisdiction over all Indians residing on their reservations," and for ignoring "two hundred years of Federal law" respecting tribes' exercise of this sovereign power.[5] H.R. Conf. Rep. No. 101-938, at H 13596, 1990 WL 201576 (1990); *see also* S. Rep. No. 102-153, 1991 WL 195174, at *3 (1991) ("Congress has never differentiated between member Indians and non-member Indians.").

---

[5] Congressional reports about the *Duro* fix sometimes refer to "misdemeanors" instead of "non-major" or "non-MCA" crimes because federal law at that time limited tribal courts to imposing prison terms of a maximum of one year. *See* Pub. L. No. 99-570, § 4217, 100 Stat. 3207, 3207-146 (1986). Congress has since increased this limit to three years per charge, with the possibility of stacking charges for prison sentences of up to nine years. 25 U.S.C. § 1302(7).

Congress emphasized, moreover, that states lack authority over non-member Indians absent congressional authorization and that *Duro* had accordingly created a jurisdictional void:

> [T]he states do not have jurisdiction to try Indians for criminal offenses committed within Indian reservations except in those few instances in which Congress has conferred such authority upon them. Thus, *Duro*'s holding that tribes lack criminal jurisdiction over non-member Indians has created a void in the preservation of law and order on many reservations.

H.R. Rep. No. 102-61, 1991 WL 83785, at *3-4 (1991); *see also, e.g.*, H.R. Conf. Rep. No. 101-938, at H 13596, 1990 WL 201576 ("[U]nless the Congress acts to fill this jurisdictional void, [non-member Indians] … may come onto an Indian reservation, commit a criminal misdemeanor, and know that there is no governmental entity that has the jurisdiction to prosecute them for their criminal acts. Such is the situation across Indian country since the Court's ruling[.]").

To fill the void, Congress had several options, including granting jurisdiction over non-member Indians to the states. One county attorney, for example, urged Congress not to restore tribal jurisdiction but instead to "grant jurisdiction over non-member Indians to the applicable State Court, at least in the case of 'open' reservations" where "the great majority of [residents] are non-Indian." *Hearing on S. 962 and S. 963 Before the S. Comm. on Indian Affs.*, 102d Cong., at 271-72 (1991) (letter of Duchesne Cnty. Att'y). But Congress rejected

31

such a solution, instead opting to reaffirm tribes' inherent authority over non-member Indians. 25 U.S.C. § 1301(2).

### 5.    Modern-Day Decisions

In keeping with the long course of legislation and case law described above, federal and state courts have continued to recognize that state criminal jurisdiction over Indians in Indian country is presumptively preempted absent congressional authorization. Given the deeply rooted acceptance of that principle, there has tended to be less direct litigation over it in the modern era. But judicial decision-making has continued to hinge on it in the context of resolving disputes over the Indian country status of the lands where a crime was committed—disputes that have assumed significance only because of the rule's continuing force.

Time and again, the courts have been called on to determine whether a reservation has been diminished or disestablished in order to resolve whether a state can prosecute an Indian for a crime taking place within its historic boundaries. *See, e.g.*, *Hagen v. Utah*, 510 U.S. 399, 408, 421 (1994) (as "Congress has not granted criminal jurisdiction to the State of Utah to try crimes committed by Indians in Indian country," Utah's prosecution of an Indian was permissible only because the locus of the crime was "not in Indian country"); *Solem v. Bartlett*, 465 U.S. 463, 465-466 & n.2 (1984) (holding that state lacked jurisdiction over Indian defendant because crime occurred in area that remained Indian country);

*DeCoteau v. Dist. Cnty. Ct.*, 420 U.S. 425, 427-28 (1975) (holding that "the state courts have jurisdiction over conduct … within the … [historic] reservation borders" because an act of Congress had "terminated" the reservation). Indeed, this was precisely the situation in *McGirt* and its predecessor case, *Murphy v. Royal*, 875 F.3d 896 (10th Cir. 2017), *aff'd sub nom.*, *Sharp v. Murphy*, 591 U.S. 977 (2020), in which this Court and the Supreme Court engaged in a painstaking analysis of the history of the Muscogee Creek Reservation, all for purposes of determining whether it had been disestablished such that Oklahoma could exercise criminal jurisdiction over Indians within its boundaries. Indian country status was again dispositive of state criminal jurisdiction.

The same was true in *Ute Indian Tribe of the Uintah and Ouray Reservation v. Utah*, 790 F.3d 1000 (10th Cir. 2015) (Gorsuch, J.), where this Court held that "unless Congress provides an exception to the rule—and it hasn't here—states possess 'no authority' to prosecute Indians for offenses in Indian country," *id.* at 1004 (quoting *Cheyenne-Arapaho Tribes*, 618 F.2d at 668). Accordingly, the state and its local subdivisions had "no legal entitlement" to prosecute Indians for offenses taking place in Indian country, *id.* at 1007; *see also United States v. Sands*, 968 F.2d 1058, 1061-63 (10th Cir. 1992) (holding that Oklahoma lacked criminal jurisdiction over Indians in Indian country).

33

The case law, moreover, continues to recognize no distinction between member and non-member Indians when it comes to the presumptive bar on state jurisdiction. *McGirt*, after all, involved a non-member Indian defendant, *see* 591 U.S. at 898 (stating that defendant "is an enrolled member of the Seminole Nation of Oklahoma and his crimes took place on the Creek Reservation"), and the Court readily affirmed the applicability of the general rule, *see id*. at 898, 929, 932.[6] In *Hagen*, the defendant was a "member of the Little Shell Band of Chippewa Indians of Montana," Petitioner's Brief, *Hagen* (No. 92-6281), 1993 WL 384821, at *4, the crime took place on land alleged to be part of the Uintah Reservation in Utah, and again the Court invoked the general rule, 510 U.S. at 401-02, 408. *See also, e.g.*, *City of Henryetta*, 809 F.Supp.3d at 1322 ("*McGirt* itself involved a Seminole citizen prosecuted for conduct on Creek land, a non-member Indian, and the Court drew no membership line. 'Indian' means Indian."); *Means v. Navajo Nation*, 432 F.3d 924, 927, 933 (9th Cir. 2005) (explaining that Arizona lacked jurisdiction within the Navajo Reservation over a defendant "who is an enrolled member of another Indian tribe," because "Arizona, like the majority of states, does not have

---

[6] The *McGirt* dissenters (each of whom joined, and one of whom authored, the *Castro-Huerta* majority opinion) did not dispute the applicability of these governing rules to the non-member Indian defendant. *See* 591 U.S. at 938-73 (Roberts, C.J., dissenting). They simply disagreed with the majority as to whether Congress had, in fact, provided the requisite statutory assent. *See id*. at 958-59 (discussing the "progression of major statutes" by which the dissent deemed Congress to have conferred the disputed criminal jurisdiction on Oklahoma).

jurisdiction to try Indians for offenses committed on a reservation"); *Olson v. N.D. Dep't of Transp.*, 909 N.W.2d 676, 681 (N.D. 2018) ("Here, the [tribe], not the State, had criminal jurisdiction over Olson, a non-member Indian, on the [the tribe's] land."); *State v. Allan*, 607 P.2d 426, 427 (Idaho 1980) (holding that "the state had no jurisdiction to try the defendant," a Quinault Indian, for bribing a county officer "within the boundaries of the Coeur d'Alene Indian Reservation"); Restatement of the Law of American Indians § 71 cmt. b (A.L.I. Mar. 2024 Update) ("Absent federal authorization, states have no jurisdiction over crimes committed by an Indian in Indian country."); William C. Canby, Jr., *American Indian Law in a Nutshell* 220 (8th ed. 2025) ("[T]ribes … have jurisdiction over crimes by nonmember Indians in Indian country and the state does not.").

\* \* \*

Congress and the courts have long agreed that states presumptively lack jurisdiction over Indians in Indian country and that concurrent criminal jurisdiction infringes on tribal sovereignty. Congress has legislated against the backdrop of these principles, carefully limiting even federal jurisdiction over Indians. Congress and the courts have also treated Indians and non-Indians, not members and non-members, as the relevant jurisdictional categories, with the one significant exception being the *Duro* decision that Congress acted swiftly to correct. Criminal jurisdiction over all Indians is hence the epitome of a domain in which "tradition

35

has recognized a sovereign immunity" from state authority, *Rehner*, 463 U.S. at

719-20 (citing *McClanahan*, 411 U.S. at 171), such that absent congressional

approval, a state's assertion of jurisdiction "unlawfully infringe[s] upon tribal self-

government," *Castro-Huerta*, 597 U.S. at 649. That long tradition should have

provided the basis for the district court's decision, but instead the district court

chose to depart dramatically from it.

## III. The District Court Improperly Balanced Interests Instead of Applying the Longstanding Presumption Against State Jurisdiction.

The district court's decision not to honor the presumption against state

criminal authority over Indians, but instead to engage in subjective interest

balancing, runs counter to the overwhelming force of authority described above,

and rests on two key legal errors.

### A. The District Court Misunderstood the Presumption to Apply Only to MCA Crimes.

The district court held that the presumptive rule against state jurisdiction

applies only to crimes enumerated in the MCA. It focused entirely on *McGirt* and

asserted that since that decision concerns the state's prosecution of a non-member

Indian for a MCA crime, the rule does not extend any further. App.272.

But the general rule long predates *McGirt*, *see supra* pp. 18-36, and the

courts have consistently applied it in the context of non-MCA crimes. In *Ute*

*Indian Tribe v. Utah*, for example, this Circuit invoked the rule with respect to

prosecutions for traffic offenses. 790 F.3d at 1004-1005. *See also, e.g.*, *Hagen*, 510

36

U.S. at 408 (distribution of controlled substances); *In re Blackbird*, 109 F. at 145

(net fishing); *In re Lincoln*, 129 F. at 247-248 (possession of deer meat); *State v.*

*Klindt*, 782 P.2d 401, 402-403 (Okla. Crim. App. 1989) (interfering with an

officer); *Jackson*, 16 N.W.2d at 754-55 (hunting partridge); *Big Sheep*, 243 P. at

1068-1070 (peyote possession); *Campbell*, 55 N.W. at 553-54 (adultery).

Thus, *McGirt* simply reaffirms a longstanding rule that precludes the District

Attorney from prosecuting Indians in Indian country for MCA and non-MCA

crimes alike. And it certainly does nothing to circumscribe the scope of the rule,

stating in broad terms that "this Court has long 'require[d] a clear expression of the

intention of Congress' before the state … may try Indians for conduct on their

lands," 591 U.S. at 929 (brackets in original) (quoting *Ex parte Crow Dog*, 109

U.S. at 572).

### B. The District Court Misinterpreted *Castro-Huerta* to Require *Bracker* Balancing in Assessing All Assertions of State Authority.

As discussed *supra* p. 15, *Castro-Huerta* describes two ways in which state

authority can be preempted in Indian country: "(i) by federal law under ordinary

principles of federal preemption, or (ii) when the exercise of state jurisdiction

would unlawfully infringe on tribal self-government." App.273 (quoting *Castro-*

*Huerta*, 597 U.S. at 638). *Castro-Huerta* involved the assertion of state authority

over non-Indians, and the Court accordingly engaged in *Bracker* balancing to

determine whether the exercise of such authority would result in unlawful infringement. 597 U.S. at 652-653.

The district court understood *Castro-Huerta* to suggest that *Bracker* balancing is *always* necessary to an infringement determination. App.276. In support of this position, which would sweep in cases involving tribal members as well, the district court cited *Castro-Huerta*'s footnote 2, which states:

> To the extent that a State lacks prosecutorial authority over crimes committed by Indians in Indian country (a question not before us), that would not be a result of the General Crimes Act. Instead, it would be the result of a separate principle of federal law that … precludes state interference with tribal self-government.

597 U.S. at 639 n.2 (citing *Bracker*, 448 U.S. at 142-143, 145; *McClanahan*, 411 U.S. at 171-172; and *Castro-Huerta* Part III–B).

Nothing about this statement decrees the universal deployment of *Bracker* balancing in all cases involving the assertion of state authority in Indian country. As discussed above, *see supra* pp. 16-18, the courts have long held that certain assertions of state authority, including the assertion of criminal jurisdiction over Indians, are presumptively preempted by virtue of their impact on tribal self-government. *Castro-Huerta*'s footnote 2 says nothing to the contrary. In referencing the "separate principle of federal law that … precludes state interference with tribal self-government," 597 U.S. at 639 n.2, it does not equate that principle with *Bracker* balancing in all circumstances—to have done so would

have meant the overruling, *sub silentio*, of a substantial number of Indian law precedents, and in a footnote no less. If Congress does not "hide elephants in mouseholes," *Whitman v. Am. Trucking Associations*, 531 U.S. 457, 468 (2001), the Court surely does not either.

*Bracker* itself explains that interest balancing does not apply to all assertions of state power, but instead pertains principally to situations involving state assertions of authority over *non*-Indians. Hence, after stating that "state law is generally inapplicable" to Indians in Indian country, *Bracker* explains that

> [m]ore difficult questions arise where, as here, a State asserts authority over the conduct of non-Indians engaging in activity on the reservation.… [This] has called for a particularized inquiry into the nature of the state, federal, and tribal interests at stake, an inquiry designed to determine whether, in the specific context, the exercise of state authority would violate federal law.

448 U.S. at 144-45.

The Supreme Court and this Court have accordingly construed *Bracker*'s balancing test as generally applicable to the assertion of jurisdiction over *non*-Indians. "As *Bracker* itself explained, … we formulated the balancing test to address the 'difficult questio[n]' that arises when 'a State asserts authority over the conduct of non-Indians'" in Indian country. *Wagnon v. Prairie Band*, 546 U.S. at 110 (brackets in original) (quoting *Bracker*, 448 U.S. at 144); *see also id*. at 99 ("[T]he *Bracker* interest-balancing test applies only where 'a State asserts authority over the conduct of non-Indians engaging in activity on the reservation.'" (quoting

*Bracker*, 448 U.S. at 144)); *Prairie Band v. Wagnon*, 476 F.3d at 823 (quoting same and holding application of *Bracker* balancing impermissible because "[t]he conduct of non-Indians … is not at issue here").

*McClanahan* (the other case cited in footnote 2 of *Castro-Huerta*) likewise draws a distinction between state assertions of authority over Indians and non-Indians. It upholds the long-settled rule that "[s]tate laws generally are not applicable to tribal Indians on an Indian reservation except where Congress has expressly provided that State laws shall apply," 411 U.S. at 170-71 (citation omitted), and specifically describes that rule as applying to "criminal jurisdiction over reservation Indians," *id.* at 178 & n.19. By contrast, it recognizes that balancing applies in cases where states posit authority over non-Indians. *Id.* at 171-72 (contrasting general rule with instances where "notions of Indian sovereignty have been adjusted to take account of the State's legitimate interests in regulating the affairs of non-Indians," including where "state courts have been allowed to try non-Indians" for conduct occurring in Indian country (citation omitted)). Similarly, in *New Mexico v. Mescalero Apache Tribe* (also cited by *Castro-Huerta*, 597 U.S. at 649), the Court identified "inherent tribal sovereignty" as an "independent barrier" to state authority distinct from *Bracker* interest balancing. 462 U.S. 324, 334 n.16 (1983).

40

To be sure, as the district court observed, the Supreme Court has not established a presumptive rule against *every* assertion of state authority over Indians in Indian country. *See* App.274 n.3 (citing *California v. Cabazon Band of Mission Indians*, 480 U.S. 202, 214-215 (1987)). Those are the rare circumstances, though, where a state seeks to exercise jurisdiction over a tribe or tribal members in a domain lacking a strong tradition of tribal sovereignty. For example, in balancing interests to determine whether a state could require a tribal member to obtain a state liquor license, the *Rehner* Court explained that under federal policy dating back to the founding era, "tribes have long ago been divested of any inherent self-government over liquor regulation," 463 U.S. at 726, and "States have also been permitted, and even required, to impose regulations related to liquor transactions," *id.* at 723; *see also id.* at 731 ("[B]ecause of the lack of a tradition of self-government in the area of liquor regulation, it is not necessary that Congress indicate expressly that the State has jurisdiction to regulate the licensing and distribution of alcohol."). And *Cabazon* sanctioned interest balancing in the decidedly non-traditional domain of a tribal casino's engagement with non-Indian customers. 480 U.S. at 214-222.

*Castro-Huerta*'s use of *Bracker* balancing to determine whether Oklahoma's prosecution of non-Indians "would unlawfully infringe upon tribal self-government," 597 U.S. at 638, 649-651, fits this pattern. Tribes have long been

deemed divested of criminal jurisdiction over non-Indians, *id.* at 650 ("Indian tribes lack criminal jurisdiction to prosecute crimes committed by non-Indians[.]" (citing *Oliphant v. Suquamish Indian Tribe*, 435 U.S. 191, 195 (1978))), and states have long exercised at least some measure of such jurisdiction in Indian country, *see id.* at 637 (discussing *McBratney*).

The contrast with the present situation could not be clearer. Indeed, in *Castro-Huerta*, Oklahoma accepted that "[t]he policy of leaving *Indians* free from state jurisdiction and control is deeply rooted in this Nation's history," Brief for the Petitioner at 36, *Castro-Huerta* (No. 21-429), 2022 WL 628282, at *36 (brackets in original) (emphasis added by Oklahoma) (quoting *McGirt*, 591 U.S. at 928), while asserting that this principle "says nothing about state power over non-Indians," *id.*

*Castro-Huerta* in no way compels the courts to depart from the longstanding presumption against state jurisdiction over Indians, as the Court's reliance on the Tenth Amendment as the linchpin for its holding, *see* 597 U.S. at 636, 653, amply confirms. The Tenth Amendment reserves to states only "that residuum of sovereignty not delegated to the United States by the Constitution[.] *Skiriotes v. Florida*, 313 U.S. 69, 77 (1941) (citation omitted). "Virtually by definition, the[] powers [delegated to Congress by the Constitution] are not powers that the Constitution 'reserved to the States.'" *United States v. Comstock*, 560 U.S. 126,

42

144 (2010). Since the Constitution places Indians in Indian country "under the exclusive control of the Federal Government," *Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 72 (1996), and vests in Congress the "exclusive" authority to legislate with respect to them, *Brackeen*, 599 U.S. at 272 (citation omitted), the Tenth Amendment has no role to play in assessing state efforts to assert authority directly over Indians. This stands in sharp distinction to *Castro-Huerta*'s reliance on the Amendment as preserving state jurisdiction over non-Indian defendants. Not surprisingly, then, this Court continues to invoke the presumption against state authority over Indian defendants after *Castro-Huerta*. *See Hopson*, 150 F.4th at 1299 ("[T]he Supreme Court 'has long "require[d] *a clear expression* of the intention of Congress" before the state or federal government may try Indians for conduct on their lands.'" (quoting *McGirt*, 591 U.S. at 929).

Nor does the District Attorney's focus on non-member Indians make *Bracker* balancing appropriate in this case. To be sure, in the civil context, the Court has generally treated non-member Indians like non-Indians, reasoning that they are "not constituents of the governing Tribe" and thus "[f]or most practical purposes … stand on the same footing as non-Indians[.]" *Confederated Tribes*, 447 U.S. at 161; *see also Rehner*, 463 U.S. at 720 n.7 (1983) (*Confederated Tribes* "held that [non-member Indians] … 'stand on the same footing as non-Indians' … insofar as imposition of tax on cigarette sales is concerned."). But such reasoning

43

does not translate to the criminal context. The Supreme Court and this Court have consistently described the presumptive rule in the domain of criminal jurisdiction as applying broadly to "Indians," not just to "members," and the Supreme Court (along with others) has applied the rule in multiple cases involving non-member Indians. *See supra* pp. 34-35.

Indeed, when the *Duro* Court sought to extend *Confederated Tribe*'s reasoning to deprive tribes of criminal jurisdiction over non-member Indians, Congress immediately intervened. Congress took note of the Court's reasoning— *see* H.R. Rep. No. 102-61, 1991 WL 83785, at *2-3 (1991) ("Since Duro could not vote in tribal elections, hold tribal office, or sit on a tribal jury, the Supreme Court viewed his relationship with the tribe as the functional equivalent of a non-Indian.")—and unequivocally repudiated its extension to the criminal context:

> Congress has recognized that tribal governments afford a broad array of rights and privileges to non-tribal members. Non-tribal member Indians own property on Indian reservations, their children attend tribal schools, their families receive health care from tribal hospitals and clinics. Federally-administered programs and services are provided to Indian people because of their status as Indians, without regard to whether their tribal membership is the same as their reservation residence. The issue of who is an Indian for purposes of Federal law is well-settled as a function of two hundred years of Constitutional and case law and Federal statutes.

H.R. Conf. Rep. No. 101-938, at H 13596, 1990 WL 201576.

What Congress said generally about the integration of non-member Indians into reservation communities is amply borne out on the Creek Reservation: As the

44

Nation's Secretary of State testified, non-member Indians are deeply interwoven in the Muscogee Creek community, with many non-member Indians residing on and owning property within the Reservation, intermarrying and raising children with Creek citizens, working for the Nation, receiving services from the Nation that are unavailable to non-Indians, and often coming from tribes with histories and land bases intertwined with those of the Nation. *See* App. 292-310 (Tr.15:16-33:1).

In light of this integration, which is replicated throughout much of Indian country, Congress reaffirmed that tribal "powers of self-government" include "the inherent power of Indian tribes … to exercise criminal jurisdiction over *all Indians*[.]" 25 U.S.C. § 1301(2) (emphasis added). Thus, of all areas of federal Indian law, this might be the one in which judicial interest balancing is the *least* appropriate for determining whether a state's assertion of authority over Indians, including specifically non-member Indians, "would unlawfully infringe on tribal self-government," App.276 (quoting *Castro-Huerta*, 597 U.S. at 649).

### C. The District Court's Decision Illustrates the Perils of Subjective Judicial Balancing.

The district court upended a rule grounded in two centuries' worth of judicial precedent and congressional enactments with a two-page analysis of the tribal, federal, and state interests it perceived to be at stake in this case, App.277-278, an analysis that well illustrates the perils of judicial balancing.

**1.**    The district court began by declaring that "the State's exercise of concurrent jurisdiction … does not infringe upon the Nation's sovereignty" because it "does not displace or diminish the Nation's jurisdiction and authority to prosecute those same individuals for violations of tribal law." App.277. But, as Congress and the Courts have long understood, concurrent jurisdiction can interfere with tribal sovereignty in significant ways.

For example, prosecutors make different judgments about which charges to bring and which punishments to seek. As the District Attorney acknowledged, "the decision to charge a suspect with a crime or decline prosecution" is "one of the most important functions performed by" his office, and good prosecutors can disagree about such decisions. App.361 (Tr.206:5-24).

Likewise, judges in different systems can come to different conclusions about appropriate punishments. While the Nation's District Court regularly orders pretrial detention and imposes substantial prison sentences, App.326-327 (Tr.63:17-64:22), its prosecutors and judges also pursue a rehabilitative approach when doing so is consistent with public safety, App.327-328 (Tr.64:23-65:5); App.339-340 (Tr.112:23-113:25). Concurrent prosecutions interfere with such decisions. For example, if the Nation's District Court opts to require an offender to undergo in-patient substance abuse treatment while a Tulsa County judge orders imprisonment, the County judge's prison sentence will make the substance abuse

46

treatment impossible. *See* App.356 (Tr.141:22-24) ("[I]t's hard to get treatment and it's hard to submit yourself to any kind of rehabilitation services if you're incarcerated."). In short, where there are concurrent prosecutions, the sovereign with the harsher judgment will have its way every time. Any decision by the Nation's justice system to show mercy or seek rehabilitation—*for Indians within the Nation's Reservation boundaries, many of whom are integrated into Creek families and the fabric of Creek life*—is thus subject to a veto by the District Attorney.

Furthermore, the district court fully ignored how its recognition of concurrent criminal jurisdiction might impact the *policing* of Indians. The Nation has cross-deputization agreements with nearly every law enforcement agency on the Reservation, including the Tulsa County Sheriff, App.57-71. These agreements do not grant state agencies carte blanche to police Indians. They impose qualifications for officers to be granted tribal cross-commissions, App.61-62, and they preserve the Nation's right to revoke any such cross-commissions, App.63. If state and local law enforcement could police Indians without a cross-deputization agreement, tribes would have no direct means of protecting Indians on their reservations from bad-apple outliers in the state and local police. *See also infra* pp. 54-56 (addressing erroneous dismissal of claims against Sheriff Regalado).

Congress's legislation on criminal jurisdiction in Indian country has long reflected the common-sense understanding that concurrent jurisdiction interferes with tribal sovereignty. The GCA's limitations on federal jurisdiction reflect the tradition of "tribal independence," *Hopson*, 150 F.4th at 1299-1300; the MCA is a "*carefully limited intrusion* of federal power into the otherwise exclusive jurisdiction of the Indian tribes," *Wheeler*, 435 U.S. at 325 n.22 (emphasis added) (citation omitted); and the 1968 amendments to P.L. 280 required tribal consent to state jurisdiction. And when faced with a jurisdictional void specifically for non-member Indians committing non-MCA crimes, Congress chose to restore jurisdiction to the tribes without granting concurrent jurisdiction to the states. *See supra* pp. 29-32.[7]

**2.**    The opinion below next asserts that "the State's exercise of concurrent jurisdiction serves tribal interests in prosecuting nonmember Indians[.]" App.277. The Nation, of course, has a different understanding of its own interests. It is concerned about the myriad ways in which concurrent jurisdiction interferes with

---

[7] Outside the criminal context, the Court has also frequently recognized that concurrent jurisdiction interferes with tribal sovereignty. *E.g.*, *Williams v. Lee*, 358 U.S. 217, 223 (1959) ("There can be no doubt that to allow the exercise of state jurisdiction here [over a private law cause of action against a tribal member] would undermine the authority of the tribal courts over Reservation affairs and hence would infringe on the right of the Indians to govern themselves."); *Mescalero Apache Tribe*, 462 U.S. 338 ("[C]oncurrent jurisdiction would effectively nullify the Tribe's authority to control hunting and fishing on the reservation. Concurrent jurisdiction would empower New Mexico wholly to supplant tribal regulations.").

its sovereignty, *see supra* pp. 46-47, which is why it is bringing this lawsuit. And as Congress recognized by enacting the tribal consent requirement in 1968, *see supra* pp. 28-29, it is the tribes themselves, not state prosecutors or federal judges, who are best fit to determine whether state criminal jurisdiction over Indians in Indian country would serve tribal interests. As far as the Nation is aware, since 1968 hardly any tribes have consented to blanket state jurisdiction within their reservations.

3.    The district court further stated that "the Nation's interest in prosecuting nonmember Indians to the exclusion of the State is of lesser weight than its legitimate governmental interest in prosecuting its own members to the State's exclusion." App.277 (citing *Confederated Tribes*, 447 U.S. at 161). But Congress emphatically rejected the extension of *Confederated Tribe*'s reasoning into the criminal context, made extensive findings about non-members' intertwinement in tribal communities throughout Indian country (findings consistent with the evidence about integration of non-member Indians into the Creek community), and modified federal law to clarify that tribal "powers of self-government" include criminal jurisdiction over non-member Indians, 25 U.S.C. § 1301(2). *See supra* pp. 29-32. The district court flatly ignored all this.

4.    The district court then declared that the State's concurrent jurisdiction "does not infringe upon federal interests." App.277. This disregards entirely "the

federal interest in encouraging tribal self-government," *Bracker*, 448 U.S. at 144, Congress's determination that tribal criminal jurisdiction over non-member Indians is an important feature of tribal "self-government," 25 U.S.C. § 1301(2), and the practical reality (long recognized by Congress) that concurrent state jurisdiction interferes with this tribal power, *see supra* pp. 46-48.

5.       Finally, the district court asserted that the State has "a strong interest" in preventing and punishing crime, App.278, without making a single finding supporting the notion that state jurisdiction is needed to protect such interests. No entity has a greater concern than the Creek Nation with protecting public safety on the Creek Reservation. As described above, *supra* pp. 3-7, the Nation has invested substantial resources in all three arms of its criminal law enforcement infrastructure and works effectively with other jurisdictions on the Reservation to combat crime in a highly collaborative and productive manner. Bald assertions about state interests should not suffice to upend tribal governance and congressional policymaking in this domain.

\* \* \*

Justice Scalia famously inveighed against judicial balancing tests, correctly recognizing that they not only allow but require judges to make policy determinations that more properly fall within Congress's purview:

> The problem is that courts are less well suited than Congress to perform this kind of balancing in every case. The burdens and the

> benefits are always incommensurate, and cannot be placed on the
> opposite balances of a scale without assigning a policy-based weight
> to each of them. It is a matter not of weighing apples against apples,
> but of deciding whether three apples are better than six tangerines.

*Dep't of Revenue of Ky. v. Davis*, 553 U.S. 328, 360 (2008) (Scalia, J., concurring in part). He advised that courts should thus limit their use of balancing tests and "leave these quintessentially legislative judgments with the branch to which the Constitution assigns them." *Id.* Nowhere is this more true than in Indian affairs, where "[j]udicial deference to the paramount authority of Congress in matters concerning Indian policy remains a central and indispensable principle of the field of Indian law[.]" *Michigan v. Bay Mills Indian Cmty.*, 572 U.S. 782, 803 (2014) (citation omitted).

The district court's decision is a case in point for adhering to that cautionary advice, and for following long-established rules regarding the allocation of jurisdiction in Indian country. In just two pages of balancing analysis, necessarily based on the district court's subjective assessment of the relative interests involved, the opinion below repeatedly contravenes Congress's and the courts' views of tribal and federal interests, and unilaterally grants state jurisdiction in contradiction of Congress's carefully calibrated scheme for doing so. If allowed to stand, the district court's approach would reduce to rubble nearly two centuries' worth of case law and a course of legislation culminating in (1) Congress's decision in 1968 to require tribal consent before any further conferrals of state

criminal jurisdiction in Indian country can take place, and (2) Congress's decision

in enacting the *Duro* fix to reaffirm tribal criminal jurisdiction over non-member

Indians rather than to confer such jurisdiction on the states.

The district court committed clear legal error in determining that the merits

of the Nation's claims do not support its request for declaratory and injunctive

relief.

## IV.    The District Court Erred in Holding that the Other Injunction Factors Weigh Against an Injunction.

Under clear Circuit precedent, the non-merits factors bearing on injunctive

relief—irreparable harm, the balance of harms, and the public interest, *Prairie

Band v. Wagnon*, 476 F.3d at 822—all call for the issuance of such relief.

Regarding irreparable harm, the district court reasoned that the District

Attorney's prosecution of non-member Indians "does not prevent the Nation from

prosecuting the same nonmember Indians under tribal law." App.279. This ignores

the significant ways that concurrent jurisdiction interferes with tribal sovereignty,

*supra* pp. 46-47, as well as Circuit precedent. This Court has "repeatedly stated

that … an invasion of tribal sovereignty can constitute irreparable injury,"

*Wyandotte Nation*, 443 F.3d at 1255, and has found actions like those at issue here

to represent the very sort of invasion warranting an injunction. Hence, when

county attorneys prosecuted traffic offenses by Indians on the Ute reservation, this

52

Court concluded that "the harm to tribal sovereignty … is perhaps as serious as any to come our way in a long time." *Ute Indian Tribe v. Utah*, 790 F.3d at 1005.

As for the balance-of-harm and public-interest factors, the district court correctly stated that the two factors "merge when the government is the party opposing" the injunction. App.279. But the district court's assessment of these merged factors again defies Circuit precedent. Noting that there are 670,000 residents of Tulsa County and sixty prosecutors in the Tulsa County District Attorney's office, the court then asserted in conclusory fashion that "[a]ny alleged injury to the Nation's sovereignty resulting from the State's exercise of concurrent criminal jurisdiction over nonmember Indians does not outweigh the injury to the citizens of Tulsa County—both Indian and non-Indian—or the adverse effect to the public interest by enjoining the defendant[.]"App.279-280.

But again, this Circuit has reached the opposite conclusion with respect to county attorneys unlawfully prosecuting Indians in Indian country. "On the Tribe's side of the ledger lies … the paramount federal policy of ensuring that Indians do not suffer interference with their efforts to develop strong self-government." *Ute Indian Tribe v. Utah*, 790 F.3d at 1007 (quotation marks and ellipsis omitted). The purported harms to the county and the public interest, by contrast, "shrink to all but the vanishing point" where the county has "no legal entitlement to [conduct the prosecutions] in the first place." *Id.* (quotation marks omitted).

53

Furthermore, even if factual findings *could* carry the day on these two injunction factors, the figures cited by the district court certainly do not. The Nation employs more prosecutors on a per capita basis than Tulsa County, App.387, and the district court made no findings questioning their ability to prosecute Indians on the Reservation. Nor did it make any findings questioning the skill and experience of the Nation's well-resourced Lighthorse police and judiciary to discharge their duties. *Supra* pp. 3-7. Indeed, the experience of other counties shows that it is entirely possible for a district attorney and the Nation to effectively protect public safety without either of them prosecuting people unlawfully. *See supra* pp. 6-7.

## V.    The District Court Improperly Dismissed the Claims Against Sheriff Regalado.

In a terse order, the district court dismissed the Nation's claims against Sheriff Regalado on the grounds that "county sheriffs do not make prosecutorial decisions." App.257. However, the Nation filed suit to stop *any* unlawful assertion of criminal jurisdiction by the defendants, not just the filing of charges. *See* App.17-19. The Sheriff is a peace officer with powers of criminal investigation, enforcement, and arrest authority under Oklahoma law. *See* Okla. Stat. tit. 19, § 516 (setting forth duties); *id.* § 180.61 (sheriff among entities "charged with enforcing the laws relating to public peace and safety"); *id.* tit. 51, § 24A.3(5) (sheriff among entities "charged with enforcing state or local criminal laws and

54

initiating criminal prosecutions"). Such duties, when exercised with respect to Indian criminal suspects, are squarely proscribed under federal law. *See*, *e.g.*, *United States v. Little*, 119 F.4th 750, 766 (10th Cir. 2024) ("[O]fficers of the Jenks, Oklahoma, Police Department lacked jurisdiction when they investigated the homicide, arrested and interrogated Little [an Indian], and searched Little's home" within the Nation's Reservation.); *United States v. Patterson*, Case No. CR-20-71-RAW, 2021 WL 633022, at *3 (E.D. Okla. Feb. 18, 2021) ("In light of the *McGirt* decision, … Deputy Youngblood lacked jurisdictional authority to arrest Defendant," an Indian.), *aff'd*, No. 21-7053, 2022 WL 17685602 (10th Cir. Dec. 15, 2022).

To be clear, the Nation does not seek to prevent the Sheriff from exercising law enforcement authority with respect to Indian suspects within the Reservation, so long as he does so in accordance with the parties' cross-deputization agreement, App.57-71. However, that agreement does not authorize the Sheriff to book Indian defendants into the county jail for violations of State law. *See* App.65 (Section 8(D)). In contradiction of its terms, the Sheriff has now openly implemented a policy of booking, detaining, and incarcerating non-member Indians for conduct arising within the Creek Reservation. He has informed those under his authority—and also informed the Nation—that non-member Indians "will not be booked or charged into tribal courts but rather STATE court and booked into [the Tulsa

55

County Jail] as any other citizen" and that "[t]he *only tribal arrests* that will take place will be Creek Citizens …. All others will be booked into [the Tulsa County Jail] and charged in Tulsa Co. District Court." App.73 (emphasis added). The Sheriff is not only asserting criminal jurisdiction over Indians but also purporting to deny the Nation the ability to do so, all in contravention of federal law. The district court was wrong to excuse him from this case.

## CONCLUSION

For the foregoing reasons, the Nation urges this Court to reverse the district court's decision and remand with instructions that the court issue a declaratory judgment and enjoin the unlawful exercise of criminal jurisdiction over Indians for conduct within the Creek Reservation.

## ORAL ARGUMENT STATEMENT

The Nation respectfully suggests that oral argument would assist the Court in deciding the critical issues of federal Indian law presented by this appeal.

Dated: April 29, 2026                    Respectfully submitted,

                                         /s/ Riyaz A. Kanji
Geraldine Wisner                         Riyaz A. Kanji
Deputy Attorney General                  David A. Giampetroni
MUSCOGEE (CREEK) NATION                   Joshua C. Handelsman
P.O. Box 580                             KANJI & KATZEN, P.L.L.C.
Okmulgee, OK 74447                       P.O. Box 3971
                                         Ann Arbor, MI 48106
O. Joseph Williams                       (734) 769-5400
O. JOSEPH WILLIAMS LAW OFFICE, PLLC      rkanji@kanjikatzen.com
The McCulloch Building
114 N. Grand Avenue, Suite 520           Philip H. Tinker
P.O. Box 1131                            KANJI & KATZEN, P.L.L.C.
Okmulgee, OK 74447                       12 N. Cheyenne Avenue, Suite 220
                                         Tulsa, OK 74103

*Counsel for Appellant Muscogee (Creek) Nation*

## CERTIFICATE OF SERVICE

I hereby certify that on April 29, 2026, I electronically filed the foregoing using the Court's CM/ECF system, which will send notification of such filing to the following:

Trevor S. Pemberton, trevor@permbertonlawgroup.com

Phillip G. Whaley, pwhaley@ryanwhaley.com

Grant M. Lucky, glucky@ryanwhaley.com

Patrick R. Pearce, Jr., rpearce@ryanwhaley.com

Kannon K. Shanmugam, kshanmugam@paulweiss.com

William Thomas Marks, wmarks@paulweiss.com

Keith A. Wilkes, kwilkes@hallestill.com

By: */s/ Riyaz A. Kanji*
   Riyaz A. Kanji
   KANJI & KATZEN, P.L.L.C.
   P.O. Box 3971
   Ann Arbor, MI 48106
   (734) 769-5400
   rkanji@kanjikatzen.com

   *Counsel for Appellant*
   *Muscogee (Creek) Nation*

**CERTIFICATE OF COMPLIANCE**

1.      This brief complies with the type-volume limitations of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 12,954 words, excluding the parts of the document exempted by Federal Rule of Appellate Procedure 32(f) and 10th Circuit Rule 32(B).

2.      This document complies with the typeface and type style requirements of Federal Rule of Appellate Procedure 32(a)(5) and 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word 365 in 14-point Times New Roman font.

3.      I hereby certify that the document was filed using the CM/ECF system, no privacy redactions are required for this filing, the electronic copy of this filing was scanned for viruses using Microsoft Defender (updated on 04/29/2026), and no viruses were detected.

Date: April 29, 2026

By: */s/ Riyaz A. Kanji*
Riyaz A. Kanji
KANJI & KATZEN, P.L.L.C.
P.O. Box 3971
Ann Arbor, MI 48106
(734) 769-5400
rkanji@kanjikatzen.com

*Counsel for Appellant*
*Muscogee (Creek) Nation*

# STATUTORY ADDENDUM

# General Crimes Act and Relevant Predecessor Statutes

## 18 U.S.C. § 1152. Laws governing [Current Version]

Except as otherwise expressly provided by law, the general laws of the United States as to the punishment of offenses committed in any place within the sole and exclusive jurisdiction of the United States, except the District of Columbia, shall extend to the Indian country.

This section shall not extend to offenses committed by one Indian against the person or property of another Indian, nor to any Indian committing any offense in the Indian country who has been punished by the local law of the tribe, or to any case where, by treaty stipulations, the exclusive jurisdiction over such offenses is or may be secured to the Indian tribes respectively.

(June 25, 1948, c. 645, 62 Stat. 757.)

## Trade and Intercourse Act of 1790

Sec. 5. *And be it further enacted*, That if any citizen or inhabitant of the United States, or of either of the territorial districts of the United States, shall go into any town, settlement or territory belonging to any nation or tribe of Indians, and shall there commit any crime upon, or trespass against, the person or property of any peaceable and friendly Indian or Indians, which, if committed within the jurisdiction of any state, or within the jurisdiction of either of the said districts, against a citizen or white inhabitant thereof, would be punishable by the laws of such state or district, such offender or offenders shall be subject to the same punishment, and shall be proceeded against in the same manner as if the offence had been committed within the jurisdiction of the state or district to which he or they may belong, against a citizen or white inhabitant thereof.

Sec. 6. *And be it further enacted*, That for any of the crimes or offences aforesaid, the like proceedings shall be had for apprehending, imprisoning or bailing the offender, as the case may be, and for recognizing the witnesses for their appearance to testify in the case, and where the offender shall be committed, or the witnesses shall be in a district other than that in which the offence is to be tried, for the removal of the offender and the witnesses or either of them, as the case may be, to the district in which the trial is to be had, as by the act to establish the judicial

courts of the United States, are directed for any crimes or offences against the United States.

(Act of July 22, 1790, ch. 33, §§ 5-6, 1 Stat. 137, 138.)


## Act of March 3, 1817

*Be it enacted by the Senate and House of Representatives of the United States of America, in Congress assembled*, That if any Indian, or other person or persons, shall, within the United States, and within any town, district, or territory, belonging to any nation or nations, tribe or tribes, of Indians, commit any crime, offence, or misdemeanor, which, if committed in any place or district of country under the sole and exclusive jurisdiction of the United States, would, by the laws of the United States, be punished with death, or any other punishment, every such offender, on being thereof convicted, shall suffer the like punishment as is provided by the laws of the United States for the like offences, if committed within any place or district of country under the sole and exclusive jurisdiction of the United States.

Sec. 2. *And be it further enacted*, That the superior courts in each of the territorial districts, and the circuit courts and other courts of the United States, of similar jurisdiction in criminal causes, in each district of the United States, in which any offender against this act shall be first apprehended or brought for trial, shall have, and are hereby invested with, full power and authority to hear, try, and punish, all crimes, offences, and misdemeanors, against this act; such courts proceeding therein in the same manner as if such crimes, offences, and misdemeanors, had been committed within the bounds of their respective districts: *Provided*, That nothing in this act shall be so construed as to affect any treaty now in force between the United States and any Indian nation, or to extend to any offence committed by one Indian against another, within any Indian boundary.

Sec. 3. *And be it further enacted*, That the President of the United States, and the governor of each of the territorial districts, where any offender against this act shall be apprehended or brought for trial, shall have, and exercise, the same powers, for the punishment of offences against this act, as they can severally have and exercise by virtue of the fourteenth and fifteenth sections of an act, entitled "An act to regulate trade and intercourse with the Indian tribes, and to preserve peace on the frontiers," passed thirtieth March, one thousand eight hundred and two, for the punishment of offences therein described.

(Act of Mar. 3, 1817, ch. 92, 3 Stat. 383.)

## Act of June 30, 1834

Sec. 25. *And be it further enacted*, That so much of the laws of the United States as provides for the punishment of crimes committed within any place within the sole and exclusive jurisdiction of the United States, shall be in force in the Indian country: *Provided*, The same shall not extend to crimes committed by one Indian against the person or property of another Indian.

(Act of June 30, 1834, ch. 161, § 25, 4 Stat. 729, 733.)

## Act of March 27, 1854

Sec. 3. *And be it further enacted*, That nothing contained in the twenty-fifth section of an act entitled "An act to regulate intercourse with the Indian tribes, and preserve peace on the frontiers," approved thirtieth of June, eighteen hundred and thirty-four, shall be construed to extend or apply to said Indian country any of the laws enacted for the District of Columbia, and that nothing contained in the twentieth section of the said act, which provides for the punishment of offences therein specified, shall be construed to extend to any Indian committing said offences in the Indian country, or to any Indian committing any offence in the Indian country who has been punished by the local law of the tribe, or in any case where, by treaty stipulations, the exclusive jurisdiction over such offences may now or hereafter be secured to said Indian tribes, respectively, and any thing in said act inconsistent with this act be, and the same is hereby repealed.

(Act of Mar. 27, 1854, ch. 26, § 3, 10 Stat. 269, 270.)

# Major Crimes Act (Current and Original Versions)

## 18 U.S.C. § 1153. Offenses committed within Indian country [Current Version]

**(a)** Any Indian who commits against the person or property of another Indian or other person any of the following offenses, namely, murder, manslaughter, kidnapping, maiming, a felony under chapter 109A, incest, a felony assault under section 113, an assault against an individual who has not attained the age of 16 years, felony child abuse or neglect, arson, burglary, robbery, and a felony under section 661 of this title within the Indian country, shall be subject to the same law and penalties as all other persons committing any of the above offenses, within the exclusive jurisdiction of the United States.

**(b)** Any offense referred to in subsection (a) of this section that is not defined and punished by Federal law in force within the exclusive jurisdiction of the United States shall be defined and punished in accordance with the laws of the State in which such offense was committed as are in force at the time of such offense.

(June 25, 1948, c. 645, 62 Stat. 758; May 24, 1949, c. 139, § 26, 63 Stat. 94; Pub.L. 89-707, § 1, Nov. 2, 1966, 80 Stat. 1100; Pub.L. 90-284, Title V, § 501, Apr. 11, 1968, 82 Stat. 80; Pub.L. 94-297, § 2, May 29, 1976, 90 Stat. 585; Pub.L. 98-473, Title II, § 1009, Oct. 12, 1984, 98 Stat. 2141; Pub.L. 99-303, May 15, 1986, 100 Stat. 438; Pub.L. 99-646, § 87(c)(5), Nov. 10, 1986, 100 Stat. 3623; Pub.L. 99-654, § 3(a)(5), Nov. 14, 1986, 100 Stat. 3663; Pub.L. 100-690, Title VII, § 7027, Nov. 18, 1988, 102 Stat. 4397; Pub.L. 103-322, Title XVII, § 170201(e), Title XXXIII, § 330021(1), Sept. 13, 1994, 108 Stat. 2043, 2150; Pub.L. 109-248, Title II, § 215, July 27, 2006, 120 Stat. 617; Pub.L. 113-4, Title IX, § 906(b), Mar. 7, 2013, 127 Stat. 125.)

## Act of March 3, 1885

Sec. 9. That immediately upon and after the date of the passage of this act all Indians, committing against the person or property of another Indian or other person any of the following crimes, namely, murder, manslaughter, rape, assault with intent to kill, arson, burglary, and larceny within any Territory of the United States, and either within or without an Indian reservation, shall be subject therefor to the laws of such Territory relating to said crimes, and shall be tried therefor in

the same courts and in the same manner and shall be subject to the same penalties as are all other persons charged with the commission of said crimes, respectively; and the said courts are hereby given jurisdiction in all such cases; and all such Indians committing any of the above crimes against the person or property of another Indian or other person within the boundaries of any State of the United States, and within the limits of any Indian reservation, shall be subject to the same laws, tried in the same courts and in the same manner, and subject to the same penalties as are all other persons committing any of the above crimes within the exclusive jurisdiction of the United States.

(Act of Mar. 3, 1885, ch. 341, § 9, 23 Stat. 362, 385.)

# Public Law 280 (Key Provisions Affecting Criminal Jurisdiction)

## Act of Aug. 15, 1953

Sec. 2.[1] Title 18, United States Code, is hereby amended by inserting in chapter 53 thereof immediately after section 1161 a new section, to be designated as section 1162, as follows:

"§ 1162. State jurisdiction over offenses committed by or against Indians in the Indian country

"(a) Each of the States listed in the following table shall have jurisdiction over offenses committed by or against Indians in the areas of Indian country listed opposite the name of the State to the same extent that such State has jurisdiction over offenses committed elsewhere within the State, and the criminal laws of such State shall have the same force and effect within such Indian country as they have elsewhere within the State:

| "State of | Indian country affected |
| --- | --- |
| California | All Indian country within the State |
| Minnesota | All Indian country within the State, except the Red Lake Reservation |
| Nebraska | All Indian country within the State |
| Oregon | All Indian country within the State, except the Warm Springs Reservation |
| Wisconsin | All Indian country within the State, except the Menominee Reservation |

"(b) Nothing in this section shall authorize the alienation, encumbrance, or taxation of any real or personal property, including water rights, belonging to any Indian or any Indian tribe, band, or community that is held in trust by the United

---

[1] Section 2 of P.L. 280 remains codified at 18 U.S.C. § 1162. The only substantive changes made to 18 U.S.C. § 1162 since this original enactment are: the addition of Alaska to the list of states; the removal of the exception for the Menominee Reservation in Wisconsin; and the addition of subsection (d), which allows for tribes in the listed states to request concurrent federal jurisdiction.

States or is subject to a restriction against alienation imposed by the United States; or shall authorize regulation of the use of such property in a manner inconsistent with any Federal treaty, agreement, or statute or with any regulation made pursuant thereto; or shall deprive any Indian or any Indian tribe, band, or community of any right, privilege, or immunity afforded under Federal treaty, agreement, or statute with respect to hunting, trapping, or fishing or the control, licensing, or regulation thereof.

 "(c) The provisions of sections 1152 and 1153 of this chapter shall not be applicable within the areas of Indian country listed in subsection (a) of this section."

 .…

 Sec. 6.[2] Notwithstanding the provisions of any Enabling Act for the admission of a State, the consent of the United States is hereby given to the people of any State to amend, where necessary, their State constitution or existing statutes, as the case may be, to remove any legal impediment to the assumption of civil and criminal jurisdiction in accordance with the provisions of this Act: *Provided*, That the provisions of this Act shall not become effective with respect to such assumption of jurisdiction by any such State until the people thereof have appropriately amended their State constitution or statutes as the case may be.

 Sec. 7.[3] The consent of the United States is hereby given to any other State not having jurisdiction with respect to criminal offenses or civil causes of action, or with respect to both, as provided for in this Act, to assume jurisdiction at such time and in such manner as the people of the State shall, by affirmative legislative action, obligate and bind the State to assumption thereof.

(Act of Aug. 15, 1953, ch. 505, §§ 2, 6-7, 67 Stat. 588, 590.)

---

[2] Section 6 of P.L. 280 is currently codified at 25 U.S.C. § 1324.

[3] Congress repealed Section 7 in 1968, with the caveat that "such repeal shall not affect any cession of jurisdiction made pursuant to such section prior to its repeal." Act of Apr. 11, 1968, Pub. L. No. 90-284, § 403, 82 Stat. 73, 79. It replaced Section 7 with 25 U.S.C. § 1321, which requires tribal consent for the assumption of state jurisdiction (and is included below in this statutory addendum).

# 1968 Amendments to Public Law 280 (Key Provisions)

## 25 U.S.C. § 1321. Assumption by State of criminal jurisdiction[4]

**(a) Consent of United States**

**(1) In general**
The consent of the United States is hereby given to any State not having jurisdiction over criminal offenses committed by or against Indians in the areas of Indian country situated within such State to assume, with the consent of the Indian tribe occupying the particular Indian country or part thereof which could be affected by such assumption, such measure of jurisdiction over any or all of such offenses committed within such Indian country or any part thereof as may be determined by such State to the same extent that such State has jurisdiction over any such offense committed elsewhere within the State, and the criminal laws of such State shall have the same force and effect within such Indian country or part thereof as they have elsewhere within that State.

**(2) Concurrent jurisdiction**
At the request of an Indian tribe, and after consultation with and consent by the Attorney General, the United States shall accept concurrent jurisdiction to prosecute violations of sections 1152 and 1153 of Title 18 within the Indian country of the Indian tribe.

**(b) Alienation, encumbrance, taxation, and use of property; hunting, trapping, or fishing**

Nothing in this section shall authorize the alienation, encumbrance, or taxation of any real or personal property, including water rights, belonging to any Indian or any Indian tribe, band, or community that is held in trust by the United States or is subject to a restriction against alienation imposed by the United States; or shall authorize regulation of the use of such property in a manner inconsistent with any Federal treaty, agreement, or statute or with any regulation made pursuant thereto; or shall deprive any Indian or any Indian tribe, band, or community of any right,

---

[4] This is the current version of 25 U.S.C. § 1321. The only substantive difference between this and the version of 25 U.S.C. § 1321 as enacted in 1968 is that the 1968 version did not include paragraph (a)(2), which allows for tribes to request concurrent federal jurisdiction in states that have assumed jurisdiction in Indian country.

privilege, or immunity afforded under Federal treaty, agreement, or statute with respect to hunting, trapping, or fishing or the control, licensing, or regulation thereof.

(Pub.L. 90-284, Title IV, § 401, Apr. 11, 1968, 82 Stat. 78; Pub.L. 111-211, Title II, § 221(a), July 29, 2010, 124 Stat. 2271.)

## 25 U.S.C. § 1323. Retrocession of jurisdiction by State

### (a) Acceptance by United States

The United States is authorized to accept a retrocession by any State of all or any measure of the criminal or civil jurisdiction, or both, acquired by such State pursuant to the provisions of section 1162 of Title 18, section 1360 of Title 28, or section 7 of the Act of August 15, 1953 (67 Stat. 588), as it was in effect prior to its repeal by subsection (b) of this section.

### (b) Repeal of statutory provisions

Section 7 of the Act of August 15, 1953 (67 Stat. 588), is hereby repealed, but such repeal shall not affect any cession of jurisdiction made pursuant to such section prior to its repeal.

(Pub.L. 90-284, Title IV, § 403, Apr. 11, 1968, 82 Stat. 79.)

## 25 U.S.C. § 1326. Special election

State jurisdiction acquired pursuant to this subchapter with respect to criminal offenses or civil causes of action, or with respect to both, shall be applicable in Indian country only where the enrolled Indians within the affected area of such Indian country accept such jurisdiction by a majority vote of the adult Indians voting at a special election held for that purpose. The Secretary of the Interior shall call such special election under such rules and regulations as he may prescribe, when requested to do so by the tribal council or other governing body, or by 20 per centum of such enrolled adults.

(Pub.L. 90-284, Title IV, § 406, Apr. 11, 1968, 82 Stat. 80.)

# Indian Civil Rights Act (Definitions, including "*Duro* Fix" provision as the final clause of (2))

## 25 U.S.C. § 1301. Definitions

For purposes of this subchapter, the term—

**(1)** "Indian tribe" means any tribe, band, or other group of Indians subject to the jurisdiction of the United States and recognized as possessing powers of self-government;

**(2)** "powers of self-government" means and includes all governmental powers possessed by an Indian tribe, executive, legislative, and judicial, and all offices, bodies, and tribunals by and through which they are executed, including courts of Indian offenses; and means the inherent power of Indian tribes, hereby recognized and affirmed, to exercise criminal jurisdiction over all Indians;

**(3)** "Indian court" means any Indian tribal court or court of Indian offense; and

**(4)** "Indian" means any person who would be subject to the jurisdiction of the United States as an Indian under section 1153, Title 18, if that person were to commit an offense listed in that section in Indian country to which that section applies.

(Pub.L. 90-284, Title II, § 201, Apr. 11, 1968, 82 Stat. 77; Pub.L. 101-511, Title VIII, § 8077(b), (c), Nov. 5, 1990, 104 Stat. 1892.)

# ATTACHMENT A

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA**

| | |
|---|---|
| **MUSCOGEE (CREEK) NATION,**<br>**a federally recognized Indian tribe,** | ) ) ) |
| **Plaintiff,** | ) ) |
| **v.** | )      **Case No. 25-CV-75-GKF-JFJ** |
| **STEVE KUNZWEILER, in his official**<br>**capacity as District Attorney for the**<br>**Fourteenth Prosecutorial District of**<br>**Oklahoma; and VIC REGALADO, in his**<br>**official capacity as Tulsa County Sheriff,** | ) ) ) ) ) ) |
| **Defendants.** | ) ) |

## ORDER

This matter comes before the court on the Motion to Dismiss of Vic Regalado [Doc. 38].

For the reasons stated below, the motion is granted.

The southern two-thirds of Tulsa County, Oklahoma lies within the Muscogee (Creek)

Reservation.  Five years ago, in *McGirt v. Oklahoma*, 591 U.S. 894 (2020), the Supreme Court

found that the Reservation was never disestablished.  The ramifications of that decision continue

to reverberate throughout Eastern Oklahoma as the boundaries of State, federal, and tribal

jurisdiction are repeatedly called into question.

In *McGirt*, the Supreme Court found that the State does not have jurisdiction over major

crimes committed by Indians in "Indian country"—i.e., the Reservation.  *Id.* at 932–38.  Two years

later, in *Oklahoma v. Castro-Huerta*, 597 U.S. 629 (2022), the Court found that Oklahoma has

concurrent jurisdiction over crimes committed by non-Indians in Indian country.

In this case, the Muscogee (Creek) Nation contends that the State of Oklahoma may not exercise criminal jurisdiction over *any* Indian—including non-member (i.e., non-Creek) Indians—for conduct occurring on the Creek Reservation.

The Nation filed its Complaint seeking:  (1) a declaratory judgment that Tulsa County lacks criminal jurisdiction over Indians (including non-member Indians) for conduct occurring within the Reservation and that continued assertion of such jurisdiction violates federal law; (2) a temporary restraining order forbidding the County from exercising jurisdiction over Indians (including non-member Indians) for conduct occurring within the Reservation;[1] (3) a preliminary and permanent injunction enjoining defendant Kunzweiler from exercising criminal jurisdiction over Indians (including non-member Indians) for conduct occurring within the Reservation without Congress's express authorization; (4) its attorney fees and costs; and (5) any other appropriate relief.

On April 7, 2025 defendant Tulsa County, Oklahoma filed a Motion to Dismiss the claims against it because "Tulsa County, Oklahoma" is an improper party pursuant to Okla. Stat. tit. 19, § 4.  Tulsa County and the Nation filed a "Stipulation to Dismiss Tulsa County from the Above-Captioned Case," which the court granted.

The remaining defendants—Sheriff Vic Regalado and District Attorney Steve Kunzweiler—filed separate Motions to Dismiss.  In his Motion to Dismiss, Sheriff Regalado argues that:  (1) the Nation lacks standing, (2) this court should abstain pursuant to *Younger v. Harris*, 401 U.S. 37 (1971), (3) this court should abstain pursuant to *Colorado River Water Conservation District v. United States*, 424 U.S. 800 (1976), and (4) the Nation has not identified any violation of federal law by him.

---

[1] On April 29, 2025 the court denied the Nation's request for a temporary restraining order.  [Doc. 54].

- 2 -

County sheriffs in Oklahoma bear a litany of responsibilities, including an obligation to maintain county jails and preserve the peace in their respective counties. OKLA. STAT. tit. 19, §§ 513, 516. However, county sheriffs do not make prosecutorial decisions. Prosecutorial decisions are the district attorney's responsibility. *Oklahoma v. Haworth*, 283 P.3d 311, 316 (Okla. Crim. App. 2012) ("The county attorney[2] acts under a discretion committed to him for public good, and one of his most important functions is to select, out of what the law permits, the charges which he will bring against offenders.") (quoting *Wilson v. Oklahoma*, 209 P.2d 512, 514 (Okla. Crim. App. 1949)); *Cuesta-Rodriguez v. Oklahoma*, 241 P.3d 214, 235 (Okla. Crim. App. 2010) ("The decision regarding which criminal charge to bring lies within the wide parameters of prosecutorial discretion.") (quoting *Childress v. Oklahoma*, 1 P.3d 1006, 1011 (Okla. Crim. App. 2000)); *and Carpenter v. Oklahoma*, 929 P.2d 988, 995 (Okla. Crim. App. 1996) ("[T]he decision whether to prosecute and what charge to file is within the discretion of the prosecutor.").

The Nation's requested relief—declaratory and injunctive relief preventing the District Attorney from exercising criminal jurisdiction over non-member Indians on the Reservation—does not implicate Sheriff Regalado. Sheriff Regalado does not make the decision to prosecute any defendant. Sheriff Regalado is not a proper party to this action, and his Motion to Dismiss [Doc. 38] is granted.

IT IS SO ORDERED this 7th day of August, 2025.

GREGORY K. FRIZZELL
UNITED STATES DISTRICT JUDGE

---

[2] The office of county attorney was abolished in 1965 and its functions assumed by the office of district attorney. OKLA. STAT. tit. 19, § 215.19.

# ATTACHMENT B

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| MUSCOGEE (CREEK) NATION, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 25-CV-75-GKF-JFJ |
| | ) | |
| STEVE KUNZWEILER, in his official | ) | |
| capacity as District Attorney for the | ) | |
| Fourteenth Prosecutorial District of | ) | |
| Oklahoma, | ) | |
| | ) | |
| Defendant. | ) | |

**OPINION AND ORDER**

This matter comes before the court on the Motion for Preliminary Injunction [Doc. 4] of plaintiff Muscogee (Creek) Nation.  The Nation seeks a preliminary injunction to prevent defendant Tulsa County District Attorney Steve Kunzweiler from asserting concurrent criminal jurisdiction over Indians who are not members of the Nation and who are alleged to have committed crimes not covered by the Major Crimes Act within the boundaries of the Nation's Reservation.  On October 9, 2025, the court held a hearing on the motion.  For the reasons stated below, the motion is denied.

"Four factors must be shown by the movant to obtain a preliminary injunction: (1) the movant 'is substantially likely to succeed on the merits; (2) [the movant] will suffer irreparable injury if the injunction is denied; (3) [the movant's] threatened injury outweighs the injury the opposing party will suffer under the injunction; and (4) the injunction would not be adverse to the public interest.'"  *Fish v. Kobach*, 840 F.3d 710, 723 (10th Cir. 2016) (quoting *Beltronics USA, Inc. v. Midwest Inventory Distrib., LLC*, 562 F.3d 1067, 1070 (10th Cir. 2009)).  "A preliminary injunction is 'an extraordinary remedy that may only be awarded upon a clear showing that the

[movant] is entitled to such relief.'" *N. M. Dep't of Game & Fish v. U.S. Dep't of the Interior*, 854 F.3d 1236, 1245 (10th Cir. 2017) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008)).  To prevail, the Nation must establish each factor.  *Denver Homeless Out Loud v. Denver*, 32 F.4th 1259, 1277 (10th Cir. 2022).

Three categories of preliminary injunctions are disfavored and require a heightened standard of proof: (1) preliminary injunctions that alter the status quo; (2) mandatory preliminary injunctions; and (3) preliminary injunctions that afford the movant all the relief that it could recover at the conclusion of a full trial on the merits.  *Colorado v. EPA*, 989 F.3d 874, 883-84 (10th Cir. 2021).  To obtain a disfavored injunction, the movant must make a "strong showing" that the likelihood-of-success-on-the-merits and the balance-of-harms factors tilt in its favor.  *Free the Nipple-Fort Collins v. City of Fort Collins, Colo.*, 916 F.3d 792, 797 (10th Cir. 2019) (quoting *Fish*, 840 F.3d at 724).

## Analysis

### I.    Likelihood of Success on the Merits

As mentioned above, the issue presented in this case is whether the Tulsa County District Attorney may assert concurrent criminal jurisdiction over Indians who are not members of the Muscogee (Creek) Nation (hereinafter referred to as "nonmember Indians") and who are alleged to have committed crimes not covered by the Major Crimes Act (MCA) within the Nation's Reservation.

The Nation raises five arguments in support of its likelihood to succeed on the merits.  All five are variants on a common theme—that state courts have no concurrent jurisdiction to try nonmember Indians unless authorized by Congress, and that the preemption analysis contained in *Oklahoma v. Castro-Huerta*, 597 U.S. 629, 638-49 (2022) cannot be applied in this case.

In its first argument, the Nation contends that, under Supreme Court precedent, States lack criminal jurisdiction over *all* Indians in Indian country absent clear Congressional assent, and that a "presumptive prohibition" exists against state criminal jurisdiction over nonmember Indians.  It cites *McGirt v. Oklahoma*, 591 U.S. 894, 929 (2020), for the proposition that the presumptive prohibition recognizes no distinction between member and nonmember Indians.  In *McGirt*, the Court held that Jimcy McGirt, an enrolled member of the Seminole Nation convicted in an Oklahoma state court of three serious sexual offenses, had committed his crimes on land established by Congress as a reservation for the Creek Nation, and therefore within "Indian country."  Pursuant to the MCA, "*[a]ny Indian* who commits" certain enumerated major crimes "within the Indian country, shall be subject to the same law and penalties as all other persons committing any of the above offenses, within the exclusive jurisdiction of the United States." 18 U.S.C. § 1153(a) (emphasis added).  In other words, the MCA required McGirt—a member of the Seminole Nation who committed his crime on the Creek Reservation—to be tried in federal court.  Accordingly, McGirt's state court convictions were reversed for lack of jurisdiction.  In contrast, this case involves nonmember Indians who allegedly committed crimes *not* covered by the MCA. The Supreme Court recognized no distinction between member and nonmember Indians in *McGirt* because the MCA recognizes no such distinction. Therefore, the holding in *McGirt* does not support a presumptive prohibition against state criminal jurisdiction over nonmember Indians in this case, as this case does not involve the MCA.

Although the holding in *Castro-Huerta* does not address the issue raised in this case,[1] the opinion sets forth the preemption analysis by which issues of a State's criminal jurisdiction in Indian country must be evaluated and decided. After reviewing its precedents, the Court stated: "[i]n short, the Court's precedents establish that Indian country is part of a State's territory and that, unless preempted, States have jurisdiction over crimes committed in Indian country." 597 U.S. at 637-38. State jurisdiction may be preempted "(i) by federal law under ordinary principles of federal preemption, or (ii) when the exercise of state jurisdiction would unlawfully infringe on tribal self-government." *Id*. at 638, 652-653.[2] Accordingly, this court shall address the Nation's likelihood of success pursuant to the preemption analysis contained in *Castro-Huerta*.

Second, the Nation asserts that Congress recognizes no distinction between member and nonmember Indians for the purposes of state criminal jurisdiction in Indian country. But Congressional provisions using the general term "Indian" "reflect the Government's treatment of Indians as a single large class with respect to *federal* jurisdiction and programs." *Duro v. Reina*, 495 U.S. 676, 689-90 (1990). Those Congressional references are not dispositive of a State's jurisdiction to prosecute nonmember Indians accused of committing non-major crimes in Indian country. More importantly, Congress need not have made a distinction between member and nonmember Indians. As the Supreme Court stated in *Castro-Huerta*:

> [U]nder the Constitution and this Court's precedents, the default is
> that States may exercise criminal jurisdiction within their territory.
> See Amdt. 10. States do not need a permission slip from Congress
> to exercise their sovereign authority. In other words, the default is

---

[1] The Court clearly stated in two footnotes that it expressed no view on the issue of whether a State may exercise jurisdiction over crimes committed by Indians against non-Indians in Indian country. *See* 597 U.S. at 650 n.6, 655 n.9.

[2] The analysis is often referred to as the *Bracker* test. *See White Mountain Apache Tribe v. Bracker*, 448 U.S. 136, 143-45 (1980).

that States have criminal jurisdiction in Indian country unless that jurisdiction is *preempted*.

597 U.S. at 653.[3]

Third, the Nation contends—and is correct—that the Court in *Castro-Huerta* expressed no view on state jurisdiction over a State's prosecution of crimes committed by an Indian against a non-Indian in Indian country. *Id.* at 650 n.6, 655 n.9. However, as previously discussed, the Court identified the preemption analysis to be applied in deciding such issues. *See id.* at 639 n.2.

Fourth, the Nation argues that "*Castro-Huerta*'s Constitutional foundation forecloses any distinction between member and non-member Indians." [Doc. 4, p. 20]. In *Castro-Huerta*, the Court cited the Tenth Amendment in support of its statement that "as a matter of state sovereignty, a State has jurisdiction over all of its territory, including Indian country." 597 U.S. at 636. The Nation contends the Court's reasoning does not support state jurisdiction over crimes by Indians because Congress's power to legislate with respect to Indian tribes is "plenary and exclusive" (citing *Haaland v. Brackeen*, 599 U.S. 255, 272 (2023)), and because the Tenth Amendment reserves to the states only "that residuum of sovereignty not delegated to the United States by the Constitution." [Doc. 4, p. 22 (citing *Skiriotes v. Florida*, 313 U.S. 69, 77 (1941), and *Ute Indian Tribe of the Uintah & Ouray Rsrv. v. Lawrence*, 22 F.4th 892, 899-900 (10th Cir. 2022), *cert. denied*, 143 S. Ct. 273 (2022), among others)].

In *Haaland v. Brackeen*, a birth mother, foster and adoptive parents, and the State of Texas brought an action seeking a declaration that the Indian Child Welfare Act (ICWA) was

---

[3] An example of Supreme Court precedent rejecting the proposition that Congress must expressly authorize the exercise of state jurisdiction is *California v. Cabazon Band of Mission Indians*, 480 U.S. 202 (1987). There, the Court wrote that "[o]ur cases … have not established an inflexible *per se* rule precluding state jurisdiction over tribes and tribal members in the absence of express congressional consent." *Id.* at 214-15.

unconstitutional because it exceeds Congress's power under Article I.  The Court rejected that

claim, confirming that Congress's power to legislate with respect to Indians is well established and

broad.   But defendant in the instant case does not contest Congress's plenary power to legislate

with respect to Indians.   He merely rejects the proposition "that a state only has criminal

jurisdiction in Indian country if Congress provides a permission slip."  [Doc. 41 at 20-21].   As

previously mentioned in footnote 3 of this Opinion and Order, the Supreme Court has not

established an inflexible *per se* rule precluding state jurisdiction in Indian country in the absence

of express congressional consent.

*Skiriotes v. Florida* involved the state court criminal conviction of a man for using diving

equipment in the taking of sponges from the Gulf of Mexico off the coast of Florida.  A Florida

statute forbade the use of diving suits for the purpose of taking commercial sponges from the Gulf

of Mexico within the territorial limits of that State.   The issue presented was whether Florida's

statute was beyond the power of the State.   The Court found no basis for holding that the statute

exceeded the limits of state power and affirmed the conviction.   The portion of the Court's opinion

on which the Nation relies has nothing to do with the Tenth Amendment.  Rather, it addresses the

power given to Congress by Section 3 of Article IV of the Constitution to admit new States.

In *Ute Indian Tribe of the Uintah & Ouray Rsrv. v. Lawrence,* a former tribal employee, a

non-Indian, filed suit in Utah state court against the tribe on claims arising out of an employment

contract.   The tribe filed suit in federal court seeking an injunction to halt the state court

proceedings.  The federal district court dismissed the tribe's complaint and the tribe appealed.   The

Tenth Circuit reversed and remanded, in part because "when a case brought against a tribe or its

members 'arise[es] from conduct in Indian country,' state courts lack jurisdiction 'absent clear

congressional authorization.'"  22 F.4th at 900 (quoting *Navajo Nation v. Dalley*, 896 F.3d 1196,

1204 (10th Cir. 2018)). *Lawrence* is unpersuasive, as the instant case does not involve a lawsuit brought against the Nation or its members in state court.

Because the Supreme Court has not established an inflexible *per se* rule precluding state jurisdiction in Indian country in the absence of express congressional consent, the Nation's fourth argument does not persuade the court that the Nation is likely to succeed on the merits.

Fifth, the Nation contends that the Oklahoma Court of Criminal Appeals' decision in *City of Tulsa v. O'Brien*, ---P.3d---, 2024 WL 5001684 (Okla. Crim. App. Dec. 5, 2024), and its reliance on *Castro-Huerta*, is not binding on this federal court. The Nation is correct as a matter of law, and the OCCA's opinion is not binding on this court. However, this contention is not itself relevant to the issue of whether the Nation is likely to succeed on the merits

### A.      Preemption by Federal Law

For the reasons stated above, the court finds and concludes that the defendant is not preempted by federal law under ordinary principles of federal preemption from asserting concurrent criminal jurisdiction over nonmember Indians charged with committing crimes not covered by the MCA within the Nation's Reservation.

### B.      Preemption by Unlawful Infringement on Tribal Self-Government

"[E]ven when federal law does not preempt state jurisdiction under ordinary preemption analysis, preemption may still occur if the exercise of state jurisdiction would unlawfully infringe on tribal self-government." *Castro-Huerta*, 597 U.S. at 649 (citing *Bracker*, 448 U.S. at 142-143; *New Mexico v. Mescalero Apache Tribe*, 462 U.S. 324, 333-35 (1983)). "Under the *Bracker* balancing test, the Court considers tribal interests, federal interests, and state interests." *Castro-Huerta*, 597 U.S. at 649. For the following reasons, this court concludes that the Nation has not

met its burden of showing that the exercise of concurrent criminal jurisdiction over nonmember Indians unlawfully infringes on tribal self-government.

First, the State's exercise of concurrent jurisdiction to prosecute non-major crimes committed by nonmember Indians does not infringe upon the Nation's sovereignty or its internal self-government. The State's exercise of concurrent jurisdiction does not displace or diminish the Nation's jurisdiction and authority to prosecute those same individuals for violations of tribal law.

Second, the State's exercise of concurrent jurisdiction serves tribal interests in prosecuting nonmember Indians for crimes committed in Tulsa County against the Nation and its property, as well as the Nation's members and their property. Tulsa County is largely metropolitan, and thus quite different in many respects than other reservations. Though the Nation has presented evidence that it has opened a courtroom in Jenks, Tulsa County, Oklahoma, the testimony presented was that the Jenks court is a traffic court only.

Third, the Nation's interest in prosecuting nonmember Indians to the exclusion of the State is of lesser weight than its legitimate governmental interest in prosecuting its own members to the State's exclusion. *See Washington v. Confederated Tribes of Colville Indian Rsrv.*, 447 U.S. 134, 161 (1980) ("For most practical purposes [nonmember] Indians stand on the same footing as non-Indians resident on the reservation.").

Fourth, the State's exercise of concurrent jurisdiction to prosecute non-major crimes committed by nonmember Indians does not infringe upon federal interests. State prosecution of crimes committed by nonmember Indians, like state prosecution of crimes committed by non-Indians in Indian country, supplements federal authority, it does not supplant it. *Cf. Castro-Huerta*, 597 U.S. at 650 ("State prosecution [of a non-Indian] would supplement federal authority, not supplant federal authority."). It also furthers federal interests by protecting the Nation and its

property, and members of the Nation and their property, against the criminal actions of nonmember Indians.

Fifth, the State has a strong interest in the exercise of concurrent jurisdiction over nonmember Indians alleged to have committed non-major crimes on the Nation's Reservation. "[T]he State has a strong sovereign interest in ensuring public safety and criminal justice within its territory, and in protecting all crime victims," both Indian and non-Indian. *Id.* at 651. "The State also has a strong interest in ensuring that criminal offenders are appropriately punished and do not harm others in the State." *Id.*

Having considered the arguments contained in the briefing and the evidence presented at the hearing, this court concludes that the Nation has not met its burden of showing that the exercise of concurrent state jurisdiction over nonmember Indians unlawfully infringes on tribal self-government. Because the Nation has not met its burden to show that it is substantially likely to succeed on the merits, the motion for preliminary injunction [Doc. 4] must be denied.[4]

## II.    Irreparable Harm

The second factor that must be shown to obtain a preliminary injunction is irreparable injury if the injunction is denied. *Free the Nipple*, 916 F.3d at 805 (citing *Awad v. Ziriax*, 670 F.3d 1111, 1131 (10th Cir. 2012)). "To constitute irreparable harm, an injury must be certain, great, actual, 'and not theoretical.'" *Heideman v. South Salt Lake City*, 348 F.3d 1182, 1189 (10th Cir. 2003) (quoting *Wisconsin Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985)). "[T]he party seeking injunctive relief must show that the injury complained of is of such *imminence* that

---

[4] The failure to establish a significant possibility of success on the merits renders addressing the remaining factors for a preliminary injunction unnecessary. *Warner v. Gross*, 776 F.3d 721, 736 (10th Cir. 2015). Although the court need not address the remaining factors, it nevertheless opts to do so.

there is a clear and present need for equitable relief to prevent irreparable harm." *Id.* (emphasis in original).

As previously stated, the defendant's prosecution of nonmember Indians alleged to have committed crimes not covered by the MCA within the Nation's Reservation does not prevent the Nation from prosecuting the same nonmember Indians under tribal law.  Just as a state and the federal government may each—as separate sovereigns—prosecute an individual for the same criminal conduct without causing harm to their respective sovereignty, so too can the Nation and the State exercise concurrent jurisdiction over a nonmember Indian for the same criminal act without irreparable harm to the Nation.  Having read the parties' briefs on the motion, and having heard the evidence presented at the hearing on the motion, this court concludes that the Nation has not shown that it is irreparably harmed by the exercise of concurrent jurisdiction over nonmember Indians alleged to have committed crimes not covered by the Major Crimes Act on its Reservation.

## III.     Balance of the Equities and the Public Interest

The third and fourth preliminary injunction factors—whether the threatened injury to the movant outweighs the injury to the party opposing the preliminary injunction and whether the preliminary injunction would not be adverse to the public interest—merge when the government is the party opposing the preliminary injunction.  *Black Emergency Response Team v. Drummond*, 737 F. Supp. 3d 1136, 1157 (W.D. Okla. 2024) (citing *Aposhian v. Barr*, 958 F.3d 969, 978 (10th Cir. 2020)).

The Nation has not shown that the threatened injury to its interests outweighs the harms that the preliminary injunction will cause the State.  Nor has it shown that a preliminary injunction would not adversely affect the public interest.  Tulsa County has a population of approximately 670,000 people, and a majority of Tulsa County lies within the Nation's Reservation.  The

defendant, along with approximately sixty (60) assistant district attorneys and sixty (60) support staff, enforces the laws of the State of Oklahoma in Tulsa County.  Any alleged injury to the Nation's sovereignty resulting from the State's exercise of concurrent criminal jurisdiction over nonmember Indians does not outweigh the injury to the citizens of Tulsa County—both Indian and non-Indian—or the adverse effect to the public interest by enjoining the defendant and his office from enforcing the laws of the State against nonmember Indians.  Accordingly, the court concludes the Nation has not met its burden as to the third and fourth factors.

## IV.     The Preliminary Injunction Sought is Disfavored

The traditional purpose for preliminary injunctions is to "preserve the status quo until a trial on the merits may be had." *SCFC ILC, Inc. v. Visa USA, Inc.*, 936 F.2d 1096, 1099 (10th Cir. 1991), *overruled on other grounds by O Centro Espirita Beneficiente Uniao Do Vegetal v. Ashcroft*, 389 F.3d 973, 975 (10th Cir. 2004).  In this Circuit, the status quo is defined "by the *reality* of the existing status and relationships between the parties, regardless of whether the existing status and relationships may ultimately be found to be in accord or not in accord with the parties' legal rights." *Id.* at 1100 (emphasis in original).

Here, the Nation seeks a preliminary injunction that would alter the status quo.  The defendant prosecuted nonmember Indians for conduct within the Nation's Reservation for over two years before the Nation filed this lawsuit and its motion for preliminary injunction.  *See, e.g., Oklahoma v. Bohanan*, No. CM-2022-108 (Tulsa Cnty. Dist. Ct. filed Jan. 10, 2022).  DA Kunzweiler has continued to prosecute nonmember Indians for conduct that occurred on the Nation's Reservation.  *See Oklahoma v. Hess*, No. CM-2024-2951 (Tulsa Cnty. Dist. Ct. filed Aug. 8, 2024); *Oklahoma v. Mason*, No. CM-2024-4510 (Tulsa Cnty. Dist. Ct. filed Nov. 27, 2024);

*Oklahoma v. Morris*, No. CM-2024-3928 (Tulsa Cnty. Dist. Ct. filed Oct. 14, 2024); *Oklahoma v. Neafus*, No. CM-2024-1222 (Tulsa Cnty. Dist. Ct. filed Apr. 3, 2024).

Because the Nation seeks a preliminary injunction that alters the status quo, it must make a strong showing with regard to both the likelihood of success on the merits and the balancing of harms. As discussed above, it fails to do so. Even if the preliminary injunction sought here was not disfavored, this court finds and concludes the plaintiff would not prevail on its motion.

### Conclusion

For the foregoing reasons, the Motion for Preliminary Injunction of plaintiff Muscogee (Creek) Nation [Doc. 4] is denied.

IT IS SO ORDERED this 7th day of November, 2025.

GREGORY K. FRIZZELL
UNITED STATES DISTRICT JUDGE

# ATTACHMENT C

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **MUSCOGEE (CREEK) NATION,**<br>**a federally recognized Indian tribe,** | ) ) ) | |
| **Plaintiff,** | ) ) | |
| **v.** | ) ) | **Case No. 25-CV-75-GKF-JFJ** |
| **The Board of County Commissioners of**<br>**the County of Tulsa; STEVE KUNZWEILER,**<br>**in his official capacity as District Attorney**<br>**for the Fourteenth Prosecutorial District of**<br>**Oklahoma; and VIC REGALADO, in his**<br>**official capacity as Tulsa County Sheriff,** | ) ) ) ) ) ) ) | |
| **Defendants.** | ) ) | |

**<u>JUDGMENT</u>**

In their Joint Status Report filed December 29, 2025, [Doc. 89], plaintiff Muscogee (Creek) Nation and defendant Steve Kunzweiler, in his official capacity as District Attorney for the Fourteenth Prosecutorial District of Oklahoma, (1) advise the court that the Opinion and Order [Doc. 87] denying plaintiff's Motion for Preliminary Injunction decided the controlling issue in this case and (2) request that the court enter final judgment in this matter.

It is therefore ORDERED, ADJUDGED, AND DECREED that plaintiff Muscogee (Creek) Nation, a federally recognized Indian tribe, take nothing, that this matter be dismissed on the merits, and that judgment is hereby entered in favor of defendant Steve Kunzweiler, in his official capacity as District Attorney for the Fourteenth Prosecutorial District of Oklahoma.

It is further ORDERED, ADJUDGED, AND DECREED that pursuant to the court's orders [Doc. 53; Doc. 75] dismissing defendants Board of County Commissioners of the County of Tulsa, and Vic Regalado, in his official capacity as Tulsa County Sheriff, as parties to this action, plaintiff

Muscogee (Creek) Nation take nothing and the claims against defendants Tulsa County and Sheriff

Regalado are dismissed.

ENTERED this 30th day of December, 2025.

Gregory K. Frizzell
United States District Judge