No. 26-5013

---

## UNITED STATES COURT OF APPEALS
## FOR THE TENTH CIRCUIT

---

MUSCOGEE (CREEK) NATION,

*Plaintiff-Appellant*,

v.

STEVE KUNZWEILER, *et al.*,

*Defendants-Appellees*.

---

On Appeal from the United States District Court
for the Northern District of Oklahoma
No. 4:25-cv-00075 (Hon. Gregory K. Frizzell)

---

### BRIEF OF *AMICUS CURIAE* UNITED SOUTH AND
### EASTERN TRIBES SOVEREIGNTY PROTECTION FUND
### IN SUPPORT OF PLAINTIFF-APPELLANT AND REVERSAL

---

Kaitlyn E. Klass
Taylour A. Boboltz
UNITED SOUTH AND EASTERN TRIBES
 SOVEREIGNTY PROTECTION FUND
1730 Rhode Island Ave. NW, Suite 909
Washington, DC 20036
(615) 872-7900
kklass@usetinc.org
tboboltz@usetinc.org

*Counsel for Amicus Curiae*

# TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................................. i

TABLE OF AUTHORITIES ........................................................................ iii

GLOSSARY ......................................................................................... viiii

INTEREST OF AMICUS ............................................................................. 1

SUMMARY OF THE ARGUMENT ............................................................. 2

ARGUMENT ............................................................................................. 4

I. TRIBAL NATIONS' AUTHORITY TO PROSECUTE CRIMES THROUGHOUT OUR LANDS, INCLUDING TO THE EXCLUSION OF STATES, IS AN ESPECIALLY FUNDAMENTAL ATTRIBUTE OF INHERENT TRIBAL SOVEREIGNTY. ..................................................... 4

    A. Tribal Nations are inherently sovereign governments possessing all the rights and authorities that sovereignty entails. ........................................... 4

    B. Criminal jurisdiction is an especially fundamental attribute of inherent Tribal sovereignty, and Tribal Nations are deeply committed to the public safety of our communities. ................................................................... 5

    C. The exercise of inherent Tribal criminal jurisdiction is not limited to Tribal citizens. ......................................................................................... 8

II. CONGRESS MUST ACT CLEARLY IF IT ABROGATES TRIBAL NATIONS' SOVEREIGN AUTHORITIES, INCLUDING OUR CRIMINAL JURISDICTION TO THE EXCLUSION OF STATES. ..... 10

    A. Absent unequivocal congressional authorization, Tribal Nations reserve and retain our inherent sovereign authority to prosecute crimes throughout our lands to the exclusion of states. ........................................................ 10

    B. A state's exercise of so-called "concurrent" jurisdiction within a Tribal Nation's lands—especially criminal jurisdiction, and especially over Native people—requires a clear statement from Congress because such exercise constitutes an abrogation of that Tribal Nation's exclusive sovereign jurisdictional rights. ................................................................. 13

**III.** ***BRACKER*** **DOES NOT REQUIRE INTEREST BALANCING WHERE A STATE'S ASSERTION OF JURISDICTION WOULD INFRINGE ON TRIBAL SELF-GOVERNMENT.** ...............................................15

    A. *Bracker* and *Castro-Huerta* incorporate a version of the clear statement rule that protects Tribal Nations' inherent right to self-government................15

    B. The State's assertion of concurrent jurisdiction here—over *Native* people and in *criminal* cases—goes to the very heart of Tribal self-government, and thus the clear statement rule applies. .................................................16

**IV. EVEN IF, ARGUENDO,** ***BRACKER*** **BALANCING WERE APPLICABLE HERE, THE DISTRICT COURT'S INTERPRETATION IMPROPERLY DIMINISHED THE TRIBAL AND FEDERAL INTERESTS AT STAKE AND INSTEAD PRIORITIZED REDUCING INCONVENIENCE TO THE STATE.** ........................................................19

    A. Tribal Nations have a clear and overriding interest in exercising and protecting our criminal jurisdiction over all Native people in Indian Country to the exclusion of states..................................................................20

    B. State concurrent jurisdiction interferes with the Tribal–federal relationship, including the federal government's interests in promoting Tribal self-government and maintaining the careful dual-sovereignty bargain struck between Tribal Nations and the United States and embedded in the Constitution.............................................................................21

    C. The district court furthered the baseless and unjust implicit divestiture doctrine by prioritizing the perceived "inconvenience" to the State as a justification to intrude on Tribal sovereignty and self-government. .........22

**V.** ***BRACKER*** **BALANCING MUST NOT BE ALLOWED TO SPREAD.**..23

    A. *Bracker* balancing is a poor tool for determining questions of criminal jurisdiction. .................................................................................23

    B. *Bracker* balancing violates the tenets of federal Indian law and originalism. ..................................................................................................24

CONCLUSION....................................................................................26

CERTIFICATE OF COMPLIANCE....................................................28

CERTIFICATE OF SERVICE ............................................................29

# TABLE OF AUTHORITIES

**Cases**

*Cherokee Nation v. Georgia,*
    30 U.S. 1 (1831)..........................................................................................10

*City of Sherrill v. Oneida Indian Nation of N.Y.,*
    544 U.S. 197 (2005)......................................................................................25

*Denezpi v. United States,*
    596 U.S. 591 (2022)....................................................................................6, 7

*Duro v. Reina,*
    495 U.S. 676 (1990).........................................................................................8

*Ex parte Kan-gi-shun-ca (Crow Dog),*
    109 U.S. 556 (1883)...................................................................................6, 11

*Haaland v. Brackeen,*
    599 U.S. 255 (2023).............................................................................5, 11, 21

*Ky. Dep't of Revenue v. Davis,*
    553 U.S. 328 (2008).......................................................................................24

*Lone Wolf v. Hitchcock,*
    187 U.S. 553 (1903)..................................................................................10, 11

*Massachusetts v. Wampanoag Tribe of Gay Head (Aquinnah),*
    853 F.3d 618 (1st Cir. 2017) ........................................................................12

*Means v. Navajo Nation,*
    432 F.3d 924 (9th Cir. 2005) ............................................................... 7, 9, 18

*Michigan v. Bay Mills Indian Cmty.,*
    572 U.S. 782 (2014).......................................................................................24

*Mitchel v. United States,*
    34 U.S. 711 (1835).........................................................................................10

*Montana v. Blackfeet Tribe of Indians*,
    471 U.S. 759 (1985)................................................................................11

*Morris v. Tanner*,
    288 F. Supp. 2d 1133 (D. Mont. 2003) .............................................18

*Morton v. Mancari*,
    417 U.S. 535 (1974)................................................................................10

*Muscogee (Creek) Nation v. City of Henryetta*,
    809 F. Supp. 3d 1317 (E.D. Okla. 2025)...........................................20

*New Mexico v. Mescalero Apache Tribe*,
    462 U.S. 324 (1983)......................................................................... 14, 21

*Okla. Tax Comm'n v. Sac & Fox Nation*,
    508 U.S. 114 (1993).................................................................................16

*Oklahoma v. Castro-Huerta*,
    597 U.S. 629 (2022)......................................... 5, 15, 16, 17, 18, 25, 26

*Oliphant v. Suquamish Indian Tribe*,
    435 U.S. 191 (1978)......................................................................... 25, 26

*Rhode Island v. Narragansett Indian Tribe*,
    19 F.3d 685 (1st Cir. 1994) ..................................................................12

*United States v. Antelope*,
    430 U.S. 641 (1977)......................................................................... 10, 22

*United States v. Dion*,
    476 U.S. 734 (1986)................................................................................11

*United States v. Kagama*,
    118 U.S. 375 (1886)..............................................................................9, 11

*United States v. Lara*,
    541 U.S. 193 (2004)..............................................................................8, 11

*United States v. Wheeler*,
   435 U.S. 313 (1978)............................................................................4, 6, 7, 11, 22

*United States v. Winans*,
   198 U.S. 371 (1905)...........................................................................................10

*Veneno v. United States*,
   607 U.S. —, 146 S. Ct. 52 (2025).......................................................................11

*Wagnon v. Prairie Band Potawatomi Nation*,
   546 U.S. 95 (2005).............................................................................................17

*White Mountain Apache Tribe v. Bracker*,
   448 U.S. 136 (1980)............................................................. 15, 16, 17, 18, 19, 23

*Williams v. Lee*,
   358 U.S. 217 (1959)................................................................................. 15, 16

## Constitutional Provisions

U.S. Const. art. I, § 2, cl. 3 (Indians Not Taxed Clause) ............................................5

U.S. Const. art. I, § 8, cl. 3 (Indian Commerce Clause) .............................................5

U.S. Const. art. II, § 2, cl. 2 (Treaty Clause) .............................................................5

U.S. Const. art. VI, cl. 2 (Supremacy Clause) ..........................................................5

## Statutes

18 U.S.C. § 1151 .....................................................................................................20

18 U.S.C. § 1152 .....................................................................................................22

18 U.S.C. § 1153 ...................................................................................................8, 22

18 U.S.C. § 1162 .....................................................................................................22

25 U.S.C. § 1301 ...................................................................................................8, 22

25 U.S.C. § 1321 .................................................................................... 20, 22

25 U.S.C. § 1326 ..........................................................................................20

25 U.S.C. § 2804 ..........................................................................................15

Maine Indian Claims Settlement Act,
  Pub. L. No. 96-420, 94 Stat. 1785 (1980)..............................................12

Rhode Island Indian Claims Settlement Act,
  Pub. L. No. 95-395, 92 Stat. 813 (1978)................................................12

Wampanoag Tribal Council of Gay Head, Inc., Indian Claims Settlement Act,
  Pub. L. No. 100-95, 101 Stat. 704 (1987)..............................................12

**Other Authorities**

American Indian Law Deskbook (2024 ed.)...........................................20

H.R. Rep. No. 101-938 (1990) (Conf. Rep.), 1990 WL 201576 ..........................8, 9

Indian L. & Ord. Comm'n, A Roadmap for Making Native America Safer: Report to
  the President & Congress of the United States (2013) ........................................24

Lauren van Schilfgaarde, *Tribal Revestiture*,
  77 Stan. L. Rev. Online 183 (2025) ...................................................................14

Sandra D. O'Connor, *Lessons from the Third Sovereign: Indian Tribal Courts*,
  33 Tulsa L.J. 1 (1997) ...................................................................................7

U.N. Declaration on the Rights of Indigenous Peoples,
  Oct. 2, 2007, G.A. Res. 61/295..................................................................6

U.S. Dep't of Just., *Cross-Deputization in Indian Country* (2018)........................14

U.S. Dep't of State, *Announcement of U.S. Support for the United Nations
  Declaration on the Rights of Indigenous Peoples* (Jan. 12, 2011) ........................6

**GLOSSARY**

| Term | Definition |
|---|---|
| State | Defendants-Appellees officials and local governments of the State of Oklahoma |
| RSA | Restrictive Settlement Act |
| Public Law 280 | Act of Aug. 15, 1953, Pub. L. No. 83-280, ch. 505, 67 Stat. 588 |

**INTEREST OF AMICUS**[1]

The United South and Eastern Tribes Sovereignty Protection Fund (USET SPF) is a non-profit, inter-Tribal organization advocating on behalf of 33 federally recognized Tribal Nations from the Northeastern Woodlands to the Everglades and across the Gulf of Turtle Island.[2]  USET SPF is a sister non-profit organization to the United South and Eastern Tribes, Inc., established in 1969.  USET SPF strives to protect, promote, and advance Tribal Nations' exercise of inherent sovereign rights and authorities, and it works to elevate the voices of Tribal Nations to ensure the United States fully delivers on its trust and treaty obligations.  USET SPF advocates

---

[1] No counsel for any party authored this brief in whole or in part; no party or party's counsel contributed money intended to fund the preparation or submission of this brief; and no person or entity other than *Amicus*, its members, and its counsel provided any monetary contribution to fund the preparation or submission of this brief.

[2] USET SPF member Tribal Nations include: Alabama-Coushatta Tribe of Texas (TX), Catawba Indian Nation (SC), Cayuga Nation (NY), Chickahominy Indian Tribe (VA), Chickahominy Indian Tribe–Eastern Division (VA), Chitimacha Tribe of Louisiana (LA), Coushatta Tribe of Louisiana (LA), Eastern Band of Cherokee Indians (NC), Houlton Band of Maliseet Indians (ME), Jena Band of Choctaw Indians (LA), Mashantucket Pequot Indian Tribe (CT), Mashpee Wampanoag Tribe (MA), Miccosukee Tribe of Indians of Florida (FL), Mi'kmaq Nation (ME), Mississippi Band of Choctaw Indians (MS), Mohegan Tribe of Indians of Connecticut (CT), Monacan Indian Nation (VA), Nansemond Indian Nation (VA), Narragansett Indian Tribe (RI), Oneida Indian Nation (NY), Pamunkey Indian Tribe (VA), Passamaquoddy Tribe at Indian Township (ME), Passamaquoddy Tribe at Pleasant Point (ME), Penobscot Indian Nation (ME), Poarch Band of Creek Indians (AL), Rappahannock Tribe (VA), Saint Regis Mohawk Tribe (NY), Seminole Tribe of Florida (FL), Seneca Nation of Indians (NY), Shinnecock Indian Nation (NY), Tunica-Biloxi Tribe of Louisiana (LA), Upper Mattaponi Indian Tribe (VA), and Wampanoag Tribe of Gay Head (Aquinnah) (MA).

1

within existing institutions to fight today's battles and simultaneously works to improve the foundations of Indian law and policy to create long-lasting impacts for Indian Country.

USET SPF's 33 member Tribal Nations have deep interests in protecting their inherent sovereign rights and authorities. Tribal Nations' status as sovereign governments is inherent, predates the formation of the United States, and has been recognized by the United States from the very beginning. USET SPF submits this *amicus* brief to aid the Court in understanding why allowing states to exercise jurisdiction within Indian Country absent clear congressional authorization—especially criminal jurisdiction over Native people—harms all Tribal Nations by infringing on a core aspect of Tribal sovereignty. Counsel for both parties have consented to the filing of this *amicus* brief.

## SUMMARY OF THE ARGUMENT

At the very heart of sovereignty is a government's authority to craft and enforce its own criminal laws throughout its territorial jurisdiction. This authority shapes and reflects a community's shared moral code of right and wrong based on that community's own beliefs and values, and it allows a government to keep its people safe.

Certain officials and local governments of the State of Oklahoma (herein jointly referred to as the State) are infringing on Tribal sovereignty by asserting

2

concurrent criminal jurisdiction over Indians who are not citizens of the Muscogee (Creek) Nation and who allegedly committed crimes not covered by the Major Crimes Act within the boundaries of the Creek Reservation.[3]  The State's incursion on Tribal self-government requires an express mandate from Congress, something no one in this case argues Congress has granted.  The district court erred in breaking from longstanding federal Indian law precedent to apply the *Bracker* interest-balancing test to divest the Muscogee (Creek) Nation of its exclusive criminal jurisdiction over all Indians throughout its Indian Country territory.

Under longstanding federal Indian law precedent, Tribal Nations retain sovereign authorities unless Congress clearly takes them away.  This rule tempers federal Indian law's so-called plenary power doctrine, by which Congress may unilaterally reshape the jurisdictional rules within Indian Country.  Abandoning the clear statement rule, as the district court did here, allows states to subsume Tribal interests wherever a reviewing court agrees that respect for Tribal sovereignty and self-government would be too inconvenient to the state.  The creep of this implicit

---

[3] USET SPF prefers to use the terms "Native American" or "Native" rather than "Indian" and the term "Tribal citizen" rather than "Tribal member," as this language more accurately reflects Native identity and the sovereign status of Tribal Nation governments.  However, we acknowledge that federal Indian law uses "Indian" as a term of art, especially in the criminal jurisdiction context, and that courts in this and related cases have used the term "nonmember Indian" to refer to Native people who are not enrolled citizens of the Tribal Nation in whose Indian Country a crime was allegedly committed.  To avoid confusion, we will therefore generally use those terms for purposes of this brief.

divestiture by reason of inconvenience breaks from the original bargain struck between Tribal Nations and the United States as separate sovereigns.

We call on this Court to uphold Tribal Nations' inherent sovereignty and longstanding principles of federal Indian law. The district court's opinion should be reversed.

## ARGUMENT

I. **Tribal Nations' Authority to Prosecute Crimes Throughout Our Lands, Including to the Exclusion of States, Is an Especially Fundamental Attribute of Inherent Tribal Sovereignty.**

A. **Tribal Nations are inherently sovereign governments possessing all the rights and authorities that sovereignty entails.**

Tribal Nations are and always have been inherently sovereign governments. Prior to the arrival of colonizing forces to our shores, Tribal Nations fully exercised our sovereignty over all two billion acres of what is now called the United States, developing sophisticated laws and complex inter-Tribal relationships to govern our people. *See Worcester v. Georgia*, 31 U.S. 515, 542–43 (1832); *United States v. Wheeler*, 435 U.S. 313, 322–23 (1978).

European colonizers, and the nascent United States, drew on principles of international law to inform their early understandings of inherent Tribal sovereignty and to govern their interactions with Tribal Nations. *See, e.g.*, *Worcester*, 31 U.S. at 560–61 (describing Tribal Nations' retained sovereignty and right to self-

4

government as consistent with "the settled doctrine of the law of nations"); *Haaland v. Brackeen*, 599 U.S. 255, 308–09 (2023) (Gorsuch, J., concurring).

Out of mutual self-interest, the United States (including its predecessors) and Tribal Nations regarded each other as sovereigns from the beginning. *See Worcester*, 31 U.S. at 546–49, 556–57. This respect for dual sovereignty is memorialized in what Justice Gorsuch has termed "the original bargain struck in the Constitution." *Brackeen*, 599 U.S. at 331 (Gorsuch, J., concurring); *see* U.S. Const. art. I, § 8, cl. 3 (granting Congress power to regulate commerce with foreign nations and "Indian tribes"); *id.* art. II, § 2 (granting the President power to "make treaties" with consent of the Senate); *id.* art. VI, cl. 2 (stating treaties are "the supreme law of the land"); *id.* art. I, § 2, cl. 3 (excluding "Indians not taxed" from calculating apportionment of representatives and taxes).

**B.   Criminal jurisdiction is an especially fundamental attribute of inherent Tribal sovereignty, and Tribal Nations are deeply committed to the public safety of our communities.**

At the very heart of Tribal self-government is the right to make and enforce laws defining what is legal and illegal—right and wrong—throughout a Tribal Nation's lands. *See, e.g.*, *Oklahoma v. Castro-Huerta*, 597 U.S. 629, 684 (2022) (Gorsuch, J., dissenting) (describing criminal jurisdiction as "striking at the heart of tribal sovereignty").

5

Jurisdiction, like all attributes of Tribal sovereignty, is an inherent right—as recognized by the U.S. Supreme Court in its "Marshall Trilogy" of foundational federal Indian law cases. *See Worcester*, 31 U.S. at 561. This inherent jurisdiction includes criminal jurisdiction over crimes committed by or against Indians. *See Ex parte Kan-gi-shun-ca (Crow Dog)*, 109 U.S. 556, 571–72 (1883). The Court continues to recognize Tribal Nations' criminal jurisdiction as flowing from inherent sovereignty today. *E.g.*, *Wheeler*, 435 U.S. at 328 (recognizing that federal and Tribal courts' criminal jurisdiction stem from independent sovereign sources); *Denezpi v. United States*, 596 U.S. 591, 598–99 (2022) (applying the same reasoning to "C.F.R." courts).

Just as international law has always informed the United States' understanding of Tribal sovereignty, so too has it informed federal Indian law's recognition of Tribal Nations' territorial jurisdiction and self-governance. *See Worcester*, 31 U.S. at 520. In the modern era, the United States has expressed its support for international law that has evolved to contain an even more robust recognition of these inherent territorial rights. *See* U.N. Declaration on the Rights of Indigenous Peoples art. 26.2, Oct. 2, 2007, G.A. Res. 61/295; U.S. Dep't of State, *Announcement of U.S. Support for the United Nations Declaration on the Rights of Indigenous Peoples* (Jan. 12, 2011).[4]

---

[4] Available at https://2009-2017.state.gov/documents/organization/154782.pdf.

Exercise of criminal jurisdiction is a solemn responsibility that Tribal Nations take seriously, as Tribal Nations are best situated and most deeply committed to ensuring justice and public safety in our communities. *See, e.g.*, Sandra D. O'Connor, *Lessons from the Third Sovereign: Indian Tribal Courts*, 33 Tulsa L.J. 1, 3 (1997) (recognizing "[t]he special strengths of the tribal courts—their proximity to the people served, the closeness of the relations among the parties and the court, and their often greater flexibility and informality").

Tribal Nations are increasingly developing our own Tribal codes, courts, and law enforcement, and courts and jurists have commented on the remarkable capacity of Tribal courts for decades. *Denezpi*, 596 U.S. at 595 ("Today, most tribes have established their own judicial systems. . . ."); *Wheeler*, 435 U.S. at 332 n.35 ("Tribal courts of all kinds . . . handled an estimated 70,000 cases in 1973."); O'Connor, *supra*, at 1 ("As of 1992, there were about 170 tribal courts, with jurisdiction encompassing a total of perhaps *one* million Americans."); *Means v. Navajo Nation*, 432 F.3d 924, 933 (9th Cir. 2005) ("The Navajo Nation has a sophisticated body of published laws, and an experienced court system in which trained trial and appellate judges adjudicate thousands of cases per year.").

The Muscogee (Creek) Nation's criminal justice system is a good example of well-developed public safety infrastructure. *See* Appellant's Br. 3–7. Tribal Nations have continued to operate and build strong public safety institutions to preserve and

enforce the criminal jurisdiction that is essential to Tribal self-government and Tribal sovereignty.

### C. The exercise of inherent Tribal criminal jurisdiction is not limited to Tribal citizens.

The U.S. Supreme Court confirmed in *United States v. Lara* that Tribal Nations' authority to prosecute *nonmember Indians* is also an attribute of inherent Tribal sovereignty rather than some delegation of federal power, and that this authority was properly "recognized and affirmed" by Congress.[5] 541 U.S. 193, 198 (2004) (quoting 25 U.S.C. § 1301(2)); *see also* H.R. Rep. No. 101-938, at 133 (1990) (Conf. Rep.), 1990 WL 201576 (explaining the statutory provisions discussed in *Lara* "recognize and affirm the inherent power of tribes to exercise criminal misdemeanor jurisdiction over all Indians on their respective reservations").

Long before *Lara*, it was understood that federal Indian law's rules about criminal jurisdiction over "Indians" did not distinguish between "members" and "nonmembers." For example, when first authorizing the federal government's reach into Indian Country to exercise criminal jurisdiction over Indians, Congress drew no distinction between member and nonmember Indians, 18 U.S.C. § 1153(a), and the

---

[5] In *Duro v. Reina*, the Court wrongly held that Tribal Nations' "retained sovereignty" did not extend to exercising criminal jurisdiction over nonmember Indians. 495 U.S. 676, 679 (1990). Congress soon after enacted the "*Duro* fix," codified at 25 U.S.C. § 1301(2). *See also* Appellant's Br. 29–32 (discussing *Duro* fix).

8

Court acknowledged federal criminal jurisdiction would thereafter extend to all "Indian[s] of some tribe," *United States v. Kagama*, 118 U.S. 375, 383 (1886).[6]

It makes good sense that Tribal Nations' inherent criminal jurisdiction should extend to nonmember Indians.  Such individuals are often interwoven into the fabric of Tribal communities via inter-marriage, residence, and other means, and they receive services from that Tribal Nation.  *Means*, 432 F.3d at 933; H.R. Rep. No. 101-938, at 133 ("Non-tribal member Indians own property on Indian reservations, their children attend tribal schools, [and] their families receive health care from tribal hospitals and clinics.").

The State here makes much ado about the fact that it seeks to exercise criminal jurisdiction over only "nonmember Indians" as opposed to those who are citizens of the Tribal Nation in whose territory the crime occurred, and the district court seemed to buy that distinction.  *See* App.277.  But federal Indian law draws no such line. Rather, as part of the original bargain struck between Tribal Nations and the United States before and at the time of the United States' formation, the United States recognized that Tribal Nations' inherent and enduring sovereign rights and

---

[6] The district court seemed to think the lack of a distinction between member and nonmember Indians for purposes of Tribal and federal criminal jurisdiction was not relevant for assessing *state* criminal jurisdiction.  App.273–74.  But a jurisdictional analysis cannot be undertaken in a vacuum, particularly where multiple governments claim overlapping jurisdiction, and these jurisdictional rules should be reconciled. The district court offers no reason why distinctions would be drawn for some sovereigns but not for others.

authorities include criminal jurisdiction throughout our Indian Country territory over member and nonmember Indians alike.

## II. Congress Must Act Clearly if It Abrogates Tribal Nations' Sovereign Authorities, Including Our Criminal Jurisdiction to the Exclusion of States.

### A. Absent unequivocal congressional authorization, Tribal Nations reserve and retain our inherent sovereign authority to prosecute crimes throughout our lands to the exclusion of states.

Under federal Indian law, the *per se* rule is that courts should readily infer the continuing existence of reserved inherent sovereign rights and authorities. *United States v. Winans*, 198 U.S. 371, 381 (1905). Because Tribal sovereignty and all its attributes are inherent, Tribal Nations reserve all rights and authorities without any need for their affirmation by the United States. *Mitchel v. United States*, 34 U.S. 711, 734 (1835).

The method by which the United States now generally abrogates Tribal Nations' retained rights is the exercise of Congress's so-called plenary power. *See Lone Wolf v. Hitchcock*, 187 U.S. 553, 565–66 (1903).[7] The U.S. Supreme Court

---

[7] The United States, in taking for itself nearly all of Tribal Nations' original lands and resources, incurred a debt to Tribal Nations that manifests in trust and treaty obligations. *See Morton v. Mancari*, 417 U.S. 535, 551–52 (1974). The U.S. Supreme Court acknowledged these trust and treaty obligations early on, *see Cherokee Nation v. Georgia*, 30 U.S. 1, 17–19 (1831), and the United States embedded in the Constitution not only its recognition of Tribal sovereignty but also the authority needed to enact legislation to carry out its trust and treaty obligations, *see United States v. Antelope*, 430 U.S. 641, 647 n.8 (1977). Yet, the Court later misconstrued these constitutional Indian affairs powers to adopt the plenary power

has taken steps to temper the unjust impacts of this doctrine by requiring that Congress speak clearly and expressly if it intends to unilaterally abrogate a Tribal Nation's rights or authorities, *United States v. Dion*, 476 U.S. 734, 738–39 (1986), and by resolving any ambiguities in favor of Tribal interests, *Montana v. Blackfeet Tribe of Indians*, 471 U.S. 759, 766 (1985). As the U.S. Supreme Court recently reaffirmed, "[i]f Congress wishes to withdraw its promises, it must say so." *McGirt v. Oklahoma*, 591 U.S. 894, 937 (2020).

In the context of criminal law, the Court has expressly recognized that Tribal criminal jurisdiction "remains among those 'inherent powers of a limited sovereignty which has never been extinguished.'" *Lara*, 541 U.S. at 197 (quoting *Wheeler*, 435 U.S. at 322–23). And the principle that Congress must act clearly to abrogate these rights is centuries old. *E.g.*, *Crow Dog*, 109 U.S. at 572 (requiring "a clear expression of the intention of congress" to intrude on exclusive Tribal jurisdiction to prosecute crime committed by one Indian against another in Indian Country).

---

doctrine. *See Lone Wolf*, 187 U.S. at 565–66; *Kagama*, 118 U.S. at 383–84. This judicially created concept asserts that Congress can unilaterally strip Tribal Nations of our sovereign rights and authorities—whether inherently reserved or treaty-affirmed—without our consent. *See Brackeen*, 599 U.S. at 326–30 (Gorsuch, J., concurring); *Veneno v. United States*, 607 U.S. —, 146 S. Ct. 52, 52–53 (2025) (Gorsuch, J., dissenting from denial of certiorari).

USET SPF Tribal Nation members know these rules well.  Many are forced to live under Restrictive Settlement Acts (RSAs) that purport to extend state jurisdiction over and/or limit Tribal jurisdiction within those Tribal Nations' Indian Country territories.  *E.g.*, Rhode Island Indian Claims Settlement Act, Pub. L. No. 95-395, § 9, 92 Stat. 813, 817 (1978); Maine Indian Claims Settlement Act, Pub. L. No. 96-420, § 6, 94 Stat. 1785, 1793–94 (1980); Wampanoag Tribal Council of Gay Head, Inc., Indian Claims Settlement Act, Pub. L. No. 100-95, §§ 6(g), 7(a), 101 Stat. 704, 707 (1987).

RSAs arose as the product of litigation or other disagreements in which Tribal Nations seeking land, federal recognition, or other rights were faced with a stark choice: acquiesce to unfair terms under great pressure from federal, state, or local governments, or suffer the greater injustice of not securing those rights at all.  Yet even in the context of RSAs, courts have held those Tribal Nations reserved their inherent rights, including jurisdiction, unless Congress spoke clearly within the RSA to alter them.  *E.g.*, *Rhode Island v. Narragansett Indian Tribe*, 19 F.3d 685, 702 (1st Cir. 1994) (finding Tribal Nation retained jurisdiction "possess[ed] by virtue of their sovereign existence" because RSA "does not unequivocally articulate an intent to deprive the Tribe of jurisdiction"); *Massachusetts v. Wampanoag Tribe of Gay Head (Aquinnah)*, 853 F.3d 618, 624–25 (1st Cir. 2017) (similar).

12

**B.    A state's exercise of so-called "concurrent" jurisdiction within a Tribal Nation's lands—especially criminal jurisdiction, and especially over Native people—requires a clear statement from Congress because such exercise constitutes an abrogation of that Tribal Nation's exclusive sovereign jurisdictional rights.**

While the term "concurrent jurisdiction" is often used innocuously, in practice it acts to displace Tribal jurisdiction—simultaneously impairing Tribal sovereignty while also actively intruding upon it.

The U.S. Supreme Court time and again has recognized that allowing concurrent state jurisdiction would infringe on Tribal Nations' sovereign rights to govern our territorial jurisdictions.  The core understanding of *Worcester*, and other integral early federal Indian law cases, was that the exercise of state law would displace Tribal jurisdiction.  31 U.S. at 561 ("The Cherokee nation, then, is a distinct community occupying its own territory, with boundaries accurately described, in which the laws of Georgia can have no force.").

More recently, the Court explained why a state's exercise of concurrent jurisdiction—there in the context of civil regulation—would in effect supplant Tribal jurisdiction:

> It is important to emphasize that concurrent jurisdiction would effectively nullify the Tribe's authority to control hunting and fishing on the reservation.  Concurrent jurisdiction would empower New Mexico wholly to supplant tribal regulations. . . . The Tribe would thus exercise its authority over the reservation only at the sufferance of the State.  The tribal authority to regulate hunting and fishing by nonmembers . . . would have a rather hollow ring if tribal authority amounted to no more than this.

13

*New Mexico v. Mescalero Apache Tribe*, 462 U.S. 324, 338 (1983).

That a state's exercise of concurrent *criminal* jurisdiction infringes even more on Tribal jurisdiction should come as no surprise. A great deal of discretion is exercised in crafting criminal laws, choosing when and how to enforce them via prosecution, and issuing sentences from the court. *See, e.g.*, Lauren van Schilfgaarde, *Tribal Revestiture*, 77 Stan. L. Rev. Online 183, 194 (2025) ("To the extent sovereigns diverge on how a criminal justice system should operate, which crimes, investigations, and prosecutions should be prioritized, and how perpetrators should be punished, concurrent jurisdiction has the effect of nullifying Tribal sovereignty.").

Rather than unilaterally impose jurisdiction over another's territorial footprint, sovereign governments enter into agreements whereby they assist each other's public safety efforts. In Indian Country, Tribal Nations and local law enforcement enter into memoranda of agreement to share funding and resources, and they cross-deputize their law enforcement officers so that they may exercise each other's jurisdiction. *See, e.g.*, U.S. Dep't of Just., *Cross-Deputization in Indian Country* (2018).[8] Federal Indian law also creates mechanisms whereby Tribal and state law enforcement may obtain "special law enforcement commissions" to

---

[8] Available at https://portal.cops.usdoj.gov/resourcecenter/content.ashx/cops-p363-pub.pdf.

exercise federal jurisdiction. 25 U.S.C. § 2804. These mechanisms demonstrate how cooperation can and *should* work between governments when there are mutual goals: by mutual consent.

### III. *Bracker* does not require interest balancing where a state's assertion of jurisdiction would infringe on Tribal self-government.

#### A. *Bracker* and *Castro-Huerta* incorporate a version of the clear statement rule that protects Tribal Nations' inherent right to self-government.

Neither *Bracker* nor *Castro-Huerta* undermine the rule that balancing is inappropriate where state jurisdiction would infringe on Tribal Nations' retained sovereign right to self-government—and instead an analysis more akin to the clear statement rule applies in those situations. *Castro-Huerta*, 597 U.S. at 638; *White Mountain Apache Tribe v. Bracker*, 448 U.S. 136, 142–43 (1980).[9] The district court itself acknowledged the foundational rule that a state may not exercise jurisdiction within Indian Country if that exercise would infringe on Tribal self-government. App.276.

This principle comports with longstanding U.S. Supreme Court precedent that congressional authorization is required for state actions that have "infringed on the right of reservation Indians to make their own laws and be ruled by them," including in the criminal jurisdiction context. *Williams v. Lee*, 358 U.S. 217, 220 (1959).

---

[9] *See* Appellant's Br. 37–40 (discussing *Bracker* and *Castro-Huerta*).

Indeed, the *Bracker* Court described Tribal self-government in these very terms when explaining that states may not exercise concurrent jurisdiction that would infringe upon it. 448 U.S. at 142–43 (citing *Williams*, 358 U.S. at 220); *see also Okla. Tax Comm'n v. Sac & Fox Nation*, 508 U.S. 114, 126 (1993) (suggesting a "Tribe's right to self-governance could operate independently" to preempt state taxation authority over Tribal employees).

Castro-Huerta* did not disturb this principle. 597 U.S. at 653 (acknowledging that "principles of tribal self-government" may preempt state criminal jurisdiction in Indian Country); *id.* at 693 (Gorsuch, J., dissenting) ("[T]he Court leaves undisturbed the ancient rule that States cannot prosecute crimes by Native Americans on tribal lands without clear congressional authorization—for that would touch the heart of 'tribal self-government.'")

Thus, even under *Bracker* and *Castro-Huerta*, no amount of balancing will allow for a state to impose jurisdiction that would infringe on Tribal self-government, *i.e.*, a Tribal Nation's right to make its own laws and be ruled by them.

B. **The State's assertion of concurrent jurisdiction here—over *Native* people and in *criminal* cases—goes to the very heart of Tribal self-government, and thus the clear statement rule applies.**

*Bracker* balancing generally does not apply in cases involving non-Indians or in cases involving criminal jurisdiction. It was a grave mistake for the district court to apply it at the intersection of these core interests.

16

That *Bracker* balancing is not applicable to state concurrent jurisdiction over *Indians* in Indian Country is clear. The U.S. Supreme Court in *Bracker* and *Castro-Huerta* expressly maintained that a state's assertion of this type of jurisdiction would infringe on Tribal Nations' inherent sovereignty and right to self-government.

The *Bracker* Court was only "called upon to consider the extent of state authority over the activities of *non-Indians*," 448 U.S. at 137 (emphasis added), an issue it conceded was "[m]ore difficult" than the clear-cut infringement on Tribal self-government posed by state jurisdiction over "on-reservation conduct involving *only* Indians," *id.* at 144 (emphasis added). Subsequent cases have similarly stressed the limited application of *Bracker* balancing to circumstances involving *non-Indians*. *E.g.*, *Wagnon v. Prairie Band Potawatomi Nation*, 546 U.S. 95, 111 (2005) (describing cases supporting the Court's creation of the *Bracker* balancing test as "exclusively concerned with the on-reservation conduct of non-Indians").

The *Castro-Huerta* Court also took pains to confirm that it dealt *only* with questions of state jurisdiction over non-Indians. 597 U.S. at 635, 639 n.2. Further, the *Castro-Huerta* Court in addressing the interaction between state concurrent jurisdiction and Public Law 280—a federal statute granting some states certain jurisdiction within Indian Country, including "over crimes committed *by Indians*"—

17

acknowledged that, "[a]bsent Public Law 280, state jurisdiction over those Indian-defendant crimes could implicate principles of tribal self-government." *Id.* at 648.[10]

It is also clear that *Bracker* balancing generally does not apply when assessing a state's assertion of concurrent *criminal* jurisdiction. *Bracker* itself, and a great majority of its progeny, have involved only *civil* jurisdiction, often arising where a state has sought to assert its taxation authority over non-Indians "engaged in commerce on an Indian reservation." 448 U.S. at 137.

Criminal jurisdiction is fundamentally different, however, and state action is even more likely to infringe on Tribal self-government in this context. Tribal criminal jurisdiction "furthers Indian self-government" by empowering Tribal Nations "to protect Indians and others who reside in or visit Indian country against lawlessness," including "by nonmember Indians." *Means*, 432 F.3d at 933. It is to be expected that individuals will be subject to the criminal laws of the territory into which they enter. *See Morris v. Tanner*, 288 F. Supp. 2d 1133, 1143 (D. Mont. 2003) ("Non-Indian citizens are called into courts of other states all the time, brought before judges whom they did not elect and subject to laws they may not support."), *aff'd*, 160 Fed. App'x 600 (9th Cir. 2005). A government's exercise of criminal jurisdiction over individuals who enter its territory—without undue interference

---

[10] *See* Appellant's Br. 27–29 (discussing Public Law 280).

from other government entities seeking to exercise concurrent jurisdiction—is a clear governmental interest and expectation, including for Tribal Nations.

Tribal Nations' exercise of *criminal* jurisdiction over *all* Indians to the exclusion of states is a foundational aspect of Tribal self-government, triggering the clear statement rule preserved in *Bracker* and *Castro-Huerta*.  Thus, even under these cases, no balancing of interests is necessary to conclude that a state may not exercise criminal jurisdiction over nonmember Indians in Indian Country.

**IV.  Even if, arguendo, *Bracker* balancing were applicable here, the district court's interpretation improperly diminished the Tribal and federal interests at stake and instead prioritized reducing inconvenience to the State.**

Because a state's attempt to impose its criminal jurisdiction over nonmember Indians in Indian Country so obviously and improperly infringes on a Tribal Nation's right to Tribal self-government, the Court need not engage in *Bracker*'s balancing test here.  Even if it did, however, the Court would find that the interests, when balanced appropriately, weigh heavily in favor of the Tribal and federal interests at stake.  Indeed, many courts employing the interest-balancing test for lesser incursions into inherent Tribal sovereignty have ruled against states, including *Bracker* itself.  448 U.S. at 152.

**A.  Tribal Nations have a clear and overriding interest in exercising and protecting our criminal jurisdiction over all Native people in Indian Country to the exclusion of states.**

The district court bought into the fallacy of "concurrent" jurisdiction, egregiously discounting the harm of one sovereign intruding on the jurisdictional territory of another.[11]  *See* App.277 (summarily concluding that "[t]he State's exercise of concurrent jurisdiction does not displace or diminish the Nation's jurisdiction and authority to prosecute [nonmember Indians] for violations of tribal law").

The district court further misconstrued Tribal interests with its stunningly paternalistic claim that unilaterally imposed state jurisdiction actually "*serves*" Tribal interests by allowing the state to *protect* a Tribal Nation and its property. App.277 (emphasis added).  But, if such claims were true, we would see Tribal Nations clamoring to provide consent for state concurrent jurisdiction under Public Law 280, *see* 25 U.S.C. §§ 1321(a), 1326—and this has not happened, *see* American Indian Law Deskbook § 4:16 & n.26 (2024 ed.); Appellant's Br. 28–29.  Instead,

---

[11] Regardless of what *Castro-Huerta* may have said about a Tribal Nation's lands being geographically located within a state's *territory*—the issue here is about "Indian Country," a legal term of art used for purposes of delineating governmental *jurisdiction*. *See* 18 U.S.C. § 1151 (defining "Indian Country"); *Muscogee (Creek) Nation v. City of Henryetta*, 809 F.809 F. Supp. 3d 1317, 1321 (E.D. Okla. 2025) ("Territory defines a map.  Jurisdiction defines the law.").

20

Tribal Nations have prioritized utilizing our own sovereignty to protect our own communities.

> **B.  State concurrent jurisdiction interferes with the Tribal–federal relationship, including the federal government's interests in promoting Tribal self-government and maintaining the careful dual-sovereignty bargain struck between Tribal Nations and the United States and embedded in the Constitution.**

The district court mistakenly concluded that state concurrent jurisdiction does not infringe on federal interests, asserting instead that it merely "supplements" federal jurisdiction and that the state's "protecti[on]" of a Tribal Nation somehow "furthers" federal interests.  App.277–78.

The district court's opinion fundamentally misunderstands the role of states—or, more accurately, the presumptive lack thereof—in the Tribal–federal relationship and Tribal Nations' place in the larger framework of the United States. The Constitution's framers reserved exclusive Indian affairs powers to the federal government precisely to *prevent* states from meddling with sovereign Tribal Nations and to protect the government-to-government relationships between Tribal Nations and the United States.  *See Brackeen*, 599 U.S. at 313–18 (Gorsuch, J., concurring).

Additionally, state concurrent criminal jurisdiction disrupts the federal government's interest in encouraging Tribal self-government, an interest recognized in *Bracker* and its progeny.  *E.g.*, *Mescalero*, 462 U.S. at 334, 341.  The federal government has demonstrated through a wide array of federal statutes that it

21

understands Tribal Nations' exercise of criminal jurisdiction over Indians, to the exclusion of states, to be a core aspect of Tribal self-government. *See* 25 U.S.C. § 1301(2) (confirming expansive Tribal criminal jurisdiction over Indians); 18 U.S.C. § 1162(d) (requiring Tribal consent for states to exercise such criminal jurisdiction); 25 U.S.C. § 1321(a) (same); 18 U.S.C. §§ 1152–1153 (extending federal, rather than state, law into Indian Country for certain crimes).

Even when extending its own criminal jurisdiction into Indian Country, the federal government has done so with a "*carefully limited intrusion* of federal power into the *otherwise exclusive jurisdiction* of the Indian tribes to punish Indians for crimes committed on Indian land." *Wheeler*, 435 U.S. at 325 n.22 (emphasis added) (quoting *Antelope*, 430 U.S. at 643 n.1). Given that the federal government, with its exclusive constitutional Indian affairs powers, should take such care to prioritize its interests in Tribal sovereignty and Tribal self-government, it is difficult to imagine that states should be able to assume similar criminal jurisdiction with no constitutional or statutory basis for that authority at all.

> **C. The district court furthered the baseless and unjust implicit divestiture doctrine by prioritizing the perceived "inconvenience" to the State as a justification to intrude on Tribal sovereignty and self-government.**

Perhaps most insidiously, the district court's analysis placed the perceived inconvenience to the State and to Tulsa County residents at the forefront in justifying the State's infringement on Tribal self-government. App.279–80. It also weighed

the fact that the State had already been exercising this jurisdiction—whether lawfully or not—against protecting exclusive Tribal jurisdiction.  App.280–81.

By discounting the importance of halting the State's ongoing infringement on Tribal sovereignty and instead elevating perceived inconvenience to others, the district court did just what the U.S. Supreme Court in *McGirt* said must not be allowed to happen: it permitted the State to amend the legal rules with its "[u]nlawful acts, performed long enough and with sufficient vigor."  591 U.S. at 937–38 (2020). And it did so for a type of jurisdiction in which states, per the *Bracker* Court, have minimal interest.  448 U.S. at 144 ("[W]hen on-reservation conduct involving only Indians is at issue, state law is generally inapplicable, *for the State's regulatory interest is likely to be minimal* and the federal interest in encouraging tribal self-government is at its strongest." (emphasis added)).

## V.   *Bracker* Balancing Must Not Be Allowed to Spread.

### A.   *Bracker* balancing is a poor tool for determining questions of criminal jurisdiction.

*Bracker* balancing is a results-oriented doctrine that introduces the perils of subjective value judgments into a critical area of federal Indian law.

Subjectivity is something we generally do not tolerate in criminal legal analyses, where there is great value in bright line rules for jurisdictional clarity.  One must know whose laws apply when personal liberty is at stake.  In Indian Country, the preexisting morass of criminal jurisdiction rules under federal Indian law can

lead to delays or inaction, counseling against injecting any further confusion. *See, e.g.*, Indian L. & Ord. Comm'n, A Roadmap for Making Native America Safer: Report to the President & Congress of the United States ch. 1 (2013).[12]

Balancing tests also open the door for judges to make policy decisions, a task for which "courts are less well suited than Congress to perform." *Ky. Dep't of Revenue v. Davis*, 553 U.S. 328, 360 (2008) (Scalia, J., concurring in part). Elected legislatures—not courts—are generally the appropriate bodies for considering such issues, and this is particularly true in federal Indian law where the Constitution specifically authorizes Congress to exercise the federal government's policy-making authority in Indian affairs. *See Michigan v. Bay Mills Indian Cmty.*, 572 U.S. 782, 800 (2014) (explaining "it is fundamentally Congress's job, not ours, to determine" issues impacting Tribal sovereignty).

### B. *Bracker* balancing violates the tenets of federal Indian law and originalism.

As discussed above, in alignment with the original bargain struck by Tribal Nations and the United States, carried forward in the U.S. Constitution, the U.S. Supreme Court has recognized that Tribal Nations' inherent sovereignty supported jurisdiction throughout our lands, including criminal jurisdiction for crimes committed by or against Indians.

---

[12] Available at https://www.aisc.ucla.edu/iloc/report/files/A_Roadmap_For_Making_Native_America_Safer-Full.pdf.

Over time, the U.S. Supreme Court issued some of its most blush-worthy federal Indian law decisions asserting not only that Congress may expressly divest Tribal Nations of our inherent sovereign authorities, but also that Tribal Nations could be *implicitly* divested of such authorities. *E.g.*, *Oliphant v. Suquamish Indian Tribe*, 435 U.S. 191 (1978); *City of Sherrill v. Oneida Indian Nation of N.Y.*, 544 U.S. 197 (2005). The Court justified these intrusions on the "inconvenience" that our continuing governmental existence—our refusal to assimilate or fade away, as the United States had intended and planned—posed to non-Indians.

*Bracker* balancing is part of this insidious implicit-divestiture-by-inconvenience set of cases that are unmoored from bedrock principles of originalism and fly in the face of the well-established clear statement rule and retained rights doctrine discussed above.

*Bracker* balancing has already been misapplied in *Castro-Huerta*, where the Court discussed in detail the inconvenience to third parties of upholding exclusive Tribal jurisdiction before permitting a state to exercise criminal jurisdiction over non-Indians. 597 U.S. at 635, 649–51. While *Castro-Huerta* dealt with state power over non-Indians and was thus very different from the blatant infringement on Tribal sovereignty that the State seeks here, it was still inappropriate for the *Castro-Huerta* Court to allow state incursion into Tribal Nations' inherent sovereign authority absent clear congressional authorization. *See* 597 U.S. at 636 (claiming without

analysis or even a nod to congressional abrogation that, while the early United States considered Indian Country as "separate from state territory" and not subject to state law due to Tribal Nations' inherent sovereignty, "[b]y 1880 the Court no longer viewed reservations as distinct nations" free from state jurisdiction (citation omitted)).[13]

*Bracker* balancing, and implicit-divestiture-by-inconvenience more broadly, must not be allowed to spread—separate and apart from its inapplicability in this case.

## CONCLUSION

Congress has not authorized the State of Oklahoma to exercise the jurisdiction it seeks in this case.  USET SPF respectfully urges this Court to reverse the district court's decision and remand with instructions to issue a declaratory judgment and

---

[13] Notably, the U.S. Supreme Court's unwholesome decision in *Oliphant* made the later *Castro-Huerta* ruling predictable as a gap filler.  In *Oliphant*, the Court stripped Tribal Nations of criminal jurisdiction over non-Native people on Tribal lands for alleged equity reasons.  435 U.S. at 204.  The *Castro-Huerta* Court later noted in its *Bracker* balancing analysis that "a state prosecution of a crime committed by a non-Indian against an Indian would not deprive the tribe of any of its prosecutorial authority" because that had already been stripped away by *Oliphant*.  597 U.S. at 650; *see also id.* at 693 ("[T]he Court's ruling today rests in significant part on the fact that Tribes currently lack criminal jurisdiction over non-Indians who commit crimes on tribal lands[.]") (Gorsuch, J., dissenting).  Rather than allow Congress to clarify that the Court got *Oliphant* wrong, as it did when it enacted the *Duro* fix, the *Castro-Huerta* Court misused *Bracker* to fill the gap.  Manufactured chaos does not justify further infringement on Tribal sovereignty.

enjoin this unlawful infringement on the Muscogee (Creek) Nation's inherent sovereign criminal jurisdiction over Indians throughout its Indian Country.

Respectfully submitted,

Dated:  May 6, 2026

/s/ *Kaitlyn E. Klass*
Kaitlyn E. Klass
Taylour A. Boboltz
UNITED SOUTH AND EASTERN TRIBES
 SOVEREIGNTY PROTECTION FUND
1730 Rhode Island Ave. NW, Ste. 909
Washington, DC 20036
Phone: (615) 872-7900
kklass@usetinc.org
tboboltz@usetinc.org

*Counsel for Amicus Curiae*

## CERTIFICATE OF COMPLIANCE

I certify that this *amicus* brief complies with the type-volume limitations of Fed. R. App. P. 29(a)(5) because it contains 6,170 words, excluding the parts of the *amicus* brief exempted by Fed. R. App. P. 32(f) and 10th Cir. R. 32(B).  I certify that, in accordance with Fed. R. App. P. 29(a)(4), this *amicus* brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and 10th Cir. R. 32(A) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman font.

Dated:  May 6, 2026

/s/ *Kaitlyn E. Klass*
Kaitlyn E. Klass
UNITED SOUTH AND EASTERN TRIBES
 SOVEREIGNTY PROTECTION FUND
1730 Rhode Island Ave. NW, Ste. 909
Washington, DC 20036
Phone: (615) 872-7900
kklass@usetinc.org

*Counsel for Amicus Curiae*

28

## CERTIFICATE OF SERVICE

I hereby certify that on May 6, 2026, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Tenth Circuit by using the CM/ECF system, which will send notification of such filing to all counsel of record.  All counsel of record are registered CM/ECF users and service will be accomplished via the CM/ECF system.

May 6, 2026

/s/ *Kaitlyn E. Klass*
Kaitlyn E. Klass
UNITED SOUTH AND EASTERN TRIBES
 SOVEREIGNTY PROTECTION FUND
1730 Rhode Island Ave. NW, Suite 909
Washington, DC 20036
(615) 872-7900
kklass@usetinc.org

*Counsel for Amicus Curiae*

29