No. 26-5013

## UNITED STATES COURT OF APPEALS
## FOR THE TENTH CIRCUIT

MUSCOGEE (CREEK) NATION,

*Appellant*,

v.

STEVE KUNZWEILER, in his official capacity as District Attorney for the Fourteenth Prosecutorial District of Oklahoma; and Victor REGALADO, in his official capacity as Tulsa County Sheriff,

*Appellee*.

Appeal from the United States District Court
for the Northern District of Oklahoma,
Case No. 25-cv-75-GKF-JFJ (Hon. Gregory K. Frizzell)

## BRIEF OF *AMICI CURIAE* THE CHEROKEE NATION, CHICKASAW NATION, AND CHOCTAW NATION OF OKLAHOMA, IN SUPPORT OF APPELLANT

Frank S. Holleman
Douglas B. L. Endreson
SONOSKY, CHAMBERS, SACHSE,
    ENDRESON & PERRY, LLP
1425 K St NW, Suite 600
Washington, D.C. 20005
Tel: 202-682-0240
E-mail: fholleman@sonosky.com
dendreso@sonosky.com

Counsel for *Amici* Cherokee Nation,
    Chickasaw Nation, and Choctaw Nation of
    Oklahoma

Chad Harsha, OBA No. 31579
Attorney General
CHEROKEE NATION
OFFICE OF ATTORNEY GENERAL
P.O. Box 1533
Tahlequah, OK 74465
Tel: 918-453-5369
E-mail: chad-harsha@cherokee.org

*Counsel for the Cherokee Nation*

Stephen H. Greetham, OBA No. 21510
GREETHAM LAW, P.L.L.C.
621 Greenwood Road
Chapel Hill, NC 27514-5921
Tel: 984-261-7240
E-mail:  sgreetham@greethamlaw.net

*Counsel for Cherokee Nation and Chickasaw
    Nation*

Michael Burrage, OBA No. 1350
WHITTEN BURRAGE
512 N. Broadway Ave., Suite 300
Oklahoma City, OK 73102
Tel: 405-516-7800
E-mail: mburrage@whittenburragelaw.com

Brian Danker, OBA No. 16638
Senior Executive Officer
DIVISION OF LEGAL & COMPLIANCE
CHOCTAW NATION OF OKLAHOMA
1802 Chukka Hina Dr.
Durant, OK 74701
Tel: 580-642-7423
E-mail: bdanker@choctawnation.com

*Counsel for the Choctaw Nation of Oklahoma*

2

## TABLE OF CONTENTS

TABLE OF AUTHORITIES.................................................................. ii

INTEREST OF *AMICI CURIAE* ....................................................1

ARGUMENT ....................................................................................4

I.    *McGirt*, Not *Castro-Huerta*, Controls This Case..............................4

    A.    Under the *McGirt* Rule, Oklahoma Lacks Criminal
    Jurisdiction Over Indians in Indian Country. ......................4

    B.    *Castro-Huerta* Does Not Disturb, Much Less Overrule,
    *McGirt*..................................................................6

II.   Congress's Authority Over Crimes By Indians In Indian
    Country Is Exclusive, As The Constitution And Historical
    Practice Confirm, Which Renders *Castro-Huerta*'s Analysis
    Inapplicable Here. ...................................................8

    A.    Under the Constitution, Congress's Power Over Indian
    Tribes and Indians Is Exclusive.......................................8

    B.    Historical Practice Confirms That Congress's Power to
    Allocate Criminal Jurisdiction Over Indians in Indian
    Country Is Exclusive................................................10

    C.    The Presumption Against State Jurisdiction Protects
    Congress's Exclusive Authority Over Indians in Indian
    Country and Indian Tribes' Inherent Sovereign
    Authority..............................................................15

III.  The State Lacks Criminal Jurisdiction Over Indians In Indian
    Country Even Assuming, *Arguendo*, That *Castro-Huerta* Could
    Be Applied To Decide That Question.....................................19

CONCLUSION ..............................................................................24

# TABLE OF AUTHORITIES

**CASES**

*Bosse v. State*, 2021 OK CR 30, 499 P.3d 771 ......................................................1

*Bryan v. Itasca County*, 426 U.S. 373 (1976) ................................................ 14-15

*Cheyenne-Arapaho Tribes v. Oklahoma*, 618 F.2d 665 (10th Cir. 1980)...........................................................................................................5

*Dick v. United States*, 208 U.S. 340 (1908) ................................................ 9-10

*Ex parte Crow Dog*, 109 U.S. 556 (1883).....................................................1, 5, 12, 13

*Fisher v. Dist. Ct.*, 424 U.S. 382 (1976) (per curiam)...........................................22

*Garcia v. San Antonio Metro. Transit Auth.*, 469 U.S. 528 (1985) ........................10

*Haaland v. Brackeen*, 599 U.S. 255 (2023) ..........................................*passim*

*Indian Country, U.S.A., Inc. v. Okla. ex rel. Okla. Tax Comm'n*, 829 F.2d 967 (10th Cir. 1987)......................................................................23

*Keeble v. United States*, 412 U.S. 205 (1973).................................... 12-13, 14

*Kennerly v. Dist. Ct.*, 400 U.S. 423 (1971) ....................................................15, 23

*Kiowa Tribe of Okla. v. Mfg. Techs., Inc.*, 523 U.S. 751 (1998) ............... 15-16, 17

*Marbury v. Madison*, 5 U.S. (1 Cranch) 137 (1803)........................................ 10-11

*McClanahan v. Ariz. State Tax Comm'n*, 411 U.S. 164 (1973) .....................*passim*

*McCulloch v. Maryland*, 17 U.S. (4 Wheat.) 316 (1819)................................ 10-11

*McGirt v. Oklahoma*, 591 U.S. 894 (2020).............................................*passim*

*Michigan v. Bay Mills Indian Cmty.*, 572 U.S. 782 (2014)...................15, 16, 17, 18

*Murphy v. Royal*, 875 F.3d 896 (10th Cir. 2017) ......................................................23

*Muscogee (Creek) Nation v. Kunzweiler*, No. 6:25-cv-75-GKF-JFJ, 2025 WL 3124450 (N.D. Okla. Nov. 7, 2025)..........................................2-3, 6-7

*New Mexico v. Mescalero Apache Tribe*, 462 U.S. 324 (1983) ............................19

*New York v. United States*, 505 U.S. 144 (1992) ....................................................10

*NLRB v. Noel Canning*, 573 U.S. 513 (2014) ....................................................11

*Oklahoma v. Castro-Huerta*, 597 U.S. 629 (2022) ...........................................*passim*

ii

*Peters v. Malin*, 111 F. 244 (N.D. Iowa 1901)........................................................21

*Rice v. Olson*, 324 U.S. 786 (1945)..............................................................18, 19

*Rice v. Rehner*, 463 U.S. 713 (1983)..................................................................20

*Santa Clara Pueblo v. Martinez*, 436 U.S. 49 (1978) ..............................9-10, 15-16

*Save the Colo. v. Spellmon*, 50 F.4th 954 (10th Cir. 2022)................................. 7-8

*Seminole Tribe of Fla. v. Florida*, 517 U.S. 44 (1996) ........................................ 8-9

*Sharp v. Murphy*, 591 U.S. 977 (2020) (per curiam) ..............................................23

*Sizemore v. State*, 2021 OK CR 6, 485 P.3d 867 .....................................................1

*Spears v. State*, 2021 OK CR 7, 485 P.3d 873 ........................................................1

*State ex rel. Matloff v. Wallace*, 2021 OK CR 21, 497 P.3d 686 ...........................1

*Talton v. Mayes*, 163 U.S. 376 (1896) ...............................................................2, 20

*U.S. ex rel. Lynn v. Hamilton*, 233 F. 685 (W.D.N.Y. 1915).................................21

*United States v. Antelope*, 430 U.S. 641 (1977)....................................................14

*United States v. Ballard*, No. 4:24-cv-626-CVE-SH (N.D. Okla.) ..........................3

*United States v. Forty-Three Gallons of Whiskey*, 93 U.S. 188 (1876) ...................9

*United States v. Iski*, No. 6:24-cv-493-CVE (E.D. Okla.) .......................................3

*United States v. Kagama*, 118 U.S. 375 (1886) ..............................................*passim*

*United States v. Lara*, 541 U.S. 193 (2004) .........................................................16

*United States v. Mitchell*, 463 U.S. 206 (1983).......................................................9

*United States v. Rogers*, 45 U.S. (4 How.) 567 (1846) .........................................11

*United States v. Wheeler*, 435 U.S. 313 (1978)..............................................*passim*

*Ute Indian Tribe v. Lawrence*, 22 F.4th 892 (10th Cir. 2022) ...............................16

*Ute Indian Tribe v. Lawrence*, 875 F.3d 539 (10th Cir. 2017) ..............................16

*Ute Indian Tribe v. Utah*, 790 F.3d 1000 (10th Cir. 2015) .....................................5

*Warren Trading Post Co. v. Ariz. State Tax Comm'n*, 380 U.S. 685
   (1965) ...............................................................................................................18

*White Mountain Apache Tribe v. Bracker*, 448 U.S. 136 (1980)............... 3-4, 6, 24

*Williams v. Lee*, 358 U.S. 217 (1959) ...........................................18, 19-20, 21-22

iii

*Worcester v. Georgia*, 31 U.S. (6 Pet.) 515 (1832) ................................................9, 18

**REGULATIONS AND RULES**

91 Fed. Reg. 4102 (Jan. 30, 2026) ........................................................................1

Federal Rule of Appellate Procedure 29(a) ...........................................................1

**FEDERAL STATUTES**

18 U.S.C. § 1151(a) ...............................................................................................1

18 U.S.C. § 1162 ...........................................................................................5, 7, 14

18 U.S.C. § 3243 ....................................................................................................7

25 U.S.C. § 1301(2) .................................................................................2, 17, 20, 21

25 U.S.C. § 1302(b)-(c) ........................................................................................17

25 U.S.C. § 1304 ..................................................................................................17

25 U.S.C. § 1321(a) ...............................................................................................6

25 U.S.C. § 1322(a) .........................................................................................17, 23

25 U.S.C. § 1324 ..................................................................................................23

25 U.S.C. § 1326 ....................................................................................................6

25 U.S.C. § 232 ......................................................................................................7

25 U.S.C. §§ 1321-1326 .......................................................................................14

28 U.S.C. § 1360 ..................................................................................................14

Act of Aug. 15, 1953, Pub. L. No. 83-280, 67 Stat. 588 ("P.L. 280") .............*passim*

Act of February 28, 1877, 19 Stat. 254 ...............................................................12

Act of July 22, 1790, 1 Stat. 137 .........................................................................11

Act of June 30, 1948, 62 Stat. 1161 ......................................................................7

Act of Mar. 27, 1854, 10 Stat. 270 ......................................................................11

Act of Mar. 3, 1817, 3 Stat. 383 ..........................................................................11

Act of Mar. 30, 1802, 2 Stat. 139 ........................................................................11

Act of May 19, 1796, 1 Stat. 469 ........................................................................11

Act of May 31, 1946, 60 Stat. 229 ........................................................................7

iv

Consolidated Appropriations Act 2022, Pub. L. No. 117-103, 136 Stat. 49 (2022) ................................................................................17

General Crimes Act, 18 U.S.C. § 1152 ................................................11

Major Crimes Act Major Crimes Act, 18 U.S.C. § 1153 ("MCA")................*passim*

Oklahoma Enabling Act, 34 Stat. 267 (1906) ...............................4, 5, 23

Pub. L. 115-301, 132 Stat. 4395 (2018) ...............................................7

Treaty of April 29, 1868, 15 Stat. 635 ................................................12

Tribal Law and Order Act, Pub. L. 111-211, Title II, 124 Stat. 2262 (2010) ....................................................................17

Violence Against Women Act Reauthorization Act of 2013, Pub. L. No. 113-4, 127 Stat. 54 (2013) ...................................................17

**LEGISLATIVE MATERIALS**

H.R. Rep. No. 83-848 (1953), *as reprinted in* 1953 U.S.C.C.A.N. 2409 ........................................................................... 14-15

**OTHER AUTHORITIES**

Br. of the Cherokee Nation & Choctaw Nation of Okla. in Supp. of the U.S.'s Mot. for Prelim. Inj., *Iski*, No. 6:24-cv-493-CVE (Dkt. No. 68-1) .............................................................................. 22-23

Br. of the Cherokee Nation, Chickasaw Nation & Choctaw Nation of Okla. in Supp. of the U.S.'s Mot. for Prelim. Inj., *Ballard*, No. 4:24-cv-626-CVE-SH (Dkt. No. 79-1) .................................................23

Bryan A. Garner, et al., *The Law of Judicial Precedent* (2016)............................ 7-8

*Cohen's Handbook of Federal Indian Law* § 2.01[1] (2012) ......................... 15-16

*The Federalist No. 42* (James Madison) (Project Gutenberg ed., 2021)...................9

U.S. Dep't of Interior, *Federal Indian Law* (1958)................................................19

## INTEREST OF *AMICI CURIAE*[1]

Amici Cherokee Nation, Chickasaw Nation, and Choctaw Nation of Oklahoma ("Nations"), are federally recognized Indian tribes, *see* 91 Fed. Reg. 4102, 4103, 4105 (Jan. 30, 2026), occupying and governing Reservations in Oklahoma that are Indian country under federal law, *see* 18 U.S.C. § 1151(a).[2] Pursuant to Federal Rule of Appellate Procedure 29(a), amici Nations appear here to vindicate their inherent sovereign authority to exercise criminal jurisdiction over all Indians on their Reservations, free from state interference. As the settled rule "'require[s] a clear expression of the intention of Congress' before the state or federal government may try Indians for conduct on their lands," *McGirt v. Oklahoma*, 591 U.S. 894, 929 (2020) (quoting *Ex parte Crow Dog*, 109 U.S. 556, 572 (1883)), and Congress has not authorized Oklahoma to exercise criminal jurisdiction over Indians in Indian country, *id.* at 932, federal and tribal criminal jurisdiction over Indians in Indian country in Oklahoma is exclusive of state jurisdiction.

---

[1] The parties have consented to the filing of this brief. No party's counsel authored this brief in whole or in part and no party, party's counsel, or other person contributed money intended to fund preparation of submission of this brief.

[2] *Oklahoma v. Castro-Huerta*, 597 U.S. 629, 633-34 (2022) (citing *State ex rel. Matloff v. Wallace*, 2021 OK CR 21, ¶ 15, 497 P.3d 686, 689); *Spears v. State*, 2021 OK CR 7, 485 P.3d 873, 875-77; *Sizemore v. State*, 2021 OK CR 6, 485 P.3d 867, 869-71; *Bosse v. State*, 2021 OK CR 30, ¶¶ 7-9, 12, 499 P.3d 771, 774.

Even before *McGirt* was decided, the Nations anticipated the recognition of the continuing existence of their Reservations and began to prepare to assume criminal jurisdiction over all Indians on their Reservations, exclusive of state jurisdiction.  The Nations enlarged the capacity of their criminal justice systems by seating additional judges, constructing new facilities, hiring more prosecutors, establishing public defender offices, increasing the size of their police forces, and entering into additional cross-deputization agreements that allow state and local agencies' officers to enforce the Nations' laws.  Since the beginning of 2021, when this effort was well under way, the Nations have initiated prosecutions for 61,447 misdemeanor and felony charges for crimes committed by Indians on their Reservations, resulting in 36,175 convictions.  This success is the product of their exercise of their right of self-government, which includes "the inherent power of Indian tribes . . . to exercise criminal jurisdiction over all Indians," 25 U.S.C. § 1301(2); *see United States v. Wheeler*, 435 U.S. 313, 328-29 (1978) ("[A]n Indian tribe's power to punish tribal offenders is part of its own retained sovereignty." (citing *Talton v. Mayes*, 163 U.S. 376 (1896))).

These fully implemented rights are now at risk.  The court below held *McGirt* inapplicable to this case on the ground that it "does not involve the [Major Crimes Act, 18 U.S.C. § 1153 ("MCA")]," *Muscogee (Creek) Nation v. Kunzweiler*, No. 6:25-cv-75-GKF-JFJ, 2025 WL 3124450, *2 (N.D. Okla. Nov. 7, 2025), and then

2

relied on *Castro-Huerta* to hold that Appellee may exercise "concurrent criminal jurisdiction over nonmember Indians charged with committing crimes not covered by the MCA within the Nation's Reservation" and that "the [Muscogee (Creek)] Nation has not met its burden of showing that the exercise of concurrent criminal jurisdiction over nonmember Indians unlawfully infringes on tribal self-government." *Id.* at *4.

These holdings were in error. Congress has not authorized Oklahoma to exercise criminal jurisdiction over Indians in Indian country, *McGirt*, 591 U.S. at 929, 932, and so the State and its agents, like Appellee, cannot exercise such jurisdiction.[3] *Castro-Huerta* does not apply here, as there the Court expressly and repeatedly stated that it was not considering state jurisdiction over Indians, 597 U.S. at 639 n.2, 650 n.6; *see id.* at 648, and said nothing to unsettle, much less overrule, *McGirt*. As Congress's exclusive authority over crimes by Indians in Indian country is held under the Constitution and confirmed by historical practice, that authority is controlling here, and the State's appeal should be to Congress, not this Court.

Even assuming, only *arguendo*, that *Castro-Huerta* could be argued to apply to this case, state criminal jurisdiction over Indians in Indian country would be

---

[3] It is doing so through actors such as Appellee in this case, and other District Attorneys elsewhere despite the opposition of the Nations and the United States. *See United States v. Iski*, No. 6:24-cv-493-CVE (E.D. Okla.); *United States v. Ballard*, No. 4:24-cv-626-CVE-SH (N.D. Okla.).

3

preempted under the "principle of federal law that . . . precludes state interference with tribal self-government." *Id.* at 639 n.2 (first citing *White Mountain Apache Tribe v. Bracker*, 448 U.S. 136, 142-43, 145 (1980); and then citing *McClanahan v. Ariz. State Tax Comm'n*, 411 U.S. 164, 171-72 (1973)). As this case concerns state jurisdiction over Indians, the principles of *McClanahan* rather than *Bracker* apply here, and they confirm that Oklahoma lacks jurisdiction over Indians in Indian country.

## ARGUMENT

### I.    *McGirt*, Not *Castro-Huerta*, Controls This Case.

#### A.    Under the *McGirt* Rule, Oklahoma Lacks Criminal Jurisdiction Over Indians in Indian Country.

In *McGirt*, the Court held that the Creek Reservation exists and is Indian country, *see* 591 U.S. at 898-927, 937-38, and that "[o]nly the federal government, not the State, may prosecute Indians for major crimes committed in Indian country," *id.* at 932. In so holding, the Court rejected the State's claim which asserted that "whether or not the Creek have a reservation, the State's historic practices have always been correct and it remains free to try individuals like Mr. McGirt in its own courts." *Id.* at 927-28. The State claimed that it had jurisdiction over crimes committed by Indians in Indian country: (i) pursuant to the federal statutes that controlled the assignment of criminal cases during the territorial era; (ii) under the Oklahoma Enabling Act, ch. 3335, 34 Stat. 267 (1906); and (iii) based on the claim

4

that, unless it has such jurisdiction, a jurisdictional void would exist at statehood with respect to minor offenses committed by Indians on Indians in Indian country. *McGirt*, 591 U.S. at 927-31.

After first reaffirming that "th[e] Court has long 'require[d] a clear expression of the intention of Congress' before the state or federal government may try Indians for conduct on their lands," 591 U.S. at 929 (quoting *Crow Dog*, 109 U.S. at 572),[4] the *McGirt* Court applied that rule to reject each of the State's contentions. The Court held that the territorial era statutes "merely discuss[] the assignment of cases among courts in the *Indian Territory*" and "say nothing about the division of responsibilities between federal and state authorities after Oklahoma entered the Union." *Id*. The State's reliance on the Oklahoma Enabling Act failed because it sent state-law cases to state court and federal-law cases to federal court, and crimes that were subject to the MCA were federal law cases. *Id.* at 929-30.

The Court then rejected the State's argument that "[i]f Oklahoma lacks the jurisdiction to try Native Americans it has historically claimed, that means at the time of its entry into the Union *no one* had the power to try minor Indian-on-Indian crimes committed in Indian country . . . because the MCA provides federal

---

[4] This Circuit's rule is the same: "unless Congress provides an exception to the rule . . . states possess 'no authority' to prosecute Indians for offenses in Indian country." *Ute Indian Tribe v. Utah*, 790 F.3d 1000, 1004 (10th Cir. 2015) (first quoting *Cheyenne-Arapaho Tribes v. Oklahoma*, 618 F.2d 665, 668 (10th Cir. 1980); and then citing 18 U.S.C. § 1162).

jurisdiction only for major crimes, and no tribal forum existed to try lesser cases after Congress abolished the tribal courts in 1898." *Id.* at 930-31 (citation omitted). The Court held jurisdictional gaps were not "foreign in this area of the law" and that Congress had filled many of those gaps by: "reauthorizing tribal courts to hear minor crimes in Indian country," "allow[ing] affected Indian tribes to consent to state criminal jurisdiction[,] 25 U.S.C. §§ 1321(a), 1326," and "expand[ing] state criminal jurisdiction in targeted bills addressing specific States." *Id.* at 931. "But Oklahoma doesn't claim to have complied with the requirements to assume jurisdiction voluntarily over Creek lands. Nor has Congress ever passed a law conferring jurisdiction on Oklahoma." *Id.*

The *McGirt* rule and the law of this Circuit, *see supra* at 5 n.4, are controlling here, as is the Court's application of the *McGirt* rule to reject the State's argument that its historic practice of exercising criminal jurisdiction over Indians anywhere in the State is lawful. The district court erred in holding otherwise.

### B.    *Castro-Huerta* Does Not Disturb, Much Less Overrule, *McGirt*.

*Castro-Huerta* did not unsettle, much less overrule, *McGirt*, which is controlling here and which governs state jurisdiction over all Indians. The court below therefore erred in relying on *Castro-Huerta*—including *Castro-Huerta*'s application of the *Bracker* test to crimes *by non-Indians* against Indians in Indian country, *see* 597 U.S. at 649-51—to hold that the State has jurisdiction over crimes

committed by nonmember Indians in Indian country. *Kunzweiler*, 2025 WL 3124450, at *2-5.[5]

In *Castro-Huerta*, the Court expressly and repeatedly stated that it was not considering state jurisdiction over Indians in Indian country, *id.* at 639 n.2, 650 n.6; *see also id.* at 648.[6]  Accordingly, *Castro-Huerta*'s preemption analysis cannot be argued to go beyond the express limits set by the Court.  Nor can quotations extracted from the opinion be offered as the *Castro-Huerta* Court's views on a question it explicitly declined to consider.  *Save the Colo. v. Spellmon*, 50 F.4th 954, 960 (10th

---

[5] The district court acknowledged that "[t]he Supreme Court recognized no distinction between member and nonmember Indians in *McGirt*," but ruled the Court did so "because the MCA recognizes no such distinction" and that therefore "the holding in *McGirt* does not support a presumptive prohibition against state criminal jurisdiction over nonmember Indians in this case, as this case does not involve the MCA." 2025 WL 3124450, at *2.  That provides no basis for distinguishing *McGirt* because the *McGirt* Court also considered and rejected the State's argument that it had jurisdiction over Indians, *see supra* at 4-6.  The district court also erred in rejecting the contention "that Congress recognizes no distinction between member and nonmember Indians for the purposes of state criminal jurisdiction in Indian country," 2025 WL 3124450, at *2, as Congress has consistently used the term "Indian" in conferring state jurisdiction over Indians in Indian country, as shown by Public Law 280, which granted certain states criminal "jurisdiction over offenses committed by or against Indians," 18 U.S.C. § 1162, and by enactments that had earlier done so on a state-by-state basis. *See* 18 U.S.C. § 3243 (Kansas); 25 U.S.C. § 232 (New York); Act of June 30, 1948, ch. 759, 62 Stat. 1161 (Iowa), *repealed by* Pub. L. 115-301, 132 Stat. 4395 (2018); Act of May 31, 1946, ch. 279, 60 Stat. 229 (North Dakota).

[6] The district court thus erred in relying on the *Castro-Huerta* Court's rhetorical statement that "States do not need a permission slip from Congress to exercise their sovereign authority." 2025 WL 3124450, at *2 (quoting *Castro-Huerta*, 597 U.S. at 653).

Cir. 2022) ("The language of a judicial decision must be interpreted with reference to the circumstances of the particular case and the question under consideration." (quoting Bryan A. Garner, et al., *The Law of Judicial Precedent* 80 (2016))).

**II.　Congress's Authority Over Crimes By Indians In Indian Country Is Exclusive, As The Constitution And Historical Practice Confirm, Which Renders *Castro-Huerta*'s Analysis Inapplicable Here.**

*Castro-Huerta* cannot be argued to support state criminal jurisdiction over Indians in Indian country because the principles that determine state criminal jurisdiction over non-Indians in Indian country are rooted in the Constitution and longstanding federal law, and *Castro-Huerta* neither considered nor unsettled those principles, which control this case.

**A.　Under the Constitution, Congress's Power Over Indian Tribes and Indians Is Exclusive.**

As the Supreme Court recently reaffirmed, "[i]n a long line of cases, we have characterized Congress's power to legislate with respect to the Indian tribes as 'plenary and exclusive.'" *Haaland v. Brackeen*, 599 U.S. 255, 272-73 (2023) (citation modified); *see also id.* at 275, 278. "While under the Interstate Commerce Clause, States retain 'some authority' over trade, . . . 'virtually all authority over Indian commerce and Indian tribes' lies with the Federal Government." *Id.* at 273

8

(quoting *Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 62 (1996)).[7]  In addition,

"the 'trust relationship between the United States and the Indian people' informs the

exercise of [Congress's] legislative power."  *Id.* at 274-75 (quoting *United States v.*

*Mitchell*, 463 U.S. 206, 225-26 (1983)).  In sum, the "[Supreme Court's] cases leave

little doubt that Congress's power in this field is muscular, superseding both tribal

---

[7] The exclusivity of the federal government's power over Indians and Indian tribes is a result of a deliberate decision made by the Framers in response to dissatisfaction with the terms of the Articles of Confederation that addressed that issue.  As the Court explained in *United States v. Forty-Three Gallons of Whiskey*, 93 U.S. 188, 194 (1876) (emphasis added):

> Under the articles of confederation, the United States had the power of regulating the trade and managing all affairs with the Indians not members of any of the States; provided that the legislative right of a State within its own limits be not infringed or violated.  Of necessity, these limitations rendered the power of no practical value.  This was seen by the convention which framed the Constitution; and *Congress now has the exclusive and absolute power to regulate commerce with the Indian tribes,—a power as broad and as free from restrictions as that to regulate commerce with foreign nations*.

*See also The Federalist No. 42* (James Madison) (Project Gutenberg ed., 2021) ("The regulation of commerce with the Indian tribes is very properly unfettered from two limitations in the articles of Confederation, which render the provision obscure and contradictory.").  In sum, "[t]he final version [of the Constitution] assigned the newly formed federal government a bundle of powers that encompassed 'all that is required for the regulation of [the Nation's] intercourse with the Indians.'" *Brackeen*, 599 U.S. at 316 (Gorsuch, J., concurring) (quoting *Worcester v. Georgia*, 31 U.S. (6 Pet.) 515, 559 (1832)).

9

and state authority." *Id.* at 273 (first citing *Santa Clara Pueblo v. Martinez*, 436 U.S. 49, 56 (1978); and then citing *Dick v. United States*, 208 U.S. 340, 353 (1908)).[8]

The *Brackeen* Court also made clear that Congress's power extends to Indians as individuals, *id.* at 278, to criminal law, and to "establishing a criminal code for Indian country," *id.* at 275.

## B.  Historical Practice Confirms That Congress's Power to Allocate Criminal Jurisdiction Over Indians in Indian Country Is Exclusive.

In the exercise of its constitutional authority over Indian tribes and Indians, Congress has long recognized that its express authorization is required for the federal or state government to exercise criminal jurisdiction over Indians in Indian country. That history is relevant here as "the longstanding 'practice of the government,' . . . can inform our determination of 'what the law is.'" *NLRB v. Noel Canning*, 573 U.S. 513, 525 (2014) (first quoting *McCulloch v. Maryland*, 17 U.S. (4 Wheat.) 316,

---

[8] For these same reasons, the *Castro-Huerta* Court's reference to the Tenth Amendment in addressing state jurisdiction "to prosecute crimes committed *by non-Indians*," 597 U.S. at 653 (emphasis added), cannot be relied on to support state jurisdiction *over Indians*. The Tenth Amendment provides that "[t]he powers *not delegated to the United States by the Constitution*, nor prohibited by it to the States, are reserved to the States respectively, or to the people." *Id.* (emphasis added). The Tenth Amendment did not reserve for the states a power that the Constitution delegated to the federal government. *See New York v. United States*, 505 U.S. 144, 156 (1992) (while "[t]he States unquestionably do retai[n] a significant measure of sovereign authority[,]" that authority is held only "to the extent that the Constitution has not divested them of their original powers and transferred those powers to the Federal Government" (quoting *Garcia v. San Antonio Metro. Transit Auth.*, 469 U.S. 528, 549 (1985))).

4914-8278-7494, v. 11

401 (1819); and then quoting *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 177 (1803)).

Since at least 1817, Congress has acted on the understanding that the exercise of criminal jurisdiction over Indians in Indian country is left exclusively to the tribes absent Congress's express authorization.[9]  In 1817 federal criminal jurisdiction was extended to crimes committed within the Indian country by 'any Indian, or other person or persons,' but 'any offence committed by one Indian against another, within any Indian boundary' was excluded." *Wheeler*, 435 U.S. at 324 (citing Act of Mar. 3, 1817, ch. 92, 3 Stat. 383).  That exception was carried forward in 1834, *id.* at 324-25, another exception was added in 1854 "providing that federal courts would not try an Indian 'who has been punished by the local law of the tribe,'" *id.* at 325 (quoting Act of Mar. 27, 1854, § 3, 10 Stat. 270), and these terms remain in the present-day General Crimes Act, 18 U.S.C. § 1152.  *See* Appellant's Opening Br. at 19-21 (reviewing Congressional enactments authorizing criminal jurisdiction over Indians in Indian country); *United States v. Rogers*, 45 U.S. (4 How.) 567, 573 (1846) (Congress "intended to leave" Indians "as regarded their own tribe, and other tribes also, to be governed by Indian usages and customs").

---

[9] Congress initially only extended federal jurisdiction over crimes by non-Indians against Indians. *See Wheeler*, 435 U.S. at 324 (discussing Act of July 22, 1790, ch. 34, § 5, 1 Stat. 137, 138); Act of May 19, 1796, ch. 30, § 4, 1 Stat. 469, 470; Act of Mar. 30, 1802, ch. 13, § 4, 2 Stat. 139, 141.

11

In *Crow Dog*, the Supreme Court reviewed Congress's enactments authorizing criminal jurisdiction over Indians, and the policy of the government supporting tribal independence to hold that only a clear expression of Congress can authorize criminal jurisdiction over Indians in Indian country.  109 U.S. at 571-72. The question before the Court was whether "section 2146 of the Revised Statutes, which excludes from the jurisdiction of the United States the case of a crime committed in the Indian country by one Indian against the person or property of another Indian, ha[d] been repealed" by the Treaty of April 29, 1868, 15 Stat. 635, and the Act of February 28, 1877, ch. 72, 19 Stat. 254.  *See Crow Dog*, 109 U.S. at 562-63.[10]  The Court held that:

> To give to the clauses in the treaty of 1868 and the agreement of 1877 effect, so as to uphold the jurisdiction exercised in this case, would be to reverse in this instance the general policy of the government towards the Indians, as declared in many statutes and treaties, and recognized in many decisions of this court, from the beginning to the present time. To justify such a departure, in such a case, *requires a clear expression of the intention of congress*, and that we have not been able to find.

*Id*. at 572 (emphasis added).  As the Court later explained, "[a]lthough recognizing the power of Congress to confer such jurisdiction on the federal courts, the [*Crow*

---

[10] The 1868 Treaty contained a provision requiring the signatory Sioux tribes to deliver Indians who had committed crimes against non-Indians to the United States for punishment.  109 U.S. at 567.  The 1877 Act codified an agreement with the Sioux in which the United States guaranteed the signatory tribes an orderly government, that they would be subject to the laws of the United States, and that the United States would protect their property, persons, and lives.  *Id.* at 568-70.

12

4914-8278-7494, v. 11

*Dog*] Court reasoned that, *in the absence of explicit congressional direction*, the Indian tribe retained exclusive jurisdiction to punish the offense." *Keeble v. United States*, 412 U.S. 205, 209-10 (1973) (emphasis added) (footnote omitted).

In "direct response" to *Crow Dog*, Congress enacted the MCA, *Keeble*, 412 U.S. at 209, which the Supreme Court promptly upheld in *United States v. Kagama*, 118 U.S. 375 (1886), a case arising in California from the murder of an Indian allegedly committed by two Indians on an Indian reservation. *Id.* at 375. After reviewing the history of federal-tribal relations both with respect to Indian lands and with the Indians themselves, the Court that Indian tribes

> were, and always have been, regarded as having a semi-independent position where they preserved their tribal relations, not as states, not as nations, not as possessed of the full attributes of sovereignty, but as a separate people, with the power of regulating their internal and social relations, *and thus far not brought under the laws of the Union or of the state within whose limits they resided.*

*Id.* at 381-82 (emphasis added). The Court upheld the MCA, ruling that it was "within the competency of congress" to enact, as "[t]hese Indian tribes *are* the wards of the nation," and that "[t]he power of the general government . . . is [n]ecessary to [the Indians'] protection, as well as to the safety of those among whom they dwell," *id.* at 384, and

> must exist in that government, *because it never has existed anywhere else*; . . . and because it alone can enforce its laws on all the tribes.

13

*Id.* at 384-85 (emphasis added). *Kagama* thus acknowledged what the Constitution and historical practice make plain; that the federal government, not states, has the power to protect Indians in Indian country through the enactment and enforcement of federal laws authorizing criminal jurisdiction over Indians in Indian country.

In short, the MCA was an "intrusion of federal power into the otherwise exclusive jurisdiction of the Indian tribes to punish Indians for crimes committed on Indian land." *United States v. Antelope*, 430 U.S. 641, 642 n.1 (1977) (quoting *Keeble*, 412 U.S. at 209).

Congress has also consistently recognized that states lack jurisdiction over crimes committed by Indians in Indian country absent its express authorization in enacting statutes that grant such jurisdiction. Congress did so initially on a state-by-state basis. *See supra* at 7 n.5. In 1953, Congress expressly authorized other states to exercise civil and criminal jurisdiction over Indians in Indian country, Act of Aug. 15, 1953, Pub. L. No. 83-280, 67 Stat. 588 (codified as amended at 18 U.S.C. § 1162, 25 U.S.C. §§ 1321-1326, 28 U.S.C. § 1360) ("P.L. 280"). As the Court explained in *Bryan v. Itasca County*, 426 U.S. 373, 379 (1976):

> The primary concern of Congress in enacting Pub.L. 280 that emerges from its sparse legislative history was with the problem of lawlessness on certain Indian reservations, and the absence of adequate tribal institutions for law enforcement. See Goldberg, Public Law 280: The Limits of State Jurisdiction over Reservation Indians, 22 U.C.L.A.L.Rev. 535, 541-542 (1975). The House Report states:

14

"These States lack jurisdiction to prosecute Indians for most offenses committed on Indian reservations or other Indian country, with limited exceptions. . . ."

(quoting H.R. Rep. No. 83-848 at 5-6 (1953), *as reprinted in* 1953 U.S.C.C.A.N. 2409, 2411-12).    As the Supreme Court made clear in *McClanahan*, absent compliance with P.L. 280, a state must concede that it "can exercise neither c[i]vil nor criminal jurisdiction over reservation Indians."    411 U.S. at 178 & n.19 (first citing *Kennerly v. Dist. Ct.*, 400 U.S. 423 (1971); and then citing *Kagama*, 118 U.S. 375).[11]

In sum, the rule that the State cannot try Indians for conduct on their lands absent "clear expression of the intention of Congress," *McGirt*, 591 U.S. at 929, reflects longstanding federal law, has been adopted by Congress, and is controlling here.

C.    **The Presumption Against State Jurisdiction Protects Congress's Exclusive Authority Over Indians in Indian Country and Indian Tribes' Inherent Sovereign Authority.**

The presumption that states lack criminal jurisdiction over Indians in Indian country protects Congress's exclusive authority over Indian affairs by recognizing that "a fundamental commitment of Indian law is judicial respect for Congress's primary role in defining the contours of tribal sovereignty." *Michigan v. Bay Mills*

---

[11] *Castro-Huerta* only considered P.L. 280 "[w]ith respect to crimes committed by non-Indians against Indians in Indian country," 597 U.S. at 655, and limited its opinion to that issue. *See supra* at 7-8.

15

*Indian Cmty.*, 572 U.S. 782, 803 (2014) (first citing *Kiowa Tribe of Okla. v. Mfg. Techs., Inc.*, 523 U.S. 751, 758-60 (1998); then citing *Santa Clara Pueblo*, 436 U.S. at 60 ("[A] proper respect . . . for the plenary authority of Congress in this area cautions that [the courts] tread lightly."); and then citing *Cohen's Handbook of Federal Indian Law* § 2.01[1] (2012) ("Judicial deference to the paramount authority of Congress in matters concerning Indian policy remains a central and indispensable principle of the field of Indian law.")); *Ute Indian Tribe v. Lawrence*, 22 F.4th 892, 899-900 (10th Cir. 2022) (The "limits [on state courts' adjudicative authority over Indians' on-reservation conduct] reflect a longstanding federal policy—enforceable against the states under the federal government's plenary and exclusive constitutional authority 'to legislate in respect to Indian tribes'—of 'leaving Indians free from state jurisdiction and control.'" (quoting *Ute Indian Tribe v. Lawrence*, 875 F.3d 539, 541-42 (10th Cir. 2017))).  As the Court explained in *Bay Mills*, "[t]he special brand of sovereignty the tribes retain—both its nature and its extent—rests in the hands of Congress," not the courts.  572 U.S. at 800 (first citing *United States v. Lara*, 541 U.S. 193, 200 (2004); and then citing *Wheeler*, 435 U.S. at 323).  As the Constitution and historical practice plainly show, criminal jurisdiction over Indians in Indian country is part of that sovereignty, and it too rests in Congress's hands, *see supra* at 8-15.

The *Bay Mills* Court's observation that "Congress . . . has the greater capacity 'to weigh and accommodate the competing policy concerns and reliance interests' involved in [tribal sovereign immunity]," 572 U.S. at 800-01 (quoting *Kiowa*, 523 U.S. at 759), also applies here.  This is shown by the adjustments Congress has made to the jurisdictional principles applicable to crimes by Indians in Indian country, which include enacting the predecessors to P.L. 280 and P.L. 280 itself, *see supra* at 7 n.5, 14, and amending P.L. 280 in 1968 to require tribal consent to the assumption of state jurisdiction over Indian country in the state, *see* 25 U.S.C. § 1322(a).  More recently, Congress has adjusted criminal jurisdiction in Indian country in the opposite direction, by reaffirming tribes' inherent sovereign authority to exercise criminal jurisdiction over all Indians, 25 U.S.C. § 1301(2), by enhancing tribal sentencing authority, Tribal Law and Order Act, Pub. L. 111-211, Title II, § 202, 124 Stat. 2262 (2010) (codified at 25 U.S.C. § 1302(b)-(c)), by establishing terms on which tribal jurisdiction may be exercised over domestic violence by non-Indians against Indians, Violence Against Women Act Reauthorization Act of 2013, Pub. L. No. 113-4, § 904, 127 Stat. 54, 120-23 (2013) (codified as amended at 25 U.S.C. § 1304), and by recognizing tribal jurisdiction over certain non-Indians for crimes of violence against children, sexual violence, sex trafficking, stalking, obstruction of justice, and assault of tribal justice personnel in Indian country, Consolidated Appropriations Act 2022, Pub. L. No. 117-103, 136 Stat. 49, 898-901 (2022).  Where

17

Congress has exercised its plenary authority, as it has with respect to criminal jurisdiction over Indians in Indian country, the Court is disinclined to "replace Congress's considered judgment with [the Court's] contrary opinion." *Bay Mills*, 572 U.S. at 803.

In addition, the rule against state criminal jurisdiction over Indians in Indian country implements the well-established principle that "unless and 'until Congress acts, the tribes retain' their historic sovereign authority." *Id.* at 788 (quoting *Wheeler*, 435 U.S. at 323). That authority includes a "concomitant jurisdictional limit on the reach of state law." *McClanahan*, 411 U.S. at 171; *Brackeen*, 599 U.S. at 316 (Gorsuch, J., concurring) (the Supreme Court has "understood the absence of state authority over tribal matters as a natural corollary of Tribes' inherent sovereignty"); *see, e.g.*, *Warren Trading Post Co. v. Ariz. State Tax Comm'n*, 380 U.S. 685, 686-87 (1965) ("[F]rom the very first days of our Government, the Federal Government had been permitting the Indians largely to govern themselves, free from state interference."); *id.* at 687 n.3 ("Certain state laws have been permitted to apply to activities on Indian reservations, where those laws are specifically authorized by acts of Congress, or where they clearly do not interfere with federal policies concerning the reservations."); *Williams v. Lee*, 358 U.S. 217, 223 (1959) ("Congress has . . . acted consistently upon the assumption that the States have no power to regulate the affairs of Indians on a reservation" and "when Congress has

18

wished the States to exercise this power it has expressly granted them the jurisdiction which Worcester v. State of Georgia had denied."). As these cases show, "[t]he policy of leaving Indians free from state jurisdiction and control is deeply rooted in this Nation's history." *McGirt*, 591 U.S. at 928 (quoting *Rice v. Olson*, 324 U.S. 786, 789 (1945)); *see Kagama*, 118 U.S. at 384.

In sum, "[n]o one can contest the 'historic immunity from state and local control' that the Tribes enjoy." *Brackeen*, 599 U.S. at 318 (Gorsuch, J., concurring) (citation modified) (quoting *New Mexico v. Mescalero Apache Tribe*, 462 U.S. 324, 332 (1983)).

## III. The State Lacks Criminal Jurisdiction Over Indians In Indian Country Even Assuming, *Arguendo*, That *Castro-Huerta* Could Be Applied To Decide That Question.

Even if *Castro-Huerta* could properly be said to apply here (it cannot, *see supra* at 6-8), state criminal jurisdiction over crimes by Indians in Indian country would be preempted under the principles of *McClanahan*, on which *Castro-Huerta* relied for the "principle of federal law that . . . precludes state interference with tribal self-government," 597 U.S. at 639 n.2.

*McClanahan* makes clear that "[s]tate laws generally are not applicable to tribal Indians on an Indian reservation except where Congress has expressly provided that State laws shall apply," 411 U.S. at 170-71 (quoting U.S. Dep't of Interior, *Federal Indian Law* 845 (1958)), and reaffirms that "[e]ssentially, absent

19

governing Acts of Congress, the question has always been whether the state action infringed on the right of reservation Indians to make their own laws and be ruled by them," *id.* at 171-72 (quoting *Williams*, 358 U.S. at 219-20). More recently, in *Rice v. Rehner*, 463 U.S. 713 (1983), the Court held that "a presumption of a lack of state authority" applies where "a tradition of self-government in the area" at issue exists, in which case state jurisdiction only applies if "Congress indicate[s] expressly that the State has jurisdiction." *Id.* at 726, 731. That rule applies here as "an Indian tribe's power to punish tribal offenders is part of its own retained sovereignty." *Wheeler*, 435 U.S. at 328-29 (citing *Talton*, 163 U.S. 376); *see also* 25 U.S.C. § 1301(2) ("[R]ecogniz[ing] and affirm[ing]" "the inherent power of Indian tribes . . . to exercise criminal jurisdiction over all Indians.").

In this case, and in any instances where the State asserts authority on the *amici* Nations' Reservations, the exercise of state criminal jurisdiction over Indians would "infringe[] on the right of reservation Indians to make their own laws and be ruled by them," *McClanahan*, 411 U.S. at 171-72, because it would subordinate the Nations' inherent sovereign authority to establish and enforce the rules that govern Indians on their Reservations, *see* 25 U.S.C. § 1301(2), to the requirements of state law. Were the State to have criminal jurisdiction over Indians on the Nations' Reservations, the State legislature would hold the power to enact the laws that govern the daily life of Indians on their Reservations, the state and local police and

20

prosecutors would hold the power to enforce those laws, and the state courts would hold the power to interpret those laws and punish Indians for the violation of those laws. The Nations would become bystanders to the governance of Indians on their Reservations. *See U.S. ex rel. Lynn v. Hamilton*, 233 F. 685, 689, 691 (W.D.N.Y. 1915) (citing *Peters v. Malin*, 111 F. 244 (N.D. Iowa 1901)).

That state jurisdiction would be concurrent would make no difference for several reasons. First, the Nations' criminal laws governing Indians on their reservations would be effective *only* to the extent those laws did not conflict with state law. Second, if state jurisdiction were concurrent, a footrace would determine which sovereign took custody and control of the defendant for the duration of the prosecution, and for the duration of any sentence of incarceration imposed, which as a practical matter would nullify the authority of the sovereign that lost the footrace. Third, even when one of the Nations won that footrace, the tribal court's determination of the appropriate sentence for violation of a tribal crime could be effectively voided by a state sentence imposed following state prosecution for the same conduct.

In short, state jurisdiction here would virtually extinguish Indian tribes' right "as a separate people, with the power of regulating their internal and social affairs," *McClanahan*, 411 U.S. at 173 (quoting *Kagama*, 118 U.S. at 381-82), "to exercise criminal jurisdiction over all Indians" on their reservations in accordance with

21

federal law, 25 U.S.C. § 1301(2).  To say the least, state jurisdiction "would undermine the authority of the tribal courts over Reservation affairs and hence would infringe on the right of the Indians to govern themselves."  *Williams*, 358 U.S. at 223; *Fisher v. Dist. Ct.*, 424 U.S. 382, 387-88 (1976) (per curiam) ("State-court jurisdiction plainly would interfere with the [tribal] powers of self-government" by subjecting Indians in Indian country "to a forum other than the one they have established for themselves.").  Federal law does not permit that result unless, at minimum, Congress has expressly required it.

*McClanahan* also recognizes that federal law may preempt state jurisdiction, and that in this analysis "[t]he Indian sovereignty doctrine . . . provides a backdrop against which the applicable treaties and federal statutes must be read."  411 U.S. at 172.  The *McClanahan* Court found state jurisdiction preempted by relying on the Navajo treaty, the disclaimer provisions of the Arizona Enabling Act, and P.L. 280's provision that States must repeal disclaimer clauses in their Constitutions and obtain tribal consent to exercise jurisdiction in Indian country.  *Id.* at 173-79.  That same analysis shows that federal law has preempted state jurisdiction over Indians on reservations in Oklahoma.  *See* Br. of the Cherokee Nation & Choctaw Nation of Okla. in Supp. of the U.S.'s Mot. for Prelim. Inj. at 27-30, *Iski*, No. 6:24-cv-493-CVE (Dkt. No. 68-1) (principles of *McClanahan* preempt state criminal jurisdiction over Indians in Indian country); *id.* at 30-32 (Cherokee Nation's treaties protect the

22

right to exercise criminal jurisdiction over all Indians within the boundaries of the Cherokee Nation Reservation, exclusive of state authority); *id.* at 24-25, 33 (Oklahoma has never acquired jurisdiction over Indian country under P.L. 280); *id.* at 32-33 ("Section one [of the Oklahoma Enabling Act] is a general reservation of federal and tribal jurisdiction over 'Indians, their lands, [and] property,' except as extinguished by the tribes or the federal—not state—government." (quoting *Indian Country, U.S.A., Inc. v. Okla. ex rel. Okla. Tax Comm'n*, 829 F.2d 967, 979 (10th Cir. 1987))); Br. of the Cherokee Nation, Chickasaw Nation & Choctaw Nation of Okla. in Supp. of the U.S.'s Mot. for Prelim. Inj. at 27-33, *Ballard*, No. 4:24-cv-626-CVE-SH (Dkt. No. 79-1).

Finally, the *McClanahan* Court also made clear that "Congress has . . . provided a method whereby States may assume jurisdiction over reservation Indians," by enacting P.L. 280.  411 U.S. at 177.  To acquire such jurisdiction, "the State must act 'with the consent of the tribe occupying the particular Indian country,' 25 U.S.C. [§] 1322(a), and must 'appropriately (amend its) constitution or statutes.'" *Id.* at 177-78 (footnote omitted) (citing 25 U.S.C. § 1324).  Absent compliance with P.L. 280, a state has "no choice but to" concede that it "can exercise neither c[i]vil nor criminal jurisdiction over reservation Indians." *McClanahan*, 411 U.S. at 178 & n.19 (first citing *Kennerly*, 400 U.S. 423; and then citing *Kagama*, 118 U.S. 375). As Oklahoma has "never acquired jurisdiction over Indian country through [P.L.]

23

280," *Murphy v. Royal*, 875 F.3d 896, 937 (10th Cir. 2017), *aff'd sub nom. Sharp v. Murphy*, 591 U.S. 977 (2020) (per curiam), it therefore remains subject to that rule.

As *McClanahan* is also dispositive here, consideration of the balancing test set forth in *Bracker*, 448 U.S. at 144-45, is unnecessary, as nothing in *Castro-Huerta* suggests state jurisdiction must be preempted twice, under both *McClanahan* and *Bracker*, to be effective. Moreover, deciding questions of state criminal jurisdiction over crimes by Indians in Indian country by applying the *Bracker* balancing test usurps Congress's role, since the Constitution assigns that right and responsibility to Congress, *see supra* at 8-10.

## CONCLUSION

For the foregoing reasons, the Court should reverse the district court's decision.

Dated: May 6, 2026　　　　　　　　　Respectfully submitted,

/s/ Frank S. Holleman
Frank S. Holleman
Douglas B. L. Endreson
SONOSKY, CHAMBERS, SACHSE,
　ENDRESON & PERRY, LLP
1425 K St NW, Suite 600
Washington, D.C. 20005
Tel: 202-682-0240
E-mail: fholleman@sonosky.com
dendreso@sonosky.com

Counsel for *Amici* Cherokee Nation,
　Chickasaw Nation, and Choctaw Nation of
　Oklahoma

24

Chad Harsha, OBA No. 31579
Attorney General
CHEROKEE NATION
OFFICE OF ATTORNEY GENERAL
P.O. Box 1533
Tahlequah, OK 74465
Tel: 918-453-5369
E-mail: chad-harsha@cherokee.org

*Counsel for the Cherokee Nation*

Stephen H. Greetham, OBA No. 21510
GREETHAM LAW, P.L.L.C.
621 Greenwood Road
Chapel Hill, NC 27514-5921
Tel: 984-261-7240
E-mail:  sgreetham@greethamlaw.net

*Counsel for Cherokee Nation and Chickasaw
   Nation*

Michael Burrage, OBA No. 1350
WHITTEN BURRAGE
512 N. Broadway Ave., Suite 300
Oklahoma City, OK 73102
Tel: 405-516-7800
E-mail: mburrage@whittenburragelaw.com

Brian Danker, OBA No. 16638
Senior Executive Officer
DIVISION OF LEGAL & COMPLIANCE
CHOCTAW NATION OF OKLAHOMA
1802 Chukka Hina Dr.
Durant, OK 74701
Tel: 580-642-7423
E-mail: bdanker@choctawnation.com

*Counsel for the Choctaw Nation of Oklahoma*

25

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rules of Appellate Procedure 29(a)(5) and 32(a)(7)(B)(i),

I hereby certify that this brief was prepared in Microsoft Word 365 version 2205 and

contains 6,134 words, as determined by the word processing software.

*/s/ Frank S. Holleman*
Frank S. Holleman

4914-8278-7494, v. 11