No. 26-5013

# In the United States Court of Appeals for the Tenth Circuit

---

MUSCOGEE (CREEK) NATION,
PLAINTIFF-APPELLANT

*v.*

STEVE KUNZWEILER, ET AL.,
DEFENDANTS-APPELLEES

---

*ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA
(CIV. NO. 25-75; THE HONORABLE GREGORY K. FRIZZELL, J.)*

---

**BRIEF OF APPELLEE STEVE KUNZWEILER**

***Oral Argument Requested***

---

WILLIAM T. MARKS
PAUL, WEISS, RIFKIND,
  WHARTON & GARRISON LLP
  *2001 K Street, N.W.*
  *Washington, DC 20006*

S. CONRAD SCOTT
PAUL, WEISS, RIFKIND,
  WHARTON & GARRISON LLP
  *1285 Avenue of the Americas*
  *New York, NY 10019*

KANNON K. SHANMUGAM
DAVIS POLK & WARDWELL LLP
  *1050 17th Street, N.W.*
  *Washington, DC 20036*
  *(202) 962-7000*
  *kshanmugam@davispolk.com*

# TABLE OF CONTENTS

Page

Introduction ...................................................................................................1

Statement of the issue ..................................................................................3

Statement of the case ...................................................................................3

    A.    Background ...........................................................................................3

    B.    Procedural history ............................................................................5

Summary of argument ..................................................................................7

Standard of review ......................................................................................10

Argument ......................................................................................................11

    The district court correctly held that the district attorney may prosecute non-member Indians for non-major crimes committed on the Creek Reservation ....................................................................11

    A.    Under ordinary principles of preemption, the district attorney may prosecute non-member Indians for non-major crimes committed on the Creek Reservation .............................................13

    B.    *Bracker* balancing provides the correct framework for assessing whether a state law impermissibly interferes with tribal sovereignty ....................................................................................17

        1.    *Bracker* balancing determines whether state law impermissibly interferes with tribal self-government .......17

        2.    *Bracker* balancing applies to state laws that regulate non-member Indians ..........................................................19

        3.    The Creek Nation's rule concerning 'traditional domains of tribal sovereignty' is unsupported ..................................25

        4.    In any event, the 'traditional domains of tribal sovereignty' do not include an exclusive right to prosecute non-member Indians .............................................31

        5.    In all events, any rule concerning 'traditional domains of tribal sovereignty' rule would not apply here, given Oklahoma's unique history and conditions ................38

Page

Table of contents—continued:

C.    Under *Bracker* balancing, the district attorney's prosecution of non-member Indians for non-major crimes on the Creek Reservation does not unduly interfere with tribal sovereignty..................................................................43

1.    The State's legitimate interest in prosecution outweighs any countervailing tribal or federal interests......................43

2.    The Creek Nation's contrary arguments lack merit .........47

Conclusion.....................................................................................53

## TABLE OF AUTHORITIES

### CASES

*Atkinson Trading Co.* v. *Shirley*, 532 U.S. 645 (2001) ......................................31

*Bearden* v. *Georgia*, 461 U.S. 660 (1983)................................................44

*Big Sandy Rancheria Enterprises* v. *Bonta*,
    1 F.4th 710 (9th Cir. 2021) ................................................21, 23

*Brown* v. *Duchesne*, 60 U.S. 183 (1857)...........................................44

*California* v. *Cabazon Band of Mission Indians*,
    480 U.S. 202 (1987)..........................................................21, 22, 26

*Cheyenne-Arapaho Tribes* v. *Oklahoma*,
    618 F.2d 665 (10th Cir. 1980)...............................................29, 30

*Chickasaw Nation* v. *State of Oklahoma ex rel. Oklahoma Tax Commission*, 31 F.3d 964 (10th Cir. 1994)...................................30

*City of Tulsa* v. *O'Brien*, 588 P.3d 908 (Okla. Crim. 2024)................................5

*Cotton Petroleum Corp.* v. *New Mexico*, 490 U.S. 163 (1989) ..........................18

*County of Yakima* v. *Confederated Tribes & Bands of Yakima Indian Nation*, 502 U.S. 251 (1992) ...............................................30

Page

Table of authorities—continued:

*Cross, In re*, 30 N.W. 428 (Neb. 1886) .......................................................36

*Crow Dog, Ex Parte*, 109 U.S. 556 (1883)..................................................35

*Denezpi* v. *United States*, 596 U.S. 591 (2022) .......................................51

*Department of Taxation & Finance* v. *Milhelm Attea & Bros.*,
   512 U.S. 61 (1994)................................................................................18

*Duro* v. *Reina*, 495 U.S. 676 (1990).......................................16, 23, 32,
                                                                          33, 34

*Exxon Mobil Corp.* v. *Allapattah Services, Inc.*, 545 U.S. 546 (2005).............34

*Free the Nipple-Fort Collins* v. *City of Fort Collins*,
   916 F.3d 792 (10th Cir. 2019).............................................................10

*FS Credit Opportunities Corp.* v. *Saba Capital Master Fund, Ltd.*,
   No. 24-345, 2026 WL 1686059 (U.S. 2026) ......................................34

*Haaland* v. *Brackeen*, 599 U.S. 255 (2023) .........................................14

*Hagen* v. *Utah*, 510 U.S. 399 (1994) ..............................................24, 36

*HCI Distribution, Inc.* v. *Peterson*, 110 F.4th 1062 (8th Cir. 2024) ................23

*Kaul* v. *Stephan*, 83 F.3d 1208 (10th Cir. 1996).........................14, 23, 34, 35, 49

*McClanahan* v. *Arizona State Tax Commission*,
   411 U.S. 164 (1973)................................................................20, 21, 26

*McGirt* v. *Oklahoma*, 591 U.S. 894 (2020)...........................3, 4, 9, 24, 36, 39, 45

*Mescalero Apache Tribe* v. *Jones*, 411 U.S. 145 (1973) ....................................14

*Montana* v. *United States*, 450 U.S. 544 (1981) ...........................................32

*Murphy* v. *Royal*, 875 F.3d 896 (10th Cir. 2017),
   *aff'd*, 591 U.S. 977 (2020)..................................................................23

Page

Table of authorities—continued:

*Muscogee (Creek) Nation* v. *Pruitt*,
669 F.3d 1159 (10th Cir. 2012)..................................................14, 18, 23, 32

*Navajo Nation* v. *Dalley*, 896 F.3d 1196 (10th Cir. 2018)..........................20, 30

*Nevada* v. *Hicks*, 533 U.S. 353 (2001)................................................12, 14

*New Mexico* v. *Mescalero Apache Tribe*,
462 U.S. 324 (1983)..............................................................18, 28, 30, 41

*Oklahoma Tax Commission* v. *Chickasaw Nation*,
515 U.S. 450 (1995)..........................................................................22

*Oklahoma Tax Commission* v. *United States*,
319 U.S. 598 (1943)....................................................................39, 45

*Oklahoma* v. *Castro-Huerta*, 597 U.S. 629 (2022).........................1, 2, 4-8, 10-21,
25, 26, 33, 34, 38, 42,
44, 46, 47, 49-51, 53

*Oliphant* v. *Suquamish Indian Tribe*, 435 U.S. 191 (1978)...............................32

*Oregon* v. *Ice*, 555 U.S. 160 (2009)....................................................44

*Organized Village of Kake* v. *Egan*, 369 U.S. 60 (1962) ..............................14, 44

*Prairie Band Potawatomi Nation* v. *Wagnon*,
476 F.3d 818 (10th Cir. 2007)..............................................................11, 25

*Puyallup Tribe, Inc.* v. *Department of Game*, 433 U.S. 165 (1977)...........40, 41

*Ramah Navajo School Board, Inc.* v. *Bureau of Revenue*,
458 U.S. 832 (1982)......................................................................18, 48

*Rice* v. *Rehner*, 463 U.S. 713 (1983)..................................................28, 29

iv

Page

Table of authorities—continued:

*Salt River Pima-Maricopa Indian Community* v. *Arizona,*
  50 F.3d 734 (9th Cir. 1995)................................................................23

*Schrier* v. *University of Colorado,* 427 F.3d 1253 (10th Cir. 2005)..................10

*Solem* v. *Bartlett,* 465 U.S. 463 (1984) ........................................................23, 36

*State* v. *Big Sheep,* 243 P. 1067 (Mont. 1926)........................................36

*State* v. *Campbell,* 55 N.W. 553 (Minn. 1893) ................................................36, 37

*State* v. *Rufus,* 237 N.W. 67 (Wis. 1931)..................................................36

*Strate* v. *A-1 Contractors,* 520 U.S. 438 (1997)......................................32

*Stroble* v. *Oklahoma Tax Commission,*
  No. 25-382, 2026 WL 922510 (U.S. Apr. 6, 2026)................................31

*Stroble, In re,* 588 P.3d 179 (Okla. 2025),
  cert. denied, 2026 WL 922510 (U.S. Apr. 6, 2026)..................................39, 41

*Three Affiliated Tribes of Fort Berthold Reservation* v. *Wold
  Engineering, P.C.,* 467 U.S. 138 (1984)................................................46, 52

*United States ex rel. Bergen* v. *Lawrence,* 848 F.2d 1502 (10th Cir. 1988).....10

*United States* v. *Cooley,* 593 U.S. 345 (2021)................................................50

*United States* v. *Hopson,* 150 F.4th 1290 (10th Cir. 2025),
  cert. denied, 2026 WL 1640874 (2026) ..................................................24, 36

*United States* v. *Kagama,* 118 U.S. 375 (1886)................................................35

*United States* v. *Lanza,* 260 U.S. 377 (1922) ................................................51

*United States* v. *Lara,* 541 U.S. 193 (2004)................................................14, 33

*United States* v. *McBratney,* 104 U.S. 621 (1881)................................................35

*United States* v. *Sands,* 968 F.2d 1058 (10th Cir. 1992)...........................24, 36

Page

Table of authorities—continued:

*Ute Indian Tribe of the Uintah & Ouray Reservation* v. *Utah*,
790 F.3d 1000 (10th Cir. 2015)......................................................23, 36

*Ute Indian Tribe* v. *Lawrence*, 22 F.4th 892 (10th Cir. 2022).........................30

*Wagnon* v. *Prairie Band Potawatomi Nation*,
546 U.S. 95 (2005)............................................................................24, 25

*Washington* v. *Confederated Tribes of the Colville Indian
Reservation*, 447 U.S. 134 (1980) ..............................2, 18, 21-24, 27,
31, 35, 46, 49

*Wells* v. *City & County of Denver*, 257 F.3d 1132 (10th Cir. 2001)...................11

*White Mountain Apache Tribe* v. *Bracker*, 448 U.S. 136 (1980)......... 1, 7-9, 12,
16-25, 27-29, 38, 42,
43, 46, 48, 49, 51-53

*Worcester* v. *Georgia*, 31 U.S. (6 Pet.) 515 (1832) ......................................12, 21

## CONSTITUTIONS AND STATUTES

U.S. Const. Art. I, § 8, cl. 3 ...........................................................................12, 13

U.S. Const. Art. II, § 2, cl. 2.................................................................................13

Muscogee Creek Nation Const. Art. VII (1979) ................................................39

Act of Aug. 15, 1953, Pub. L. No. 83-280, 67 Stat. 588.................7, 15, 16, 37, 38

18 U.S.C. § 1152 (General Crimes Act) ......................................................7, 15, 18

18 U.S.C. § 1153 (Major Crimes Act) ....................................................1, 3, 24, 36

18 U.S.C. § 1162 ..................................................................................................15

25 U.S.C. § 1301(2)..........................................................7, 16, 33, 34, 46, 50

25 U.S.C. § 1302(a)(7) .........................................................................................48

Page

Statutes—continued:

25 U.S.C. § 1321 ..............................................................................15

42 U.S.C. § 1983 ..............................................................................52

21 OK Stat. § 1021.2v2 .....................................................................48

## MISCELLANEOUS

S. Rep. No. 153, 102d Cong., 1st Sess. (1991).......................................34

Tulsa County, *About Tulsa County* <www2.tulsacounty.org/about> ..........42

## STATEMENT OF RELATED CASES

This case came before this Court previously when two individuals appealed from the denial of their motions to intervene in the district court. *See* Nos. 25-5061, 25-5062 & 25-5064. Appellee is not aware of any related cases currently pending before this Court.

**INTRODUCTION**

Tulsa County District Attorney Steve Kunzweiler has authority to prosecute Indians who are not members of the Muscogee (Creek) Nation for state-law crimes that are committed on the Creek Reservation and are not of the kind enumerated in the federal Major Crimes Act. As the Supreme Court recently explained in *Oklahoma* v. *Castro-Huerta*, 597 U.S. 629 (2022), a State has "sovereignty and jurisdiction over all the territory within her limits." *Id.* at 636 (citation omitted). Indian country is no exception because it is "part of the State, not separate from the State." *Id.* A State may thus prosecute crimes in Indian country unless federal law preempts that authority. And federal law can do so only in two ways: if "ordinary principles of federal preemption" apply or if the exercise of state authority would "unlawfully infringe on tribal self-government." *Id.* at 638.

As the district court correctly held, neither form of preemption applies here. No provision of federal law preempts the State of Oklahoma's sovereign prosecutorial authority under ordinary principles of preemption; indeed, the Creek Nation does not seriously argue otherwise. And under the familiar balancing test set forth in *White Mountain Apache Tribe* v. *Bracker*, 448 U.S. 136 (1980), the State's powerful interest in protecting all of its citizens—Indians and non-Indians alike—from criminal activity outweighs any contrary interest the Creek Nation might have. By definition, non-member Indians are not political constituents of the Creek Nation. And the State's exercise of concurrent

(1)

criminal jurisdiction with the Creek Nation in no way interferes with any legitimate interest the Creek Nation may have in prosecuting crimes committed by non-member Indians.

The Creek Nation attempts to resist that conclusion by broadening this case into one concerning the district attorney's authority to prosecute "Indians" *in general* for crimes committed on the Creek Reservation. But this case does not present such a sweeping question. The district attorney has never asserted the authority to prosecute members of the Creek Nation for offenses committed on the Creek Reservation. This case thus concerns only *non-member* Indians, who "[f]or most practical purposes . . . stand on the same footing as non-Indians resident on the reservation." *Washington* v. *Confederated Tribes of the Colville Indian Reservation*, 447 U.S. 134, 161 (1980). For that reason alone, many of the Creek Nation's arguments and authorities are inapposite.

The Creek Nation is also incorrect that Oklahoma needs authorization from Congress to exercise its criminal jurisdiction here, on the theory that prosecuting Indians in Indian country is a "traditional domain of tribal sovereignty." That rule would stand *Castro-Huerta* on its head: Oklahoma does "not need a permission slip from Congress to exercise [its] sovereign authority." *Castro-Huerta*, 597 U.S. at 653.

The district court correctly held that the district attorney may prosecute non-Creek Indians for non-major crimes committed on the Creek Reservation. Its judgment should be affirmed.

## STATEMENT OF THE ISSUE

Whether the District Attorney for Tulsa County, Oklahoma, may prosecute Indians who are not members of the Creek Nation for state-law crimes that are committed within the boundaries of the Creek Reservation and are not of the kind enumerated in the Major Crimes Act, 18 U.S.C. § 1153.

## STATEMENT OF THE CASE

### A.    Background

Defendant-appellee Steve Kunzweiler is the District Attorney for Oklahoma's Fourteenth Prosecutorial District.  The Fourteenth District encompasses Tulsa County, the State's most densely populated county with more than 650,000 residents, and nearly all of the City of Tulsa, the State's second-largest city.  App. 14.  Plaintiff-appellant is the Muscogee (Creek) Nation, a federally recognized tribe.  App. 13.

In *McGirt* v. *Oklahoma*, 591 U.S. 894 (2020), the Supreme Court held that the Creek Nation's historical reservation had never been disestablished and thus constituted "Indian country" for purposes of the Major Crimes Act, 18 U.S.C. § 1153, which courts have interpreted as granting the federal government exclusive jurisdiction to prosecute certain enumerated felonies

3

involving Indians in Indian country. *See McGirt*, 591 U.S. at 897-898. The Creek Reservation extends over nearly two-thirds of Tulsa County, App. 14, including "most of Tulsa," *McGirt*, 591 U.S. at 932. Of the approximately 137,000 Indians who live on the Creek Reservation, only around 46,000—or one-third—are enrolled citizens of the Creek Nation. App. 314, 395.

In *Oklahoma* v. *Castro-Huerta*, 597 U.S. 629 (2022), the Supreme Court reaffirmed that Indian country, including reservations in Oklahoma, remains "part of the State." *Id.* at 636. Accordingly, a State presumptively retains criminal jurisdiction over "all of its territory, including Indian country," unless that jurisdiction is preempted by federal law under "ordinary principles of federal preemption" or because the exercise of state jurisdiction would "unlawfully infringe on tribal self-government." *Id.* at 636, 638. Applying that framework, the Court held that Oklahoma retains jurisdiction to prosecute crimes that non-Indians commit against Indians in Indian country. *Id.* at 656.

Following *Castro-Huerta*, District Attorney Kunzweiler began prosecuting Indians who are not members of the Creek Nation for committing non-major crimes on the Creek Reservation. *See* App. 17; *see, e.g.*, *Oklahoma* v. *Bohanan*, No. CM-2022-108 (Tulsa Cnty. Dist. Ct. filed Jan. 10, 2022). On the Creek Reservation alone, approximately two-thirds of the Indians are non-members. App. 314, 395. The district attorney has not prosecuted members

of the Creek Nation who commit crimes on the Creek Reservation; in his view, he "cannot" do so.  D. Ct. Dkt. 86, at 186-187.

In 2024, two years after the district attorney began prosecuting non-members, the Oklahoma Court of Criminal Appeals (the State's highest criminal court) affirmed his right to do so.  *See City of Tulsa* v. *O'Brien*, 588 P.3d 908 (2024).  Applying *Castro-Huerta*, the Court of Criminal Appeals held that neither ordinary principles of preemption nor principles of tribal sovereignty preempt Oklahoma's authority to exercise criminal jurisdiction over Indians who commit crimes in the Indian country of a tribe of which they are not members.  *Id.* at 915-921.

### B.    Procedural History

1.    After the Oklahoma Court of Criminal Appeals' decision, and more than three years after the district attorney began prosecuting non-members, the Creek Nation filed this action in the District Court for the Northern District of Oklahoma.  App. 3.  The Nation sought a declaratory judgment that the County lacks criminal jurisdiction over any Indian for conduct occurring within the Creek Reservation, as well as preliminary and permanent injunctive relief prohibiting the district attorney from asserting criminal jurisdiction over Indians within the boundaries of the Creek Nation.  App. 19, 28.  The Creek Nation cited five prosecutions as the basis for its action; in each, the

district attorney had prosecuted a non-member Indian for conduct that occurred on the Creek Reservation.  App. 17.

2. After a hearing, the district court denied the Creek Nation's motion for a preliminary injunction.  *See* App. 270.  The district court held that the Creek Nation had failed to demonstrate entitlement to relief under the four traditional factors for injunctive relief.  App. 270.  As to likelihood of success on the merits, the district court reasoned that *Castro-Huerta* "sets forth the preemption analysis by which issues of a State's criminal jurisdiction in Indian country must be evaluated and decided."  App. 273.  Applying that framework, the court held that federal law did not preempt Oklahoma's presumptive authority to assert jurisdiction over all its territory, including over non-member Indians in Indian country.  App. 273-278.  The court further determined that the Creek Nation had failed to demonstrate irreparable harm and that the balance of harms and public interest weighed again the issuance of an injunction.  App. 278-281 & n.4.

3. After the district court's decision, the parties agreed that the district court's ruling on the preliminary injunction "decide[d] the controlling issue in this case."  App. 283-284.  Accordingly, the parties jointly requested that the court enter final judgment, with the Creek Nation reserving the right to appeal, and the court did so.  App. 284, 286.

## SUMMARY OF ARGUMENT

The district court correctly held that the district attorney may prosecute non-members of the Creek Nation under state law for non-major crimes committed on the Creek Reservation.

A.    As the district court correctly recognized, the preemption framework articulated in *Oklahoma* v. *Castro-Huerta*, 597 U.S. 629 (2022), applies here.    Under that framework, States have criminal jurisdiction throughout their territory, which includes Indian country, unless the exercise of jurisdiction is preempted by federal law because ordinary principles of federal preemption apply or because the exercise of state jurisdiction would impermissibly infringe on tribal self-government.

B.    Under ordinary principles of preemption, federal law does not preempt the district attorney's authority to prosecute non-member Indians for non-major crimes committed on the Creek Reservation.  The Creek Nation does not seriously argue to the contrary, and for good reason.  Nothing in any of the federal laws the Creek Nation discusses or that are plausibly relevant here—namely, the Constitution, the General Crimes Act, Public Law 280, and the federal statute known as the "*Duro* fix"—preempts Oklahoma's preexisting criminal jurisdiction over crimes committed in Indian country.

C.    Under *Castro-Huerta*, the balancing test articulated in *White Mountain Apache Tribe* v. *Bracker*, 448 U.S. 136 (1980), governs the question whether the State's exercise of criminal jurisdiction excessively interferes

7

with tribal self-government. That test requires a court to weigh the State's interests against the effect of state law on any competing tribal and federal interests.

The Creek Nation argues that *Bracker* balancing is inapplicable. In the Nation's view, the prosecution of all Indians in Indian country—including non-members—constitutes a "traditional domain of tribal sovereignty" where state law cannot apply absent authorization from Congress. But that expansive approach plainly contravenes *Castro-Huerta*, which makes clear that *Bracker* provides the correct framework for considering the effect of state law on tribal sovereignty, regardless of whether the state law regulates non-Indians or non-member Indians. There is no support in precedent for the Creek Nation's proposed rule. As the Supreme Court has repeatedly explained, federal law long ago moved away from limiting state jurisdiction based on the sort of "platonic notions of Indian sovereignty" the Creek Nation invokes. In any event, there is no "traditional domain of tribal sovereignty" creating an exclusive tribal right to prosecute non-member Indians; to the contrary, courts have long treated non-member Indians as analogous to non-Indians for most purposes. And there is certainly no such "traditional domain" in eastern Oklahoma, given the region's distinctive history and demographics and the fact that the Creek Nation lacked tribal courts in which to prosecute *anyone* for most of the twentieth century.

D. Applying *Bracker*, the district court correctly determined that the district attorney's exercise of prosecutorial authority does not impermissibly interfere with tribal self-government. The State has a powerful sovereign interest in enforcing its criminal laws to protect all of its citizens, including its citizens who are members of a federally recognized Indian tribe. And that interest is no less compelling merely because the crime is committed by a non-member Indian on the Creek Reservation. The Creek Reservation recognized in *McGirt* is not the typical Indian reservation. Its population is overwhelmingly non-Indian, and the State has provided public services to all residents within reservation borders since statehood.

The Creek Nation's and the federal government's potential competing interests are comparatively weak. For the Creek Nation, non-members are functionally equivalent to non-Indians in that they are not constituents of the tribe. And because state jurisdiction over non-member Indians would be concurrent with tribal jurisdiction, its exercise would not deprive the tribe of any prosecutorial interest it has. Concurrent state jurisdiction would also supplement federal jurisdiction, furthering the federal interest in ensuring public safety on the reservation.

The Creek Nation's contrary arguments fail. The Nation's exercise of its own tribal jurisdiction cannot vindicate the State's sovereign interest in applying its own criminal laws. For many crimes, moreover, the tribe lacks the

authority to impose the same punishments that the State would. In addition, concurrent state jurisdiction would not interfere with tribal sovereignty merely because the State might impose harsher penalties for the same conduct. The Supreme Court considered and implicitly rejected that argument in *Castro-Huerta*, and any disparities in penalties are an ordinary incident of dual sovereignty—no different from what the tribe already experiences with concurrent federal jurisdiction.

## STANDARD OF REVIEW

This Court reviews the denial of injunctive relief for abuse of discretion. *Free the Nipple-Fort Collins* v. *City of Fort Collins*, 916 F.3d 792, 796 (10th Cir. 2019). A district court abuses its discretion if it makes an error of law, a clear factual error, or otherwise exercises "arbitrary, capricious, whimsical, or manifestly unreasonable judgment." *Schrier* v. *University of Colorado*, 427 F.3d 1253, 1258 (10th Cir. 2005) (citation omitted).

Because the parties stipulated that the district court's "ruling on plaintiff's motion for preliminary injunction decided the controlling issue in this case" and jointly requested the entry of final judgment, App. 283-284 (citation omitted), the district court's denial of the motion for a preliminary injunction merged into the final judgment. *See United States ex rel. Bergen* v. *Lawrence*, 848 F.2d 1502, 1512 (10th Cir. 1988). The question before this Court is thus

10

whether the district court properly denied the Creek Nation a permanent injunction.

To obtain a permanent injunction, a litigant must demonstrate "actual success on the merits"; "irreparable harm"; the "threatened injury outweighs the harm that the injunction may cause the opposing party"; and the requested injunction would not "adversely affect the public interest." *Prairie Band Potawatomi Nation* v. *Wagnon*, 476 F.3d 818, 822 (10th Cir. 2007) (citation omitted). Because the parties' arguments on the three equitable factors are largely intertwined with the merits, *cf.* Creek Br. 52-54, the principal question on appeal is whether the district court correctly resolved the legal question that the parties stipulated was controlling. *See Wells* v. *City & County of Denver*, 257 F.3d 1132, 1136, 1138 (10th Cir. 2001) (proceeding directly to the merits in a similar procedural posture).

## ARGUMENT

**THE DISTRICT COURT CORRECTLY HELD THAT THE DISTRICT ATTORNEY MAY PROSECUTE NON-MEMBER INDIANS FOR NON-MAJOR CRIMES COMMITTED ON THE CREEK RESERVATION**

In *Oklahoma* v. *Castro-Huerta*, 597 U.S. 629 (2022), the Supreme Court considered whether a State has jurisdiction to prosecute a non-Indian who committed a state-law crime against an Indian in Indian country. The Court held the answer was yes. *See id.* at 636. The Court explained that, "as a matter of state sovereignty," a State has "jurisdiction over all the territory within her

11

limits," including Indian country, which is "part of the State," not "separate" from it. *Id.* (citation omitted). A State, the Court thus explained, does not need a "permission slip" from Congress to exercise criminal jurisdiction in Indian country. *Id.* at 653. Instead, the "default" rule is that a State has jurisdiction over state-law crimes committed in Indian country unless federal law preempts that authority. *See id.* at 638-639, 653.

As the Supreme Court explained in *Castro-Huerta*, that "default" rule has a long historical pedigree. *See id.* at 653. The Supreme Court once viewed state law as having "no force" in Indian country because Indian country was "completely separated from that of the [S]tates." *Worcester* v. *Georgia*, 31 U.S. (6 Pet.) 515, 557, 561 (1832). But that view "yielded to closer analysis," *Castro-Huerta*, 597 U.S. at 636 (citation omitted), and the Court "[l]ong ago" "departed" from it, *White Mountain Apache Tribe* v. *Bracker*, 448 U.S. 136, 141 (1980). Accordingly, "[s]ince the latter half of the 1800s, the Court has consistently and explicitly held that Indian reservations are part of the surrounding State and subject to the State's jurisdiction except as forbidden by federal law." *Castro-Huerta*, 597 U.S. at 636 (internal quotation marks and citation omitted). Over a century of precedent thus makes clear today that "State sovereignty does not end at a reservation's border." *Nevada* v. *Hicks*, 533 U.S. 353, 361 (2001).

12

The Creek Nation does not dispute that *Castro-Huerta*'s basic preemption framework controls this case. It accepts that the question in this case is whether "federal law preempt[s] [Oklahoma's] authority in Indian country 'under ordinary principles of preemption,'" or because the "'exercise of state jurisdiction would unlawfully infringe upon tribal self-government.'" Br. 15 (quoting *Castro-Huerta*, 597 U.S. at 638, 649). The answer to both questions is no.

**A.     Under Ordinary Principles Of Preemption, The District Attorney May Prosecute Non-Member Indians For Non-Major Crimes Committed On The Creek Reservation**

Notably, the Creek Nation makes no genuine attempt to argue that, under ordinary principles of preemption, federal law preempts the district attorney's authority to prosecute non-members for non-major crimes committed within the Creek Reservation. Instead, the Creek Nation offers a historical survey of Indian law (Br. 18-33), citing various federal laws that it believes establish that prosecution of non-member Indians in Indian country constitutes a "traditional domain of tribal sovereignty." *See* pp. 25-42, *infra*. None of those laws preempts the State of Oklahoma's criminal jurisdiction under ordinary principles of preemption.

1.     The Creek Nation first discusses the Constitution, suggesting that it grants the federal government broad authority in Indian affairs "to the exclusion of the [S]tates." Br. 20; *see also* Br. 18-20, 42-43. To be sure, the Indian

Commerce Clause, Art. I, § 8, cl. 3, and Treaty Clause, Art. II, § 2, cl. 2, grant Congress "broad general powers to legislate in respect to Indian tribes." *United States* v. *Lara*, 541 U.S. 193, 200 (2004). But that authority is "not unbounded"; while "plenary within its sphere," that sphere "has borders." *Haaland* v. *Brackeen*, 599 U.S. 255, 276 (2023). In particular, the Constitution's grant of authority to the federal government does not deprive States of criminal jurisdiction within *their* spheres: "[u]nder the Constitution, States have jurisdiction to prosecute crimes within their territory," including "crimes committed in Indian country." *Castro-Huerta*, 597 U.S. at 638, 652-653.

The Creek Nation also contends that the Constitution grants the federal government exclusive authority not just with respect to Indian tribes, but also with respect to "individual Indians." Br. 17; *see also* Br. 15. That is incorrect. The Supreme Court has long held that States have jurisdiction, including criminal jurisdiction, over Indians for off-reservation conduct. *See Hicks*, 533 U.S. at 362; *Mescalero Apache Tribe* v. *Jones*, 411 U.S. 145, 147-149 (1973) (*Jones*); *Organized Village of Kake* v. *Egan*, 369 U.S. 60, 75 (1962). That same jurisdictional principle extends to tribal members when "act[ing] outside of their own Indian country," including "within the Indian country of another tribe." *Muscogee (Creek) Nation* v. *Pruitt*, 669 F.3d 1159, 1172 (10th Cir. 2012); *see Kaul* v. *Stephan*, 83 F.3d 1208, 1218-1220 (10th Cir. 1996).

14

2.     The Creek Nation also raises the General Crimes Act, which provides that "the general laws of the United States . . . shall extend to the Indian country." 18 U.S.C. § 1152. As the Creek Nation observes (Br. 21), that statute makes federal-enclaves law applicable in Indian country. But it "does not say that Indian country is equivalent to a federal enclave for jurisdictional purposes." *Castro-Huerta*, 597 U.S. at 639. Nor does it "make federal jurisdiction exclusive" in Indian country or "preempt state jurisdiction" there. *Id.* at 644. Instead, it "simply 'extend[s]' federal law to Indian country, leaving untouched the background principle of state jurisdiction over crimes committed within the State, including in Indian country." *Id.* at 639 (quoting 18 U.S.C. § 1152).

3.     The Creek Nation mentions in passing (Br. 27-29) Public Law 280 and its state-specific predecessors, which "affirmatively grant[] certain States broad jurisdiction to prosecute state-law offenses committed by or against Indians in Indian country." *Castro-Huerta*, 597 U.S. at 647; *see* 18 U.S.C. § 1162. States may also opt in to that same scheme with tribal consent. *See* 25 U.S.C. § 1321. But as the Supreme Court reiterated in *Castro-Huerta*, Public Law 280 "does not preempt any preexisting or otherwise lawfully assumed jurisdiction that States possess to prosecute crimes in Indian country." 597 U.S. at 647. That follows from the law's text, which "contains no language that preempts States' civil or criminal jurisdiction." *Id.* at 648.

15

The Creek Nation hints (Br. 27-28) that Public Law 280 may impliedly preempt States' criminal jurisdiction over Indians because Congress would not have needed affirmatively to grant States such jurisdiction if they already had it.  But the Supreme Court considered and rejected a similar argument in *Castro-Huerta*.  *See* 597 U.S. at 648.  As the Court explained, Public Law 280 was not "pointless surplusage," even though States already had concurrent jurisdiction over crimes committed by non-Indians, because it empowered States to prosecute crimes committed by *any Indian*, obviating the need to consider whether the exercise of such jurisdiction would impermissibly interfere with tribal self-government.  *See id.* (citing *Bracker*, 448 U.S. at 142-143).

4.    Finally, the Creek Nation discusses (Br. 31-32) the statute implementing the "*Duro* fix," 25 U.S.C. § 1301(2).  That statute was enacted in the wake of the Supreme Court's decision in *Duro* v. *Reina*, 495 U.S. 676 (1990), which held that tribes' retained sovereignty does not include the right to prosecute non-members.  The statute defines the "powers of self-government" of the federally recognized Indian tribes to include the "inherent power" to exercise criminal jurisdiction over "all Indians." 25 U.S.C. § 1301(2).  But like Public Law 280, Section 1301(2) contains no language divesting the States of any criminal jurisdiction in Indian country.  Instead, it is simply a definitional provision that gives a tribe concurrent jurisdiction to prosecute all Indians,

16

including non-members of the tribe, for crimes committed in the tribe's Indian country.

### B.    *Bracker* Balancing Provides The Correct Framework For Assessing Whether A State Law Impermissibly Interferes With Tribal Sovereignty

Because no federal law preempts Oklahoma's exercise of criminal jurisdiction over non-member Indians under an ordinary preemption analysis, those prosecutions may proceed unless the Creek Nation shows that they would "unlawfully infringe upon tribal self-government." *Castro-Huerta*, 597 U.S. at 649 (citing *Bracker*, 448 U.S. at 142-143); *see id.* at 639 n.2. As *Castro-Huerta* makes clear, the *Bracker* balancing test supplies the correct framework for that inquiry. The Creek Nation resists the application of *Bracker* balancing, but its proposed alternative does not withstand scrutiny.

### 1.    Bracker *Balancing Determines Whether State Law Impermissibly Interferes With Tribal Self-Government*

For over forty years, courts have applied *Bracker* balancing to determine whether state law impermissibly interferes with tribal self-government and is thus preempted. In answering that question, the "tradition of Indian sovereignty over the reservation and tribal members" will rarely justify "[a]utomatic exemptions" from state law. *Bracker*, 448 U.S. at 143 (internal quotation marks and citation omitted). Instead, tribal sovereignty provides an "important backdrop" to the analysis and must be weighed against "any applicable regulatory interest of the State." *Id.* at 143-144 (citation omitted).

Defining the bounds of tribal sovereignty thus necessarily requires an "accommodation between the interests of the Tribes and the Federal Government, on the one hand, and those of the State, on the other." *Washington* v. *Confederated Tribes of the Colville Indian Reservation*, 447 U.S. 134, 156 (1980).

The Supreme Court and this Court have repeatedly applied *Bracker* balancing to assess whether a challenged state law impermissibly infringes on tribal self-government. *See, e.g., Castro-Huerta*, 597 U.S. at 649-651; *Department of Taxation & Finance* v. *Milhelm Attea & Bros.*, 512 U.S. 61, 73-75 (1994); *Cotton Petroleum Corp.* v. *New Mexico*, 490 U.S. 163, 176-187 (1989); *New Mexico* v. *Mescalero Apache Tribe*, 462 U.S. 324, 333-344 (1983) (*Mescalero Apache Tribe*); *Ramah Navajo School Board, Inc.* v. *Bureau of Revenue*, 458 U.S. 832, 837-846 (1982); *Pruitt*, 669 F.3d at 1170-1182.

*Castro-Huerta* makes clear that *Bracker* supplies the correct framework for determining whether state law impermissibly interferes with tribal self-government. In *Castro-Huerta*, the Court stated that, if "a State lacks prosecutorial authority over crimes committed by Indians in Indian country," it would be not because of the General Crimes Act but instead because of the "separate principle of federal law" that "precludes state interference with tribal self-government"—and it followed that statement by citing *Bracker*. 597 U.S. at 639 n.2. The Court proceeded to apply *Bracker*, upholding Oklahoma's exercise of concurrent jurisdiction over crimes committed by non-

18

Indians against Indians in Indian country only after considering how those prosecutions would affect the balance of tribal, federal, and state interests. *See id.* at 649-651.

If there were any previous doubt, *Castro-Huerta* thus makes it clear that *Bracker* balancing applies to determine whether Oklahoma's exercise of concurrent jurisdiction to prosecute non-major offenses by non-member Indians on the Creek Reservation would impermissibly infringe on tribal sovereignty.

### 2. Bracker *Balancing Applies To State Laws That Regulate Non-Member Indians*

Without disputing that *Castro-Huerta*'s preemption framework is generally controlling, the Creek Nation seeks to distinguish that decision's invocation of *Bracker* balancing (Br. 15-16, 37-38) on the ground that it arose from the prosecution of a non-Indian. According to the Creek Nation (Br. 16, 37-40), *Bracker* balancing applies only to laws that regulate the conduct of non-Indians in Indian country; when the conduct of Indians in Indian country is at issue, the Creek Nation contends, a more categorical rule requiring congressional authorization applies. That argument is incorrect.

a. The Creek Nation's attempt to distinguish *Bracker* misreads *Castro-Huerta*. Although *Castro-Huerta* did involve the application of state law to a non-Indian, the Supreme Court explicitly described its holding as including the overarching principle that "Indian country within a State's territory is

19

part of a State, not separate from a State," 597 U.S. at 655, such that "the default is that States may exercise criminal jurisdiction within their territory," *id.* at 653. And in so doing, the Supreme Court explicitly rejected the contention, advanced by the Creek Nation here, that "Congress must affirmatively authorize States to exercise jurisdiction in Indian country." *Id.* (citation omitted). Whether those statements are described as *Castro-Huerta*'s holding or reasoning, this Court is bound by them. *See Navajo Nation* v. *Dalley*, 896 F.3d 1196, 1208 n.6 (10th Cir. 2018).

The Creek Nation also argues (Br. 38-40) that the second footnote in *Castro-Huerta* does not mandate *Bracker* balancing here, even though the Court expressly cited *Bracker* as a reason why a State might sometimes be barred from prosecuting "crimes committed *by Indians* in Indian country." 597 U.S. at 639 n.2 (emphasis added). The Creek Nation notes that the Court also cited *McClanahan* v. *Arizona State Tax Commission*, 411 U.S. 164 (1973), which the Creek Nation contends "draws a distinction between state assertions of authority over Indians and non-Indians." Br. 40. But the footnote in fact cited a different portion of *McClanahan* than the one on which the Creek Nation relies. *Compare Castro-Huerta*, 597 U.S. at 639 n.2 (citing *McClanahan*, 411 U.S. at 171-172), *with* Creek Br. 40 (citing *McClanahan*, 411 U.S. at 170-171). The portion of *McClanahan* the Supreme Court cited primarily

20

discusses the "considerable evolution" in its conception of tribal sovereignty since *Worcester*. *See McClanahan*, 411 U.S. at 171-172.

b.　　Even setting aside *Castro-Huerta*, other precedent makes clear that *Bracker* provides the correct framework for analyzing whether the application of state law would intrude on tribal self-government, at least where—as here—the law regulates non-members or tribal members' interactions with non-members.

The Supreme Court has repeatedly applied *Bracker* and similar balancing frameworks to analyze state regulation of "transactions between [a] tribe and nonmembers on the tribe's reservation." *Big Sandy Rancheria Enterprises* v. *Bonta*, 1 F.4th 710, 729 (9th Cir. 2021) (emphasis omitted). For example, in *Colville*—decided two weeks before *Bracker*—the Court held that the State of Washington's legitimate interest in taxing tribal sales of cigarettes to non-members more than offset the harms to the tribes and their members from requiring tribal smokeshops to collect those taxes and keep detailed records of those sales. *See* 447 U.S. at 156-157.

Similarly, in *California* v. *Cabazon Band of Mission Indians*, 480 U.S. 202 (1987), the Court held that the State of California could not apply its gaming laws to prohibit a tribe from offering on-reservation bingo games to non-members—but only after weighing the State's interests against the tribal and federal ones. *See id*. at 214-222; *see also id*. at 217 (citing *Bracker*, 448 U.S. at

21

143). Indeed, the Court expressly rejected the tribe's argument for an "inflexible per se rule" barring California from regulating "tribal Indians on an Indian reservation" absent express congressional authorization. *Id.* at 214 (emphasis and citation omitted).

*Oklahoma Tax Commission* v. *Chickasaw Nation*, 515 U.S. 450 (1995), is to the same effect. There, the Court reiterated that a State may require tribal retailers to collect taxes on sales on the tribe's reservation, as long as the "legal incidence of the tax rests on non-Indian[]" buyers and "the balance of federal, state, and tribal interests favors the State." *Id.* at 459. The Creek Nation's suggestion that *Bracker* balancing applies only to laws that regulate "non-Indians" is thus incorrect.

The Creek Nation does not dispute (Br. 12, 16) that *Bracker* supplies the correct test for analyzing the effect on tribal sovereignty of state laws that regulate non-Indians' on-reservation conduct. But that gives away the game. As the Supreme Court explained in *Colville*, "[f]or most practical purposes," non-member Indians "stand on the same footing as non-Indians resident on the reservation." 447 U.S. at 161. State regulation of non-member Indians thus does not burden tribal self-government to the same extent as regulation of member Indians (if at all) "for the simple reason that nonmembers are not constituents of the governing Tribe." *Id.*

Following *Colville*, the Supreme Court, this Court, and other courts have equated non-member Indians with non-Indians for many jurisdictional purposes. *See, e.g.*, *Duro*, 495 U.S. at 684-688; *Pruitt*, 669 F.3d at 1172; *Kaul*, 83 F.3d at 1218-1219; *HCI Distribution, Inc.* v. *Peterson*, 110 F.4th 1062, 1066 n.3 (8th Cir. 2024); *Big Sandy Rancheria Enterprises*, 1 F.4th at 726. Accordingly, even if *Bracker* balancing "typically" applies to exercises of "state power over *non*-Indians in Indian country," Creek Br. 16, that test would still apply to laws that regulate non-member Indians, who "stand on the same footing as non-Indians," *Colville*, 447 U.S. at 161. Indeed, other courts of appeals have applied *Bracker* balancing to state laws regulating tribes' on-reservation dealings with non-member Indians, relying on that precise logic. *See HCI Distribution*, 110 F.4th at 1066 n.3, 1068-1070; *Salt River Pima-Maricopa Indian Community* v. *Arizona*, 50 F.3d 734, 736 & n.4 (9th Cir. 1995).

c.      The Creek Nation contends that the case law recognizes "no distinction between member and non-member Indians when it comes to the presumptive bar on state jurisdiction" over on-reservation activity. Br. 34; *see* Br. 32-33. But the cases the Creek Nation cites do not support that assertion.

Some of the Creek Nation's cases (Br. 32-33) arose from prosecutions of *member* Indians for offenses committed in their own tribes' Indian country. *See Solem* v. *Bartlett*, 465 U.S. 463, 465 (1984); *Murphy* v. *Royal*, 875 F.3d 896, 904 (10th Cir. 2017), *aff'd*, 591 U.S. 977 (2020); *Ute Indian Tribe of the Uintah*

23

*& Ouray Reservation* v. *Utah*, 790 F.3d 1000, 1004-1005 (10th Cir. 2015); *cf.*
*United States* v. *Sands*, 968 F.2d 1058, 1060 (10th Cir. 1992) (addressing the
prosecution of a Creek member for crimes committed on an allotment in "the
territory of the Five Civilized Tribes (which includes the Creeks)"). Those
cases say nothing about the proper framework for analyzing whether States
have jurisdiction over *non-member* Indians.

*Hagen* v. *Utah*, 510 U.S. 399 (1994), and *McGirt* are inapposite because
the fact that the defendants were non-member Indians was neither raised by
the parties nor relevant to the court's analysis. In addition, *McGirt* involved a
prosecution under the Major Crimes Act, *see* 591 U.S. at 898, which the Su-
preme Court has interpreted as giving the federal government exclusive juris-
diction to prosecute certain crimes committed in Indian country by "any In-
dian," 18 U.S.C. § 1153, regardless of the defendant's tribal membership, *see*
*Colville*, 447 U.S. at 160-161. This Court's decision in *United States* v. *Hopson*,
150 F.4th 1290 (2025), *cert. denied*, 2026 WL 1640874 (2026), likewise involved
a Major Crimes Act prosecution. *See id.* at 1293.

*Wagnon* v. *Prairie Band Potawatomi Nation*, 546 U.S. 95 (2005), also
does not preclude the application of *Bracker* balancing to the conduct of a non-
member Indian within another tribe's reservation. *See* Creek Br. 16, 39. Alt-
hough the Supreme Court there noted that it originally formulated the
*Bracker* test in the context of a state assertion of authority over non-Indians

24

in Indian country, *see Wagnon*, 546 U.S. at 99, the Court has since repeatedly applied *Bracker* balancing to regulations of *Indians* in Indian country. *See* pp. 21-22, *supra*. The decision in *Wagnon* also concerned state regulation of the off-reservation activities of non-Indians, so the Court had no occasion to address the question presented here. *See* 546 U.S. at 99.

### 3. *The Creek Nation's Rule Concerning 'Traditional Domains Of Tribal Sovereignty' Is Unsupported*

As an alternative to *Bracker* balancing, the Creek Nation proposes that, when a State "act[s] within," "interferes with," or "assert[s] authority in" a "traditional domain of tribal sovereignty," state authority is preempted unless Congress has expressly authorized the State to act. Br. 10, 12, 16. That is also incorrect.

a.    The Creek Nation's proposed alternative to *Bracker* balancing contravenes Supreme Court precedent. Most notably, in *Castro-Huerta*, the Court engaged in a conventional application of *Bracker*, "consider[ing] tribal interests, federal interests, and state interests" to determine whether the State's prosecution of non-Indians who commit crimes against Indians in Indian country "unlawfully infringe[d] upon tribal self-government." 597 U.S. at 649. At no point did the Court suggest the need for any additional inquiry into whether the State's exercise of jurisdiction intruded on a "traditional domain of tribal sovereignty." And more fundamentally, the Creek Nation's insistence that States may act in certain "traditional domains" only with express

25

congressional authorization is incompatible with *Castro-Huerta*'s core premise that a State has "criminal jurisdiction in Indian country unless that jurisdiction is *preempted.*" *Id.* at 653. The Creek Nation's proposed rule would flip that presumption on its head and demand the "permission slip from Congress" that *Castro-Huerta* made clear is not required. *Id.*

Indeed, in arguing that States are barred from exercising jurisdiction in certain "traditional domains" absent congressional authorization, the Creek Nation ignores half a century of precedent disapproving of such per se rules. As the Supreme Court explained in the 1970s, the "trend has been away from the idea of inherent Indian sovereignty as a bar to state jurisdiction and toward reliance on federal pre-emption." *McClanahan*, 411 U.S. at 172. "The modern cases thus tend to avoid reliance on platonic notions of Indian sovereignty and to look instead to applicable treaties and statutes which define the limits of state power." *Id.*

The Court has thus tended to reject "inflexible per se rule[s] precluding state jurisdiction . . . in the absence of express congressional consent." *Cabazon Band*, 480 U.S. at 214-215 (emphasis omitted). In proposing a new per se limit on state authority based on "platonic notions of Indian sovereignty," *McClanahan*, 411 U.S. at 172, the Creek Nation seeks to turn back the clock to an understanding of States' authority in Indian country that has not been the law for decades.

26

In fact, the Creek Nation's claim that *Bracker* balancing does not apply to laws implicating "traditional domains of tribal sovereignty" is inconsistent with *Bracker* itself and the cases applying its balancing test. In *Bracker*, the Supreme Court made clear that the balancing analysis must account for "[t]he tradition of Indian sovereignty over the reservation and tribal members" and treat "traditional notions of Indian self-government" as the "important backdrop against which vague or ambiguous federal enactments must always be measured." 448 U.S. at 143 (internal quotation marks and citation omitted). Because *Bracker* expressly accounts for traditional areas of tribal sovereignty, it makes little sense to say, as the Creek Nation argues, that laws affecting such areas are exempt from *Bracker* balancing. And *Bracker* says as much: in the same paragraph discussing "[t]he tradition of Indian sovereignty over the reservation and tribal members," the Court noted that, "[a]t the same time any applicable regulatory interest of the State must be given weight," and it underscored that "automatic exemptions as a matter of constitutional law are unusual." *Id*. at 143-144 (internal quotation marks and citation omitted).

The Supreme Court has repeatedly applied a balancing approach to determine the applicability of state laws that arguably implicated "traditional domains of tribal sovereignty." For example, in *Colville*, the Court considered whether a State could tax sales to non-members occurring on a reservation. *See* 447 U.S. at 156-159. The Court acknowledged that the tribe's power to tax

27

transactions occurring on its reservation was a "a fundamental attribute of [its] sovereignty." *Id.* at 152. But it ultimately concluded, based on a weighing of the respective tribal and state interests, that the State could concurrently tax sales to non-members without impermissibly infringing on tribal sovereignty. *See id.* at 156-159. And in *Mescalero Apache Tribe*, the Court recognized that tribes have sovereign authority to manage the "use of their territory and resources by both members and nonmembers," 462 U.S. at 335, including by "regulat[ing] on-reservation hunting and fishing," *id.* at 337. But rather than treating state fish-and-game laws as presumptively invalid, the Court concluded that those laws were inapplicable only as a result of *Bracker* balancing. *See id.* at 334-343.

b.      The cases cited by the Creek Nation fail to support its theory that state laws affecting "traditional domains of tribal sovereignty" are presumptively invalid. The Creek Nation grounds that theory principally in *Rice* v. *Rehner*, 463 U.S. 713 (1983). But as the Court explained there, "historical notions of tribal sovereignty" "informed," but were not themselves dispositive of, its analysis. *Id.* at 718. To determine whether the State of California could apply its liquor laws in Indian country, the Court thus weighed the purported tribal interest—which was minimal, given the lack of a historical tradition of tribal control of alcoholic-beverage licensing and distribution—against

28

relevant federal and state interests. *See id.* at 720-735. In effect, *Rice* applied *Bracker* balancing, rather than carving out an exception to it.

In arguing otherwise, the Creek Nation selectively quotes *Rice* for the proposition that balancing is not required "if a state attempts to assert authority in a domain in which 'tradition has recognized a sovereign immunity [from state power] in favor of the Indians.'" Br. 16 (quoting *Rice*, 463 U.S. at 719) (alterations in original). But what the Court in fact said is this:

> When we determine that tradition has recognized a sovereign immunity in favor of the Indians in some respect, then we *usually are reluctant* to infer that Congress has authorized the assertion of state authority in that respect . . . . If, however, we do not find such a tradition, *or if we determine that the balance of state, federal, and tribal interests so requires*, our pre-emption analysis may accord less weight to the "backdrop" of tribal sovereignty.

*Rice*, 463 U.S. at 719-720 (emphases added; internal quotation marks and citations omitted). *Rice* thus supports the application of *Bracker* here, not counsels against it.

The Creek Nation's attempt to identify other "traditional domains of tribal sovereignty" in which state law is presumptively inapplicable does not withstand scrutiny. For example, the Creek Nation cites (Br. 17) this Court's decision in *Cheyenne-Arapaho Tribes* v. *Oklahoma*, 618 F.2d 665 (1980), which stated in passing that, with respect to hunting and fishing laws, "States have no authority over Indians in Indian Country unless it is expressly conferred by Congress." *Id.* at 668. But in the same decision, this Court admitted that

29

States have "dual control"—that is, concurrent jurisdiction—on lands located within a reservation "when needed to support conservation measures." *Id.* at 667. That suggests a form of balancing—which is exactly what the Supreme Court did in *Mescalero Apache Tribe* when assessing a State's ability to regulate on-reservation hunting and fishing. *See* p. 28, *supra*.

This Court's decisions in *Dalley*, *supra*, and *Ute Indian Tribe* v. *Lawrence*, 22 F.4th 892 (2022), are also inapposite. They address the distinct question whether, under particular statutory schemes, a plaintiff can bring a civil action in state court against a federally recognized tribe concerning conduct that occurred in that tribe's Indian country. *See Lawrence*, 22 F.4th at 903; *Dalley*, 896 F.3d at 1205. While each decision states that States lack power to regulate the on-reservation conduct of tribal members without clear congressional authorization, *Lawrence*, 22 F.4th at 899-900; *Dalley*, 896 F.3d at 1204, the Supreme Court has in fact held that a State may exercise such power in "exceptional circumstances," *Mescalero Apache Tribe*, 462 U.S. at 331-332. In any event, neither decision suggests that the scope of state authority turns on "traditional domains of tribal sovereignty," as the Creek Nation suggests.

That leaves only cases involving state taxation. *See* Creek Br. 16-17 (citing *Chickasaw Nation* v. *State of Oklahoma ex rel. Oklahoma Tax Commission*, 31 F.3d 964 (10th Cir. 1994)). But state taxation is the sole area in which the Supreme Court has applied the "more categorical approach" that

30

congressional approval is required for state law to apply in Indian country. *County of Yakima* v. *Confederated Tribes & Bands of Yakima Indian Nation*, 502 U.S. 251, 258 (1992). And even within that area, there are good reasons to believe that the rule should not apply in Oklahoma. *Cf.* pp. 38-42, *infra*; *Stroble* v. *Oklahoma Tax Commission*, No. 25-382, 2026 WL 922510 (U.S. Apr. 6, 2026) (denying certiorari to review the Oklahoma Supreme Court's decision holding that the State may tax the income of Creek members who live on unrestricted, non-trust, private fee lands within the Creek Reservation).

### 4. *In Any Event, The 'Traditional Domains Of Tribal Sovereignty' Do Not Include An Exclusive Right To Prosecute Non-Member Indians*

Even if state laws affecting "traditional domains of tribal sovereignty" were subject to a unique preemption analysis, that rule would do nothing for the Creek Nation in this case. That is for the simple reason that Indian tribes have not traditionally had an exclusive right to prosecute non-member Indians who commit crimes in their territory.

a. There is no longstanding tradition barring States from prosecuting non-member Indians who violate state law in Indian country. As explained above, following the Supreme Court's decision in *Colville*, courts have analogized non-member Indians to non-Indians for jurisdictional purposes. *See* pp. 22-23. The Supreme Court has thus repeatedly held that the inherent sovereignty of Indian tribes "generally does not extend to the activities of

31

nonmembers of the tribe." *Atkinson Trading Co.* v. *Shirley*, 532 U.S. 645, 652 (2001) (quoting *Montana* v. *United States*, 450 U.S. 544, 565 (1981) (alterations omitted)); *Strate* v. *A-1 Contractors*, 520 U.S. 438, 445-446 (1997).  Indeed, in the special context of state taxation, this Court has contrasted the different rules that apply to member and non-member Indians:  although Indians are generally immune from state tax when acting in their own Indian country, Indians who "act outside of their own country . . . *including within the Indian country of another tribe* . . . are subject to non-discriminatory state laws otherwise applicable to all citizens of the state." *Pruitt*, 669 F.3d at 1172 (emphasis added).

Consistent with the distinction between member and non-member Indians, the Supreme Court held in *Duro* that an Indian tribe's inherent authority did not extend to the prosecution of non-members.  *See* 495 U.S. at 688.  After a careful review of the historical record, the Court concluded that the limited and equivocal evidence before the Court did not suggest a strong tradition of tribal prosecutions of non-members.  *See id.* at 689-692.  And it noted that non-member Indians stood in a similar relation to tribes as non-Indians, whom the Court had already held tribes lacked inherent authority to prosecute.  *See id.* at 688; *Oliphant* v. *Suquamish Indian Tribe*, 435 U.S. 191, 195 (1978).  Consistent with that history and those principles, the Court held in *Duro* that "the retained sovereignty of the tribe . . . does not include the authority to

32

impose criminal sanctions against a citizen outside its own membership." 495 U.S. at 679.

*Castro-Huerta* confirms that a State should presumptively have authority to prosecute non-member Indians for crimes committed in Indian country. If a State may prosecute non-Indians for such crimes, as *Castro-Huerta* held, and non-member Indians are generally equivalent to non-Indians with respect to a tribe's authority, then it follows that a State generally should have the authority to prosecute non-member Indians for crimes committed in Indian country.

b.      The Creek Nation's contrary arguments lack merit.

i.      The Creek Nation first asserts that, following *Duro*, Congress enabled tribes to exercise "[c]riminal jurisdiction over all Indians," Br. 35, by defining such jurisdiction as an aspect of tribes' "inherent authority," 25 U.S.C. § 1301(2).  But that decision by Congress did not rewrite history to make the authority to prosecute non-members a *traditional* domain of tribal sovereignty.  Nor did it purport to alter a State's preexisting authority to prosecute non-members for on-reservation crimes.  *See* pp. 16-17, *supra*.  As the Court explained in *Lara*, Congress's decision to "relax the restrictions imposed by the political branches on the tribes' inherent prosecutorial authority" "involve[d] no interference with the power or authority of any State." 541 U.S. at 205.  When Congress recognized tribal authority to prosecute non-member

33

Indians, it did not strip States' preexisting authority and give it to the tribes; instead, it created concurrent jurisdiction for both States and tribes to prosecute those offenses.

The Creek Nation finds support for its rule that States lacked authority to prosecute non-member Indians in the legislative history for Section 1301(2). In particular, the Nation states (Br. 30-32) that some members of Congress believed that *Duro* created a "jurisdictional void" in which no sovereign had authority to prosecute non-member Indians who committed non-major offenses in Indian country. By this point, the limits on the force of legislative history are well-documented. *See, e.g.*, *FS Credit Opportunities Corp.* v. *Saba Capital Master Fund, Ltd.*, No. 24-345, 2026 WL 1686059, at *8-*9 (U.S. 2026); *Exxon Mobil Corp.* v. *Allapattah Services, Inc.*, 545 U.S. 546, 568 (2005). Even if some legislators assumed that States lacked jurisdiction over on-reservation offenses committed by non-member Indians, congressional "assumptions" are "not laws." *Castro-Huerta*, 597 U.S. at 648. And although some may have thought *Duro* created a jurisdictional void, others recognized the contrary view that the decision "d[id] not cause a jurisdictional gap because it equate[d] nonmember Indians with non-Indians, over whom the [S]tate may exercise jurisdiction." S. Rep. No. 153, 102d Cong., 1st Sess. 21 (1991).

This Court's decision in *Kaul*—which postdated *Duro*—confirms the absence of any "traditional domain of tribal sovereignty" precluding state

34

exercise of criminal jurisdiction over non-member Indians.  There, this Court held that a State could execute a search warrant on the store of an enrolled Indian operated on the reservation of a different tribe.  83 F.3d at 1210, 1218.  Applying *Colville*, the Court explained that non-member Indians are analogous to non-Indians for most practical purposes.  *See id.* at 1218.  From that premise, the Court concluded that treating the non-member "as a non-Indian" would not "infringe on the [reservation] tribe's sovereignty because [she] is not a member of that tribe."  *Id.* at 1218-1219.

ii.     The Creek Nation cites a litany of dated cases (Br. 18-35) for the proposition that States lack authority to prosecute "Indians" for crimes committed in Indian country.  But those cases say little about States' authority to prosecute *non-member* Indians for non-major crimes.

For example, in *United States* v. *McBratney*, 104 U.S. 621 (1881), the Supreme Court addressed only the question whether a State could prosecute a non-Indian who committed a crime on an Indian reservation, and the Court expressly reserved the question of who could punish "crimes committed by or against Indians."  *Id.* at 624.  In *Ex Parte Crow Dog*, 109 U.S. 556 (1883), the Court expressly addressed a murder committed by a tribal member on *his own* tribe's reservation.  *See id.* at 557, 559.  And in *United States* v. *Kagama*, 118 U.S. 375 (1886), the Court addressed *federal* jurisdiction over an Indian-on-Indian *major* crime.  *Id.* at 376.  As explained above, the more recent

35

decisions cited by the Creek Nation are similarly inapposite because they involved prosecutions of tribal members for on-reservation conduct (as in *Solem* and *Ute Indian Tribe of the Uintah*); did not analyze the member/non-member distinction (as in *Hagen, McGirt,* and *Sands*); or expressly involved prosecutions under the Major Crimes Act (as in *McGirt* and *Hopson*). *See* pp. 23-25. None of those decisions addressed whether a State has jurisdiction to prosecute an Indian for a crime committed in a different tribe's Indian country.

The state-court cases cited by the Creek Nation are to the same effect. Each concluded that the State lacked jurisdiction to prosecute a tribal member who lived on, and allegedly committed a crime on, his tribe's reservation. *See State* v. *Rufus*, 237 N.W. 67, 67-68 (Wis. 1931) (Chippewa member on Chippewa Reservation); *State* v. *Big Sheep*, 243 P. 1067, 1068 (Mont. 1926) (Crow member on Crow Reservation); *In re Cross*, 30 N.W. 428, 428 (Neb. 1886) (Winnebago member on Winnebago Reservation). Those cases stand at most for the proposition that courts have sometimes referred generically to "Indians" when discussing the interplay of federal, state, and tribal jurisdiction.

The only historical case cited by the Creek Nation that addresses criminal jurisdiction over non-member Indians actually supports the exercise of state jurisdiction over those defendants. The Creek Nation quotes language from *State* v. *Campbell*, 55 N.W. 553, 554 (Minn. 1893), stating that state courts lack jurisdiction to prosecute "tribal Indians residing under the care of the

general government upon a reservation set apart by it for that purpose." Br. 24 (citation omitted). But as the reference to "tribal Indians" suggests, that portion of *Campbell* discussed jurisdiction over the *member Indian* defendant who "belong[ed] to th[e] tribe, who had retained his tribal relations, and [who] lived on the reservation" of his tribe. 55 N.W. at 553-554. The court in *Campbell* made clear that, as to his *non-member Indian* co-defendant, the jurisdictional rule was different. Although the co-defendant was an Indian, she did "not sustain any tribal relations," and the court thus harbored "no doubt that she is just as amenable to the criminal laws of the state for an offense committed on the reservation as she would have been had the offense been committed anywhere else in the state." *Id.* at 554; *see also id.* (stating that "[t]here are numerous cases holding that the [S]tate has jurisdiction of crimes committed by Indians who have abandoned their tribal relations").

iii.    The Creek Nation also again invokes (Br. 27-29) Public Law 280. But for the same reasons that Public Law 280 does not preempt the State's exercise of concurrent criminal jurisdiction over non-member Indians (pp. 15-16, *supra*), that law does not imply that there is a "traditional domain of tribal sovereignty" encompassing an exclusive tribal right to prosecute non-member Indians. To begin with, the fact that Congress in 1953 saw fit to vest multiple States with authority to prosecute *all* Indians for on-reservation offenses is at odds with the Creek Nation's claim that there is a longstanding federal policy

37

of thwarting state prosecutions of non-member Indians. And in Public Law 280, Congress did not purport to strip States of any preexisting authority. Even if some in Congress may have assumed that States would otherwise lack jurisdiction to prosecute certain individuals for crimes in Indian country, such "assumptions are not laws." *Castro-Huerta*, 597 U.S. at 648. There is accordingly no reason to believe that there is a "traditional domain[] of tribal sovereignty" that encompasses an exclusive right to prosecute non-major crimes committed by non-member Indians in other tribes' Indian country.

### 5.    *In All Events, Any Rule Concerning 'Traditional Domains Of Tribal Sovereignty' Would Not Apply Here, Given Oklahoma's Unique History And Conditions*

There is yet another reason for the Court to reject the Creek Nation's suggestion that *Bracker* balancing does not apply because the district attorney's prosecutions implicate a "traditional domain of tribal sovereignty." The unique history of Oklahoma and the Creek Reservation precludes recognition of any such "traditional domain of tribal sovereignty," even if such a tradition existed elsewhere.

a.    From statehood until 2020, it was widely understood that no reservations existed in eastern Oklahoma. Statehood followed a long process by which Congress stripped the Creek Nation and the other "Five Civilized Tribes" of their right to self-governance, including allotting tribal land to individual members, taking control of tribal schools and other buildings, and (most

38

relevant here) abolishing tribal courts and transferring all pending cases to federal territorial court. *See McGirt*, 591 U.S. at 904-911 (discussing history). Tribal courts were not reestablished until 1979 and did not reassert jurisdiction over *members* until 1982. *See id.* at 912; Muscogee Creek Nation Const. Art. VII (1979). Following statehood, "[a]lthough there [we]re remnants of the form of tribal sovereignty, these Indians ha[d] no effective tribal autonomy," held their land in fee simple, and were "citizens of the State with little to distinguish them from all other citizens." *Oklahoma Tax Commission* v. *United States*, 319 U.S. 598, 603 (1943). Accordingly, the Supreme Court has already concluded in the taxation context that "[t]he underlying principles" on which prior decisions about Indian exemptions from state tax law were based "do not fit the situation of the Oklahoma Indians." *Id.*

As a result of this process, for over a century, Oklahoma "asserted jurisdiction over the former Indian Territory on the understanding that it is not a reservation, without any objection by the Five Tribes." *McGirt*, 591 U.S. at 968 (Roberts, C.J., dissenting). Since statehood, Oklahoma has provided "public services to all people throughout Oklahoma's territory," without regard to tribal status or where reservations start or end. *In re Stroble*, 588 P.3d 179, 194 n.2 (Okla. 2025) (Kane, J., concurring), *cert. denied*, 2026 WL 922510 (U.S. Apr. 6, 2026). The Creek Nation's claim of a "traditional domain of tribal sovereignty" defies credulity given that, for most of the twentieth century, the

39

Creek Nation lacked courts in which to prosecute *anyone* and treated as Indian country only a small fraction of the more than 3 million acres currently recognized as reservation land.

b.    Even setting that history aside, the presumptions of tribal autonomy that underpin leading cases about competing tribal and state jurisdiction are ill-suited for the realities of eastern Oklahoma.  The demographic and political realities of the region counsel in favor of recognizing the State's concurrent jurisdiction to enforce its law throughout the region, at least as to nonmembers.

The Supreme Court's decision in *Puyallup Tribe, Inc.* v. *Department of Game*, 433 U.S. 165 (1977), demonstrates that state authority in Indian country is stronger where the State has historically exercised authority there and where the lands, although still Indian country, have been alienated by the tribe.  In *Puyallup*, the Court allowed the State of Washington to regulate even member Indians' on-reservation fishing.  *See id.* at 174-175.  The Court did so in large part because the relevant Indian tribe had sold in fee simple all but 22 acres of its formerly 18,000-acre reservation, and the fishing the State sought to regulate took place on private, alienated lands.  *See id.*  Because reservation resources were no longer set aside for the tribe's "exclusive use," the Court held that the State had greater authority over those lands and waters. *Id.* at 173-174 & n.11.

40

The Court's decision in *Mescalero Apache Tribe* supports the same basic point.  In holding that the State of New Mexico lacked the authority to regulate non-members' hunting and fishing on the Mescalero Apache Reservation, the Court noted that the Reservation was almost completely intact (the tribe having alienated only 194 of 460,000 acres) and almost wholly occupied by tribal members (who made up more than 90% of residents).  *See* 462 U.S. at 326.  The Court contrasted the integrity of that reservation with the one at issue in *Puyallup*, and it noted that the State had failed to articulate how its application of state fishing and game laws was necessary to any "governmental functions it provide[d]" to non-members on the reservation.  *Id.* at 332 n.15, 342 (internal quotation marks and citation omitted).

Given the distinctive nature of the Creek Reservation, it would be inappropriate to conclude that Oklahoma categorically lacks authority to prosecute non-member Indians for offenses committed there.   The broad swath of eastern Oklahoma that the Supreme Court has recognized as the reservations of the Five Tribes has a population that is "85-90% non-Indian and land that is 95% private fee land."  *Stroble*, 588 P.3d at 201 (Kane, J., concurring).  As to the Creek Reservation in particular, Tulsa County spreads over more than 500 square miles and is home to more than 650,000 people, only a small fraction of whom are Indian, and even fewer of whom are enrolled Creek Nation members.    *See*  pp.  3-4,  *supra*;  Tulsa  County,  *About  Tulsa  County*

41

<www2.tulsacounty.org/ about>. Further, the State has a long history of providing services to all of its citizens (both Indian and non-Indian) throughout the region, including by enforcing state criminal law against the many non-Indians who live on the Creek Reservation. Given the significant role the State has played throughout the region and the limited "historical traditions of tribal independence," *Bracker*, 448 U.S. at 145, this Court should be reluctant to conclude that Oklahoma categorically lacks jurisdiction over non-members who commit crimes on the Creek Reservation.

*    *    *    *    *

In sum, *Bracker* balancing provides the correct framework for assessing whether the district attorney's prosecution of state-law crimes committed by non-member Indians on the Creek Reservation impermissibly interferes with tribal self-government and is thus preempted by federal law. That is the framework the Supreme Court used in *Castro-Huerta*, and precedent from the Supreme Court and this Court support its application here. The Creek Nation's attempt to create a presumption against state jurisdiction in this context lacks support in precedent, fails on its own terms, and is particularly inappropriate for application in Oklahoma. The district court was thus correct to apply *Bracker* balancing to determine the district attorney's authority here.

42

**C.**    **Under *Bracker* Balancing, The District Attorney's Prosecution Of Non-Member Indians For Non-Major Crimes On The Creek Reservation Does Not Unduly Interfere With Tribal Sovereignty**

The *Bracker* test clearly supports Oklahoma's assertion of prosecutorial authority over non-member Indians for non-major crimes committed on the Creek Reservation.  The Creek Nation's contrary arguments about the application of *Bracker* are unpersuasive.

**1.    *The State's Legitimate Interest In Prosecution Outweighs Any Countervailing Tribal Or Federal Interests***

*Bracker* requires a "particularized inquiry into the nature of the state, federal, and tribal interests at stake" to determine whether the application of state law in Indian country is impermissible in the absence of preemption under ordinary preemption principles.  448 U.S. at 145.  The State's interest here in enforcing its criminal laws is more than sufficient to justify the assertion of state authority, particularly in view of the limited tribal interest in thwarting state prosecutions of non-member Indians.

a.    States have a compelling interest in defining and enforcing their own criminal laws throughout their territory.  As the Supreme Court has explained, it is "[b]eyond question" that "the authority of States over the administration of their criminal justice systems lies at the core of their sovereign status."  *Oregon* v. *Ice*, 555 U.S. 160, 170 (2009).  Oklahoma thus has a "strong sovereign interest in ensuring public safety and criminal justice within its

43

territory," including by "ensuring that criminal offenders" are "appropriately punished and do not harm others in the State." *Castro-Huerta*, 597 U.S. at 651.

That sovereign interest is no less legitimate simply because the offender is an Indian. The Supreme Court has long recognized that "*every* person who is found within the limits of a [g]overnment . . . is bound by its laws." *Brown* v. *Duchesne*, 60 U.S. 183, 194 (1857) (emphasis added). A State thus has a "fundamental interest in appropriately punishing" all offenders "who violate its criminal laws," regardless of their "background." *Bearden* v. *Georgia*, 461 U.S. 660, 669-670 (1983). It is thus beyond dispute that States may enforce their criminal laws against Indians who commit crimes outside of Indian country. *See*, *e.g.*, *Organized Village of Kake*, 369 U.S. at 75. And just as a State has a sovereign interest in prosecuting lawbreakers, it has an equally strong interest in "ensur[ing] that crime victims in state territory are protected under the State's laws," regardless of the identity of the offender. *Castro-Huerta*, 597 U.S. at 651 n.7. Although the identity of the offender, including whether the offender is a member Indian, could conceivably influence the relevant *tribal* interests, that in no way diminishes the *State*'s powerful and legitimate law-enforcement interests.

That interest is especially strong in Oklahoma, given the State's unique history and the on-the-ground realities of Indian country in the State. As

44

already discussed, the Creek Reservation recognized by *McGirt* extends over a large swath of the State that is home to hundreds of thousands of people, the vast majority of whom are non-Indian. *See* pp. 3-4, 38-42. Given the facts that non-Indians have long since settled the area and that the State exercised undisputed jurisdiction over most of the land for more than a century, there is little practical difference between the private, alienated fee land that is now Indian country and the rest of the State, just as there is very "little to distinguish" Indians in Oklahoma "from all other citizens." *Oklahoma Tax Commission*, 319 U.S. at 603.

An effective criminal justice system is one of the most fundamental public services a State can offer. Oklahoma thus has a compelling interest in ensuring that all of its citizens, regardless of tribal affiliation, benefit from the effective and undifferentiated enforcement of that system. Restricting the district attorney from exercising criminal jurisdiction over a significant non-member Indian population residing within Tulsa County, including within Tulsa's city limits, would hamper the State's ability to ensure both that offenders are appropriately punished and that victims are effectively protected by the State's criminal laws.

b. On the other side of the ledger, the State's exercise of criminal jurisdiction over non-member Indians would not unduly interfere with any tribal interests. Most importantly, such jurisdiction would not undermine the tribal

interest most relevant to *Bracker* balancing:  the right of tribal members to "make their own laws and be ruled by them." *Three Affiliated Tribes of Fort Berthold Reservation* v. *Wold Engineering, P.C.*, 467 U.S. 138, 147 (1984) (internal quotation marks and citation omitted).  By definition, the district attorney's prosecution of *non-member* Indians does not mean that Creek Nation *members* are ruled by state law.  And the State's exercise of criminal jurisdiction over non-member Indians would "not deprive the tribe of any of its prosecutorial authority," *Castro-Huerta*, 597 U.S. at 650, because the Creek Nation could concurrently prosecute non-member Indians who commit crimes on its reservation.  *See* 25 U.S.C. § 1301(2).

In addition, Indians who are present on the Creek Reservation but are not Creek citizens lack the political rights of tribal members.  As the Creek Nation admits, those non-member Indians cannot vote in tribal elections; they cannot hold office; and they generally cannot serve on juries.  *See* D. Ct. Dkt. 86, at 148.  Because those non-members are not constituents of the Creek Nation, tribal sovereignty does not require shielding them from state jurisdiction.  *See Colville*, 447 U.S. at 161.

c.     There is also no significant federal interest in preventing Oklahoma from exercising jurisdiction in this context.  The State's exercise of concurrent criminal jurisdiction over non-member Indians would only further the federal interest in "protecting Indian victims" and ensuring public safety on

46

the Creek reservation. *Castro-Huerta*, 597 U.S. at 651. Any state prosecution of non-member Indians would not "preclude an earlier or later federal prosecution" for crimes committed against non-Indians; it would only "supplement" the federal government's existing prosecutorial efforts. *Id.* at 650-651. Concurrent jurisdiction, moreover, would "facilitate effective law enforcement" in Tulsa County by allowing Oklahoma and the federal government to coordinate resources for responding to crime on the Reservation. *Id.* at 651.

### 2.    *The Creek Nation's Contrary Arguments Lack Merit*

The Creek Nation's contention (Br. 45-52) that the balance of interests weighs in favor of preempting Oklahoma's criminal jurisdiction over non-member Indians on the Creek Reservation is unpersuasive.

a.    With respect to state interests, the Creek Nation does not dispute that Oklahoma has a "strong interest in preventing and punishing crime" within its borders. Br. 50 (internal quotation marks and citation omitted). Instead, it suggests only that state jurisdiction is not "needed to protect [that] interest[]" when tribal jurisdiction can just as readily vindicate it. *Id.* That is a non sequitur. As *Castro-Huerta* recognized, the State's interest is not merely in seeing that crime is punished by *someone*; it is in vindicating the State's sovereign interest in formulating and enforcing its own criminal laws. *See* 597 U.S. at 651. A sovereign's interest in enforcing its own laws is, by definition, an interest that no other sovereign can vindicate.

47

In any event, tribal jurisdiction is no substitute for state jurisdiction, given the limited remedies available to the Creek Nation. Tribal courts cannot subject any person to more than three years of imprisonment per count, with a total of nine years maximum in the event of multiple charges. *See* 25 U.S.C. § 1302(a)(7). Consequently, for certain crimes, the sentences the Creek Nation could impose are significantly shorter than those the people of Oklahoma have deemed necessary. *See, e.g.*, 21 OK Stat. § 1021.2v2 (imposing a maximum term of imprisonment of 20 years for possessing child pornography). Indeed, the Creek Nation's own deputy attorney general has admitted that the three-year cap on tribal sentences prevents the Creek Nation from sufficiently punishing certain crimes. *See* D. Ct. Dkt. 86, at 166.

The Creek Nation contends (Br. 50) that the district court did not make sufficient findings to support its conclusion that the State's interests are strong here. But under *Bracker* balancing, a court need only ask whether the State has "asserted any specific, legitimate regulatory interest to justify" its exercise of jurisdiction. *Ramah Navajo School Board*, 458 U.S. at 843. Here, the district court did exactly that: after "considering the arguments contained in the brief and the evidence presented at the hearing," it concluded that the State had asserted a strong sovereign interest in enforcing its criminal laws. App. 278. That is all the district court needed to do under *Bracker*.

48

b.      As for tribal interests, the Creek Nation contends (Br. 46-49) that concurrent state jurisdiction would interfere with tribal self-government because it has a strong interest in punishing and protecting non-member Indians.  But the Creek Nation has no meaningful response to the decisions of the Supreme Court and this Court, such as *Colville* and *Kaul*, which recognize that tribes have a *weaker* interest in regulating non-member Indians because they are more similar to non-Indians than to member Indians.  *See* pp. 22-23, *supra*.

The Creek Nation attempts to brush off those decisions, contending that the rationale of those civil cases "does not translate to the criminal context." Br. 44.  But the Supreme Court squarely rejected that precise argument in *Castro-Huerta*.  There, the defendant also dismissed the civil cases that Oklahoma relied on, including *Bracker*, on the ground that cases concerning a State's civil jurisdiction in Indian country were irrelevant to questions concerning a State's criminal jurisdiction.  *See* Resp. Br. at 46-49, *Castro-Huerta*, *supra* (No. 21-429).  The Supreme Court did not agree.  Instead, it relied on numerous civil cases that Oklahoma invoked and held that *Bracker* applies in the criminal context.  *See Castro-Huerta*, 597 U.S. at 637, 649.

In any event, the Creek Nation's attempt to distinguish those civil cases fails on its own terms.  The Creek Nation cannot explain why *Colville* would not apply with at least as much force in the prosecutorial context.  The logic underlying *Colville*'s analogy between non-members and non-Indians is that

49

neither are political members of the tribal community.  That analogy has even more salience in the criminal context, not less, because the tribe is seeking not merely to regulate but to *punish* individuals who do "not belong to the tribe and consequently had no say in creating the laws that would be applied to them."  *United States* v. *Cooley*, 593 U.S. 345, 353 (2021).

The Creek Nation contends (Br. 49) that Congress "emphatically rejected" the extension of the non-member/member distinction to the criminal context when it enacted the *Duro* fix.  Not so.  It merely gave tribes authority to exercise criminal jurisdiction over non-member Indians.  25 U.S.C. § 1301(2); *see* pp. 16-17, 33-34, *supra*.  It did not displace the background principle—which the Supreme Court and this Court have continued to apply in numerous subsequent cases—that tribes have a weaker interest in *asserting* their inherent authority over non-members.

In any event, even if the Creek Nation did have an equally strong interest as the State in prosecuting non-member Indians, it fails to explain convincingly how concurrent state-tribal jurisdiction would unduly impinge that interest.  The Nation contends (Br. 47) that the State may impose punishments that are harsher or incompatible with the tribe's determination of what is just.  But *Castro-Huerta* forecloses that argument.  There, the defendant also argued that concurrent state jurisdiction over crimes involving Indian victims would "undermine tribal sovereignty," given the prospect that Oklahoma

could impose more "lenient" or "harsh[er]" sentences than the tribe. Resp. Br. at 50-53, *Castro-Huerta*, *supra*. Yet the Court had little difficulty concluding that *Bracker* balancing favored the State's assertion of criminal jurisdiction.

There is no basis for a different result here. It is an "inseparable incident" of dual sovereignty that conduct made criminal by two separate sovereigns "may be punished by each" and that each may vary in the "penalties prescribed." *United States* v. *Lanza*, 260 U.S. 377, 382 (1922). If one sovereign imposes a harsher punishment than the other, the one's sovereign's vindication of "its own sovereignty" does not diminish or "interfer[e]" with the sovereignty of the other. *Id.* What is more, concurrent state-tribal jurisdiction would not undermine tribal sovereignty interests any more than concurrent federal-tribal jurisdiction already does. The federal government has long asserted concurrent criminal jurisdiction over certain crimes in Indian country involving Indians, and it routinely exercises that power to prosecute the same conduct as the tribes and to impose different—and oftentimes harsher—penalties. *See, e.g.*, *Denezpi* v. *United States*, 596 U.S. 591, 596-597 (2022).

The Creek Nation identifies no reason why concurrent state jurisdiction should be treated any differently. The Creek Nation asserts (Br. 45) that non-member Indians are "interwoven" in the Creek community by residence, employment, marriage, social services, and history. That may be true, but the

Creek Nation does not explain why prosecuting those individuals under state law would meaningfully infringe the Nation's members' right "to make their own laws and be ruled by them." *Three Affiliated Tribes*, 467 U.S. at 147 (internal quotation marks and citation omitted).

Finally, the Creek Nation contends that concurrent criminal jurisdiction would harm its ability to protect Indians on the Reservation from "bad-apple" state police officers. Br. 47. But federal and state law already prohibit police misconduct and provides remedies when officers violate individuals' constitutional rights. *See, e.g.*, 42 U.S.C. § 1983. Nor would the Creek Nation's rule exclude state-law enforcement from the reservation: at minimum, state law enforcement has undisputed authority to police offenses by non-Indians throughout Indian country (which again includes most of Tulsa County and the City of Tulsa). The Creek Nation thus offers no reason to conclude that the State's exercise of concurrent criminal jurisdiction over non-member Indians would unduly undermine the tribes' interest in protecting those same Indians from police misconduct.

c.      Finally, as to federal interests, the Creek Nation asserts that concurrent state jurisdiction would undermine the federal interest in "encouraging tribal self-government." Br. 50 (quoting *Bracker*, 448 U.S. at 144). But that simply recycles the argument that concurrent state jurisdiction over non-member Indians would unduly impinge tribal self-government. In effect,

52

therefore, the Nation makes no meaningful argument that any independent federal interest might tip the balance toward preemption.

*     *     *     *     *

The Creek Nation may have a "policy preference for federal jurisdiction or tribal jurisdiction, but not state jurisdiction," *Castro-Huerta*, 597 U.S. at 650 n.6, over crimes committed by non-member Indians.  But that policy preference "does not factor into the *Bracker* analysis."  *Id.*  Given the balance of state, tribal, and federal interests, it is clear that Oklahoma's exercise of criminal jurisdiction over non-member Indians for non-major crimes in Indian country does not impermissibly interfere with the Creek Nation's tribal self-government.  And because no federal law preempts the district attorney's prosecutorial authority under an ordinary preemption analysis, the district court correctly held that the district attorney is free to protect the citizens of Tulsa County—Indian and non-Indian alike—from criminal activity that occurs within county borders.

<strong>CONCLUSION</strong>

The judgment of the district court should be affirmed.

<strong>STATEMENT REGARDING ORAL ARGUMENT</strong>

Appellee Steve Kunzweiler respectfully submits that oral argument may assist this Court in deciding the issues of state and tribal criminal jurisdiction presented by this appeal.

53

Respectfully submitted,

/s/ Kannon K. Shanmugam

WILLIAM T. MARKS

KANNON K. SHANMUGAM

PAUL, WEISS, RIFKIND,

DAVIS POLK & WARDWELL LLP

  WHARTON & GARRISON LLP

  *1050 17th Street, N.W.*

  *2001 K Street, N.W.*

  *Washington, DC 20036*

  *Washington, DC 20006*

  *(202) 962-7000*

  *kshanmugam@davispolk.com*

S. CONRAD SCOTT

PAUL, WEISS, RIFKIND,

  WHARTON & GARRISON LLP

  *1285 Avenue of the Americas*

  *New York, NY 10019*

JULY 9, 2026

## CERTIFICATE REGARDING SEPARATE BRIEF

I, Kannon K. Shanmugam, counsel for appellee Steve Kunzweiler and a member of the Bar of this Court, certify, pursuant to Local Rule 31.3(b), that appellee Steve Kunzweiler requires a brief separate from the other appellee, Vic Regalado, because the underlying legal issue as to Steve Kunzweiler is materially distinct from that as to Vic Regalado.

/s/ Kannon K. Shanmugam
KANNON K. SHANMUGAM

JULY 9, 2026

## CERTIFICATE OF COMPLIANCE
## WITH TYPEFACE AND WORD-COUNT LIMITATIONS

I, Kannon K. Shanmugam, counsel for appellee Steve Kunzweiler and a member of the Bar of this Court, certify that this brief complies with Federal Rule of Appellate Procedure 32(a) and Tenth Circuit Rule 32 because it is proportionally spaced, has a typeface of 14 points or more, and contains 12,130 words.

/s/ Kannon K. Shanmugam
KANNON K. SHANMUGAM

JULY 9, 2026