**No. 26-5013**

---

**UNITED STATES COURT OF APPEALS**
**FOR THE TENTH CIRCUIT**

---

MUSCOGEE (CREEK) NATION,

*Plaintiff/Appellant*,

v.

STEVE KUNZWEILER, et al.,

*Defendants/Appellees*.

---

Appeal from the United States District Court
for the Northern District of Oklahoma,
Case No. 4:25-cv-00075-GKF-JFJ (Hon. Gregory K. Frizzell)

---

# APPELLANT'S REPLY BRIEF

***Oral Argument Requested***

---

Geraldine Wisner
Deputy Attorney General
MUSCOGEE (CREEK) NATION
P.O. Box 580
Okmulgee, OK 74447

O. Joseph Williams
O. JOSEPH WILLIAMS LAW OFFICE, PLLC
The McCulloch Building
114 N. Grand Avenue, Suite 520
P.O. Box 1131
Okmulgee, OK 74447

Riyaz A. Kanji
David A. Giampetroni
Joshua C. Handelsman
KANJI & KATZEN, P.L.L.C.
P.O. Box 3971
Ann Arbor, MI 48106
(734) 769-5400
rkanji@kanjikatzen.com

Philip H. Tinker
KANJI & KATZEN, P.L.L.C.
12 N. Cheyenne Avenue, Suite 220
Tulsa, OK 74103

*Counsel for Appellant Muscogee (Creek) Nation*

# TABLE OF CONTENTS


TABLE OF AUTHORITIES ... iii

GLOSSARY ... vii

INTRODUCTION ... 1

ARGUMENT ... 3

I. Under Longstanding Precedent, States May Not Exercise Criminal Jurisdiction over Indians in Indian Country Absent Congressional Authorization. ... 3

II. The Categorical Rule Reflects a Core Domain of Tribal Sovereignty ... 6

III. Defendants' Assertion of Concurrent Criminal Jurisdiction over Indians Infringes on Tribal Sovereignty. ... 12

IV. *Bracker* Balancing Is Not Necessary to Determine that Defendants' Assertion of Jurisdiction over Non-Member Indians Impermissibly Infringes on Tribal Sovereignty. ... 15

A. The State's Exercise of Jurisdiction Is Presumptively Preempted in Traditional Domains of Tribal Independence. ... 15

B. *Castro-Huerta* Does Not Require *Bracker* Balancing. ... 19

C. In the Criminal Context, Non-Member Indians Are Situated Like Tribal Members. ... 20

V. Oklahoma Is Not Immune from the Legal Principles Governing Indian Country. ... 21

VI. If *Bracker* Balancing Applies, Defendants' Assertion of Criminal Jurisdiction Is Still Preempted. ... 23

A. Tribal Interests ... 24

B. State Interests ... 25

C. Federal Interests ....................................................................................27

VII. The Remaining Equitable Factors Favor Injunctive Relief...........................28

VIII. The Nation's Claims Extend to Sheriff Regalado's Conduct. .......................29

CONCLUSION .....................................................................................................30

CERTIFICATE OF SERVICE

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

**Cases**

*Bartenwerfer v. Buckley*,
598 U.S. 69 (2023) .......... 8

*Bryan v. Itasca County*,
426 U.S. 373 (1976) .......... 16

*Cheyenne-Arapaho Tribes of Oklahoma v. Oklahoma*,
618 F.2d 665 (10th Cir. 1980) .......... 18

*Chickasaw Nation v. Oklahoma ex rel. Oklahoma Tax Commission*,
31 F.3d 964 (10th Cir. 1994) .......... 17

*City of Tulsa v. O'Brien*,
Case No. S-2023-715, 2024 WL 5001684 (Okla. Crim. App. Dec. 5, 2024) .......... 5

*Duro v. Reina*,
495 U.S. 676 (1990) .......... 10, 14

*Frasier v. Evans*,
992 F.3d 1003 (10th Cir. 2021) .......... 28

*Haaland v. Brackeen*,
599 U.S. 255 (2023) .......... 7

*Iowa Mutual Insurance Co. v. LaPlante*,
480 U.S. 9 (1987) .......... 28

*Kaul v. Stephan*,
83 F.3d 1208 (10th Cir. 1996) .......... 11

*McClanahan v. State Tax Commission of Arizona*,
411 U.S. 164 (1973) .......... 16

*McGirt v. Oklahoma*,
591 U.S. 894 (2020) .......... 1, 3, 4, 8, 12, 21, 22, 23

*Moe v. Confederated Salish and Kootenai Tribes of Flathead Reservation*,
425 U.S. 463 (1976) .......... 22, 23

*Muscogee (Creek) Nation v. City of Henryetta*,
25-CV-227-JAR, 2026 WL 1336060 (E.D. Okla. May 13, 2026) ...................... 25

*Muscogee (Creek) Nation v. City of Henryetta*,
809 F.Supp.3d 1317 (E.D. Okla. 2025) ............................................................ 4

*Muscogee (Creek) Nation v. Pruitt*,
669 F.3d 1159 (10th Cir. 2012)............................................................ 16, 24

*Navajo Nation v. Dalley*,
896 F.3d 1196 (10th Cir. 2018).................................................................... 18

*Nebraska v. Parker*,
577 U.S. 481 (2016) ........................................................................................ 23

*New Mexico v. Mescalero Apache Tribe*,
462 U.S. 324 (1983) ............................................................................ 15, 18, 23

*Oklahoma v. Castro-Huerta*,
597 U.S. 629 (2022) ...................................................................... 8, 9, 14, 19, 25

*Oklahoma Tax Commission v. United States*,
319 U.S. 598 (1948) ........................................................................................ 22

*People ex rel. Schuyler v. Livingstone*,
205 N.Y.S. 888 (Sup. Ct. 1924) ........................................................................ 5

*People for Ethical Treatment of Property Owners v. U.S. Fish and Wildlife Service*,
852 F.3d 990 (10th Cir. 2017)......................................................................... 11

*Puyallup Tribe, Inc. v. Department of Game*,
433 U.S. 165 (1977) ........................................................................................ 23

*Rice v. Rehner*,
463 U.S. 713 (1983) .................................................................................. 7, 16

*State v. Campbell*,
55 N.W. 553 (Minn. 1893)............................................................................... 6

*United States v. Antelope*,
430 U.S. 641 (1977) .................................................................................. 8, 13

*United States v. Cooley*,
593 U.S. 345 (2021) ........................................................................................ 22

*United States v. Hopson*,
150 F.4th 1290 (10th Cir. 2025) ............................................................ 3, 6, 8, 13

*United States v. Michigan*,
653 F.2d 277 (6th Cir. 1981)........................................................................... 18

*Ute Indian Tribe of the Uintah and Ouray Reservation v. Lawrence*,
22 F.4th 892 (10th Cir. 2022) ......................................................................... 18

*Ute Indian Tribe of the Uintah and Ouray Reservation v. Utah*,
790 F.3d 1000 (10th Cir. 2015)................................................................... 3, 13

*Ute Mountain Ute Tribe v. Rodriguez*,
660 F.3d 1177 (10th Cir. 2011)....................................................................... 17

*Walden v. City of Duncan*,
No. 25-6153, 2026 WL 2329610 (10th Cir. Aug. 12, 2026) ....................... 1, 3, 30

*Washington v. Confederated Tribes of Colville Indian Reservation*,
447 U.S. 134 (1980) .................................................................................. 14, 20

*White Mountain Apache Tribe v. Bracker*,
448 U.S. 136 (1980) ........................................................................ 7, 15, 16, 24

*Williams v. Lee*,
358 U.S. 217 (1959) ........................................................................................ 18

**Statutes**

18 U.S.C. § 1151 ................................................................................................ 22

18 U.S.C. § 1152 (General Crimes Act) ............................................... 8, 13, 20, 26

18 U.S.C. § 1153 (Major Crimes Act).................................. 3, 8, 13, 20, 21, 22, 26

25 U.S.C. § 1301(2) (*Duro* Fix)....................................................... 9, 10, 11, 14, 20

Act of Aug. 15, 1953, Pub. L. No. 83-280, ch. 505, 67 Stat. 588 .................. 8, 9, 23

**Legislative Materials**

S. Rep. No. 102-153, 1991 WL 195174 (1991)............................................... 10, 11

**Other Authorities**

Brief for the Petitioner, *Oklahoma v. Castro-Huerta* (No. 21-429),
2022 WL 628282 ......................................................................... 9, 12, 16

Greg Ablavsky, *State Criminal Jurisdiction in Indian Country: A History*
133 Va. L. Rev. (forthcoming 2027)................................................. 5, 6

U.S. Department of Justice, *Citizen's Guide To U.S. Federal Law on Child Pornography* (last accessed Aug. 21, 2026) ....................................................... 26

U.S. Department of Justice, *Criminal Resource Manual*, *CRM 500-999*, *678. The General Crimes Act-18 U.S.C. § 1152*
(last accessed Aug. 21, 2026)....................................................................... 26

U.S. Department of Justice, *Press Release*: *Tulsa Couple Sentenced*
(June 29, 2026) ............................................................................................ 26

## GLOSSARY

| **Term** | **Definition** |
|---|---|
| Defendants | Tulsa County District Attorney Steve Kunzweiler and Tulsa County Sheriff Vic Regalado |
| District Attorney | Tulsa County District Attorney Steve Kunzweiler |
| *Duro* Fix | 25 U.S.C. § 1301(2) (defining tribal "powers of self-government" to include "the inherent power of Indian tribes … to exercise criminal jurisdiction over all Indians") |
| GCA | General Crimes Act (18 U.S.C. § 1152) |
| Kunz.Br. | Response Brief of Appellee Steve Kunzweiler |
| major crimes / MCA crimes | state or federal offenses of the type enumerated in the Major Crimes Act |
| MCA | Major Crimes Act (18 U.S.C. § 1153) |
| Nation | Muscogee (Creek) Nation |
| P.L. 280 | Act of Aug. 15, 1953, Pub. L. No. 83-280, ch. 505, 67 Stat. 588 |
| Regalado.Br. | Response Brief of Appellee Vic Regalado |
| Sheriff | Tulsa County Sheriff Vic Regalado |

## INTRODUCTION

Just last week, this Court again reaffirmed the bedrock rule that governs this case: Absent a "congressionally created exception[]," state courts cannot "'try Indians for conduct committed in Indian country.'" *Walden v. City of Duncan*, No. 25-6153, 2026 WL 2329610, at *3 (10th Cir. Aug. 12, 2026) (quoting *McGirt v. Oklahoma*, 591 U.S. 894, 898 (2020)). The decision undercuts every distinction Defendants posit in seeking to evade that rule. The criminal defendant in *Walden* was a non-member Indian—a Choctaw citizen arrested on the Chickasaw Reservation in eastern Oklahoma. *Id.* at *1. He was arrested for non-major crimes. *Id.* And the case squarely concerned "what actual authority [the local police officer] had to act" in arresting the defendant. *Id.* at *3.

Congress has legislated against this backdrop rule for two centuries, carefully circumscribing when states may exercise criminal jurisdiction over Indians in Indian country. It has expressly affirmed that criminal jurisdiction over non-member Indians is an inherent power of tribal "self-government," while declining to grant states such jurisdiction. Unsurprisingly, then, courts have long held that states are preempted from asserting criminal jurisdiction over any Indian for any conduct in Indian country.

Defendants attempt to sidestep the force of this history and precedent, attacking an ordinary-preemption strawman and weakly deriding a long tradition of

case law as "a litany of dated cases." Kunz.Br.35. They argue that *Castro-Huerta*, which involved only state jurisdiction over non-Indians and which repeatedly proclaimed adherence to precedent, overruled *sub silentio* every categorical rule against state authority in Indian country. Finally, they recycle the soundly rejected claim that fundamental principles of federal Indian law have no relevance in eastern Oklahoma.

But even if they are correct and balancing applies, it strongly favors preemption. That tribes largely lack authority to prosecute non-Indians was critical to the balancing in *Castro-Huerta.* Here, federal policy and tribal sovereignty weigh heavily in support of safeguarding the tribal prosecution of all Indians—which Congress has reaffirmed as a core component of tribal self-government—from state interference. Moreover, Defendants have neither contested the effectiveness of the Nation's criminal justice system nor substantiated any public-safety imperative for state jurisdiction, let alone one that could justify judicial abrogation of Congress's considered allocation of criminal jurisdiction in Indian country.

## ARGUMENT

### I. Under Longstanding Precedent, States May Not Exercise Criminal Jurisdiction over Indians in Indian Country Absent Congressional Authorization.

1. "[T]he Supreme Court 'has long required a clear expression of the intention of Congress before the state or federal government may try Indians for conduct on their lands.'" *United States v. Hopson*, 150 F.4th 1290, 1299 (10th Cir. 2025) (citation modified) (quoting *McGirt*, 591 U.S. at 929), *cert. denied*, No. 25-1039, 2026 WL 1640874 (U.S. June 8, 2026). That principle has been reaffirmed repeatedly, Opening.Br.32-35, and it resolves this case. Congress has never "passed a law conferring jurisdiction on Oklahoma." *McGirt*, 591 U.S. at 932.

Defendants argue that many cases upholding the rule concern major crimes, *see* Kunz.Br.24, 35-36, and that because the MCA expressly preempts state prosecutions, those cases do not bear on state authority over *non*-major crimes, Kunz.Br.24; Regalado.Br.6 (incorporating Kunzweiler arguments). But the categorical rule has frequently been affirmed in cases implicating non-major crimes. *See, e.g.*, *Ute Indian Tribe of the Uintah and Ouray Rsrv. v. Utah*, 790 F.3d 1000, 1004-1005 (10th Cir. 2015); Opening.Br.36-37 (additional examples). This Court recently did so in *Walden*, 2026 WL 2329610, and *Hopson*, 150 F.4th at 1303 ("Only a tribal court may punish Mr. Hopson for the crime of misdemeanor simple assault committed in Indian country against an Indian victim.").

Moreover, courts have invariably framed the rule against state criminal jurisdiction as pertaining to all "Indians," and they have consistently applied it in cases involving non-member Indians. *See* Opening.Br.34-35 (citing cases). The most recent affirmations of the rule by the Supreme Court (in *McGirt*) and this Court (in *Walden*) both concerned non-member Indians. That those and other decisions do not belabor the implications of non-member status only demonstrates how well-accepted it is that a rule phrased in terms of all Indians applies to all Indians. *See Muscogee (Creek) Nation v. City of Henryetta*, 809 F.Supp.3d 1317, 1322 (E.D. Okla. 2025) ("'Indian' means Indian.").

It is also entirely inaccurate to say that *McGirt* did not grapple with the scope of the categorical rule. Oklahoma argued there that if the Creek Reservation remained extant, "*no one* [would have] had the power to try minor Indian-on-Indian crimes" committed within the reservation for much of Oklahoma's history (because the state would have lacked jurisdiction due to the categorical rule, while tribal courts were long absent and the federal government lacked jurisdiction over such crimes). 591 U.S. at 930-31. The Supreme Court agreed that its holding meant this "jurisdictional gap" had existed. *Id.* at 931. That the District Attorney—an "arm of the state," Regalado.Br.8.n.7 (citation omitted)—now seeks to distance himself from the categorical rule does not mean the *McGirt* Court did not closely consider its implications.

2. While Defendants attempt impossible gymnastics to explain away cases adhering to the categorical rule, perhaps even more telling is that with the exception of *City of Tulsa v. O'Brien*, Case No. S-2023-715, 2024 WL 5001684 (Okla. Crim. App. Dec. 5, 2024), they cannot cite a single case in which a court (federal or state) has allowed a state, absent congressional authorization, to prosecute an Indian on the ground that he belonged to a different tribe. Stanford legal historian Greg Ablavsky, who has compiled a history of state criminal jurisdiction in Indian country, has uncovered no such cases. The closest he found is a 1924 decision by a New York court involving a Canadian First Nation member who would not even be considered an "Indian" today. *See State Criminal Jurisdiction in Indian Country: A History* at 58-59, 133 Va. L. Rev. (forthcoming 2027) ("*A History*") (discussing *People ex rel. Schuyler v. Livingstone*, 205 N.Y.S. 888, 894 (Sup. Ct. 1924)).[1]

To be sure, courts did not always agree on who counted as an "Indian." Opening.Br.25.n.4; *see also A History* at 53, 57 (explaining that state courts after *Worcester* "accepted the principle of exclusive federal and tribal jurisdiction [over Indians in Indian country] as black-letter law" even while contesting the definitions of "Indian" and "Indian country"). For example, courts once held that Indians who "had severed their tribal relations" by assimilating into mainstream society did not

[1] https://papers.ssrn.com/sol3/papers.cfm?abstract_id=6953978.

qualify as "Indians" for jurisdictional purposes. *A History* at 44. But under these antiquated norms, such individuals were not considered "non-member Indians," in the sense of belonging to a different tribe; rather, they were not considered Indians at all. *Id.* at 58 n. 278.

*State v. Campbell*, 55 N.W. 553 (Minn. 1893), accordingly does not help Defendants. *Contra* Kunz.Br.36-37. *Campbell* held that a defendant was not a "tribal Indian" because her father and husband were white and she "did not sustain any tribal relations," not because of membership status (which it did not address). 55 N.W. at 553-54.

* * *

In sum, the Supreme Court, this Court, and numerous other tribunals have recognized a blackletter jurisdictional rule that resolves this case, and Defendants' efforts to distinguish that substantial body of case law fail.

## II. The Categorical Rule Reflects a Core Domain of Tribal Sovereignty.

1. The categorical rule is grounded in what this Court has described as a "historical understanding of tribal independence" concerning criminal jurisdiction, *Hopson*, 150 F.4th at 1299. That understanding has manifested in a series of statutes enacted by Congress—dating back to 1790—that carefully circumscribe the circumstances under which the federal and state governments may exercise

criminal jurisdiction in Indian country, and that have always treated member and non-member Indians alike. Opening.Br.18-36.

Defendants assert that the "Nation makes no genuine attempt to argue that, under ordinary principles of preemption," the various statutes viewed in isolation preclude state authority. Kunz.Br.13. That is sleight of hand. The Nation does not argue ordinary preemption at all. "The unique historical origins of tribal sovereignty make it generally unhelpful to apply to federal enactments regulating Indian tribes those standards of pre-emption that have emerged in other areas of the law." *White Mountain Apache Tribe v. Bracker*, 448 U.S. 136, 143 (1980). Rather, "[t]he tradition of Indian sovereignty over the reservation and tribal members must inform the determination whether the exercise of state authority has been pre-empted," *id.*, such that where "tradition has recognized a sovereign immunity in favor of the Indians" there exists a "presumption of preemption," *Rice v. Rehner*, 463 U.S. 713, 719, 726 (1983). *See* Opening.Br.15-18.

2. Defendants' focus on ordinary preemption, Kunz.Br.13-17, means they never engage with the significance of Congress's enactments. Properly viewed, the statutory course makes plain that Congress has exercised its "plenary and exclusive" power in Indian affairs, *Haaland v. Brackeen*, 599 U.S. 255, 272 (2023) (citation omitted), to carefully control incursions of federal or state authority into the "otherwise exclusive" power of tribes over prosecutions of Indians in Indian

country, *Hopson*, 150 F.4th at 1305 (quoting *United States v. Antelope*, 430 U.S. 641, 642 (1977)). In the nineteenth century, Congress granted the federal government power to assert only tightly circumscribed forms of criminal jurisdiction through the GCA and MCA. Opening.Br.18-23. In the mid-twentieth century, Congress granted jurisdiction over Indians to specific states and prescribed a process for others to assume jurisdiction under P.L. 280—a process that "Oklahoma doesn't claim to have complied with," *McGirt*, 591 U.S. at 932, and that has long included a requirement of tribal consent. Opening.Br.26-29.

Oklahoma seeks to cast aside this history on the basis that "assumptions are not laws," Kunz.Br.34, 38 (quoting *Oklahoma v. Castro-Huerta*, 597 U.S. 629, 648 (2022)). Rarely has a single clause in an opinion been asked to bear such weight, and it cannot do so here. Congress's Indian country enactments go far beyond assumptions. They embody Congress's clear prescriptions as to the circumstances under which states may exercise criminal authority over Indians in Indian country. They reflect Congress's understanding of the categorical rule, *see Bartenwerfer v. Buckley*, 598 U.S. 69, 80 (2023) ("This Court generally assumes that, when Congress enacts statutes, it is aware of this Court's relevant precedents." (citation omitted)), and further cement that rule in the law.

By contrast, *Castro-Huerta* concerned a domain lacking a tradition of tribal sovereignty or clear precedent—and one that, as Oklahoma emphasized, was not

Congress's focus in enacting P.L. 280. *See* Brief for the Petitioner at 13, *Castro-Huerta* (No. 21-429), 2022 WL 628282, at *13 ("*Castro-Huerta* Petitioner.Br.") ("The history surrounding the passage of [P.L. 280 and companion statutes] makes clear that Congress was reacting to the lack of prosecution of *Indians*[.]"). It is hardly surprising, then, that the *Castro-Huerta* Court gave no weight to Congress's purported assumptions about state jurisdiction over non-Indians, while specifying that its decision did "not negate the significance of Public Law 280" because "Public Law 280 also grants States jurisdiction over crimes committed *by Indians*," 597 U.S. at 648.

3. Defendants also seek to minimize the *Duro* Fix, but they fail to refute its twofold significance.

First, as *Castro-Huerta* confirms, the fundamental question in assessing the availability of state authority in Indian country is whether a state's assertion of authority "would unlawfully infringe upon tribal *self-government*," *id.* at 649 (emphasis added). *See* Opening.Br.37-45. In the *Duro* Fix, Congress expressly affirmed that "the inherent power of Indian tribes … to exercise jurisdiction over all Indians" is a power of "*self-government*," 25 U.S.C. § 1301(2) (emphasis added), and it chose *not* to grant this power to the states. Short of express preemption (which would not have made sense given Congress's prior enactments establishing the circumstances under which states can assert such jurisdiction), it is

hard to imagine clearer confirmation that Defendants' exercise of criminal jurisdiction over non-member Indians improperly interferes with tribal self-government.[2]

Second, (as Defendants do not contest) both the majority and the dissent in *Duro* recognized that states would need tribal consent—or an act of Congress—to begin prosecuting non-member Indians. Opening.Br.29-30. Defendants nevertheless suggest that the legislative history of the *Duro* Fix shows that "although some may have thought *Duro* created a jurisdictional void, others recognized … that [*Duro*] 'did not cause a jurisdictional gap because it equated nonmember Indians with non-Indians, over whom the State may exercise jurisdiction.'" Kunz.Br.34 (brackets omitted) (quoting S. Rep. No. 102-153, 1991 WL 195174 (1991)). But that is highly misleading. Every *Duro* Fix congressional report explains that *Duro* created a jurisdictional void because states lack jurisdiction over non-member Indians. Opening.Br.30-31 (quoting reports). The

[2] Defendants note that in *Duro v. Reina*, 495 U.S. 676, 691 (1990), the Court concluded that the "equivocal" historical record "did not suggest a strong tradition of tribal prosecution of non-members," and they argue that the *Duro* Fix does not refute this conclusion because it describes tribes' power to prosecute non-member Indians as "inherent" rather than "traditional." Kunz.Br.32-33. This is hairsplitting in the extreme. *Duro* looked to the historical record in assessing the scope of "inherent tribal jurisdiction," 495 U.S. at 691, and the *Duro* Fix's affirmation of tribes' "inherent" jurisdiction reflects a wholesale rejection of *Duro*'s reasoning. Legislative history further confirms Congress's recognition that this "inherent" power was a "traditional" power of self-government. *See* Opening.Br.30.

line quoted by Defendants simply states that "[s]ome"—without specifying whether that meant Congressmen, witnesses, letter writers, or other constituents—"have suggested that *Duro* does not cause a jurisdictional gap[.]" 1991 WL 195174, at *21. It then explains that case law undercuts that suggestion, and concludes that "the jurisdictional gap is real and adversely affects the tribe's ability to protect reservation residents from violations of the law," *id.* at *22. *Cf. People for Ethical Treatment of Prop. Owners v. U.S. Fish and Wildlife Serv.*, 852 F.3d 990, 1006 (10th Cir. 2017) (looking to congressional reports to determine what "the statutory scheme was intended" to accomplish).

Defendants suggest that *Kaul v. Stephan*, 83 F.3d 1208 (10th Cir. 1996), evidences the insignificance of the *Duro* Fix because it subsequently recognized concurrent state jurisdiction over non-member Indians. Kunz.Br.34-35. But *Kaul*'s holding rested principally on Congress's grant to Kansas of "jurisdiction over all crimes committed by or against Indians on Indian reservations," 83 F.3d at 1216-17 (citation omitted), and it did not mention, let alone grapple with, the *Duro* Fix. Not surprisingly, then, no court has ever cited *Kaul* as precedent supporting state jurisdiction over non-member Indians absent congressional authorization. And *McGirt* and *Walden* make clear that it lacks any such force.

4. In *McGirt*, the Supreme Court reaffirmed that the categorical rule stems from a "policy of leaving Indians free from state jurisdiction and control [that] is

deeply rooted in this Nation's history." 591 U.S. at 928 (citation omitted). This has nothing to do with "platonic notions of Indian sovereignty," Kunz.Br.26. Oklahoma itself previously recognized the same,[3] and the long and consistent course of judicial decisions and congressional enactments leaves no room for concluding otherwise.

## III. Defendants' Assertion of Concurrent Criminal Jurisdiction over Indians Infringes on Tribal Sovereignty.

Defendants repeatedly suggest that their assertion of concurrent jurisdiction over Indians will not, as a practical matter, interfere with the Nation's governmental interests. The argument defies reality.

1. Concurrent jurisdiction infringes on tribal sovereignty by preventing cases from reaching tribal authorities, negating prosecutorial discretion over whether to bring charges and what punishments to seek, interfering with tribal sanctions, and subjecting the tribal system's determination of the proper punishment to a veto by another sovereign. Opening.Br.46-48. Congress clearly recognizes this, which is why for over 200 years it has carefully circumscribed its grants of federal and state criminal jurisdiction over Indians. *See supra* pp. 6-12.

---

[3] Oklahoma distinguished *Castro-Huerta*'s facts from *McGirt* by arguing that while "'[t]he policy of leaving *Indians* free from state jurisdiction and control is deeply rooted in this Nation's history,'" that policy "says nothing about state power over non-Indians." *Castro-Huerta* Petitioner.Br.36 (brackets and emphasis in original) (quoting *McGirt*, 591 U.S. at 928).

This Court shares that understanding. It recently characterized the MCA as "a 'carefully limited *intrusion* of federal power into the otherwise exclusive jurisdiction of the Indian tribes to punish Indians for crimes committed on Indian land,'" *Hopson*, 150 F.4th at 1305 (emphasis added) (quoting *Antelope*, 430 U.S. at 642), and it described the exceptions to the GCA (which preserve exclusive tribal jurisdiction) as reflecting a regard for "tribal independence," *id.* at 1299. This Court has likewise held a county attorney's prosecution of Indians for traffic offenses to interfere with "efforts to develop strong self-government," constituting a "harm to tribal sovereignty" that "is perhaps as serious as any to come our way in a long time," *Ute Indian Tribe*, 790 F.3d at 1005, 1007 (citation modified).

2. Defendants cite the dual sovereignty doctrine, and argue that "concurrent state-tribal jurisdiction would not undermine tribal sovereignty interests any more than concurrent federal-tribal jurisdiction already does." Kunz.Br.51. But the fact that concurrent jurisdiction sometimes exists does not mean it has no impact on the affected sovereigns, nor is it reason to throw a third sovereign into the mix. Two centuries' worth of congressional enactments and court cases recognize this common-sense reality when it comes to tribal authority.

Defendants seek support from *Castro-Huerta*, Kunz.Br.46, but it holds that state prosecutions of non-Indians do not interfere with tribal prosecutorial authority specifically "because … *Indian tribes lack criminal jurisdiction to prosecute*

*crimes committed by non-Indians*," 597 U.S. at 650 (emphasis added). That reasoning plainly does not apply here.

3. Defendants also suggest that concurrent state jurisdiction over *non-member Indians* does not meaningfully interfere with tribal self-government because non-member Indians (like non-Indians) cannot vote or serve in tribal government. Kunz.Br.45-46, 49-50 (citing *Washington v. Confederated Tribes of Colville Indian Rsrv.*, 447 U.S. 134, 161 (1980)). But Congress has rejected this very argument. *Duro*, like *Colville*, reasoned that criminal jurisdiction over non-member Indians is not relevant to tribal "self-governance" because they lack powers of political participation. *Duro v. Reina*, 495 U.S. 676, 686-87 (1990). Congress promptly disagreed and reaffirmed that "criminal jurisdiction over all Indians" is an "inherent power" of tribal "*self-government*," 25 U.S.C. § 1301(2) (emphasis added).

Congress's action accords with practical reality. As the uncontroverted record evidence establishes, non-member Indians are deeply intertwined in the Muscogee Creek community, and the Nation, like many other tribes, affords rights and privileges to non-member Indians not afforded to non-Indians. *See* Opening.Br.44-45. At bottom, self-governance includes the power to determine and administer the appropriate punishment for conduct within a sovereign's territory, especially the conduct of individuals interwoven into the sovereign's

community, regardless of whether those individuals vote. In all the ways discussed above, *supra* p. 12, Defendants' actions interfere with this core aspect of Nation self-governance.

## IV. *Bracker* Balancing Is Not Necessary to Determine that Defendants' Assertion of Jurisdiction over Non-Member Indians Impermissibly Infringes on Tribal Sovereignty.

Defendants argue that notwithstanding the categorical rule and the core domain of tribal sovereignty and practical realities it reflects, *Bracker* balancing is the only way to determine whether their assertion of jurisdiction impermissibly infringes on tribal self-government. Kunz.Br.17-31. If accepted, this argument would fundamentally re-write federal Indian law.

### A. The State's Exercise of Jurisdiction Is Presumptively Preempted in Traditional Domains of Tribal Independence.

1. Courts have repeatedly recognized categorical infringement and interest-balancing as independent forms of preemption under *Bracker*. In *New Mexico v. Mescalero Apache Tribe*, 462 U.S. 324 (1983), for example, the Supreme Court noted that "inherent tribal sovereignty" is "an independent barrier"—distinct from *Bracker* interest balancing—precluding state jurisdiction that would "'unlawfully infringe[] on the right of reservation Indians to make their own laws and be ruled by them.'" *Id.* at 334 n.16 (quoting *Bracker*, 448 U.S. at 142). Similarly, this Court has explained that tribal sovereignty is not only "a backdrop for [*Bracker* balancing] preemption analysis" but also "an independent barrier" precluding state

jurisdiction in certain cases. *Muscogee (Creek) Nation v. Pruitt*, 669 F.3d 1159, 1171 (10th Cir. 2012) (citing *Bracker*, 448 U.S. at 143).

This "independent barrier" applies in domains where there is a strong tradition of tribal independence. Opening.Br.16-17. While the District Attorney accuses the Nation of "selectively quot[ing]" *Rehner* to this end, Kunz.Br.29, Oklahoma (represented by the same counsel) acknowledged in *Castro-Huerta* that "where a matter implicates an 'aspect of exclusive tribal self-government,' the Court will apply a 'presumption of preemption' and require that 'Congress expressly provide for the application of state law.'" *Castro-Huerta* Petitioner.Br.40 (quoting *Rehner*, 463 U.S. at 720).

*McClanahan v. State Tax Commission of Arizona*, 411 U.S. 164 (1973), cited by Defendants for the idea that courts have moved away from "platonic notions of Indian sovereignty," Kunz.Br.26, underscores the importance of tradition to Indian law preemption analysis. The Court held Arizona preempted from taxing tribal member income in Indian country based on the "tradition of Indian independence," 411 U.S. at 174, and a treaty and statutes that assumed—but did not expressly grant—Indian immunity from state taxation, *id.* at 172-179. The Supreme Court has since held repeatedly that *McClanahan* and its progeny reflect a categorical rule. *E.g.*, *Bryan v. Itasca County*, 426 U.S. 373, 376-377 & n.2 (1976).

To be sure, *Rehner* also includes language suggesting that the traditional-domain inquiry informs *Bracker* balancing without always being dispositive, Kunzweiler.Br.28-29, which makes sense where a strong tradition does not exist. This Court took that approach in a case involving state taxation of non-Indians' oil and gas leases in Indian country, holding that a brief period of immunity from such taxation was a non-dispositive part of the "historical backdrop" relevant to *Bracker* balancing. *See Ute Mountain Ute Tribe v. Rodriguez*, 660 F.3d 1177, 1194 (10th Cir. 2011). Elsewhere, however, this Court has confirmed that a tradition of tribal independence controls, as when it held that Oklahoma cannot tax tribal members in Indian country because such action "conflicts with a power within the traditional scope of Indian sovereign authority," *Chickasaw Nation v. Oklahoma ex rel. Okla. Tax Comm'n*, 31 F.3d 964, 972-73 (10th Cir. 1994), *aff'd in part, rev'd in part sub nom.*, *Okla. Tax Comm'n v. Chickasaw Nation*, 515 U.S. 450 (1995), *reaffirmed in relevant part*, 64 F.3d 577 (10th Cir. 1995). Here, the categorical rule regarding state criminal jurisdiction over Indians is at least as deeply rooted, and is likewise dispositive.

2. Defendants' position that *Bracker* balancing applies universally requires them to argue that categorical rules against state power in Indian country do not exist, even for assertions of authority over tribal members. *See* Kunz.Br.26-28. But

there are numerous such rules, Opening.Br.17-18, none of which Defendants explain away.

Defendant is simply incorrect that *Ute Indian Tribe of the Uintah and Ouray Reservation v. Lawrence*, 22 F.4th 892, 900 (10th Cir. 2022), and *Navajo Nation v. Dalley*, 896 F.3d 1196, 1204 (10th Cir. 2018), relate only to "particular statutory schemes," Kunz.Br.30. Each turned on the principle that, absent an act of Congress, states lack jurisdiction over tribal members for civil lawsuits arising in Indian country—a principle that has been recognized as blackletter law since *Williams v. Lee*, 358 U.S. 217 (1959).

For hunting and fishing laws, Defendants acknowledge this Court's recognition that "[s]tates have no authority over Indians in Indian Country unless it is expressly conferred by Congress," but then claim that the conservation-necessity exception to this rule equates to balancing. Kunz.Br.29-30 (quoting *Cheyenne-Arapaho Tribes of Okla. v. Oklahoma*, 618 F.2d 665, 668 (10th Cir. 1980)). It does not. The exception is narrow, allowing for state regulation only when "irreparable harm" to a species is "highly probable" and the state regulates using the "least restrictive" means, *United States v. Michigan*, 653 F.2d 277, 279 (6th Cir. 1981)—circumstances the Supreme Court has described as "exceptional," *Mescalero Apache*, 462 U.S. at 332 & n.15.

Defendants do not dispute that courts have applied a categorical approach in numerous taxation cases. They instead insist that taxation is "the sole area" in which the courts have done so. Kunz.Br.30. But they do not explain why tribal self-government should operate as an "independent barrier" to state jurisdiction only in that realm, and the existence of other categorical rules confirms this not to be the case. *See supra* pp. 17-18.

### B. *Castro-Huerta* Does Not Require *Bracker* Balancing.

Defendants argue that *Bracker* balancing must apply because in *Castro-Huerta* the Court proceeded straight to that step. Kunz.Br.18-19. But that is hardly surprising, given that no plausible argument exists that criminal jurisdiction over non-Indians constitutes a traditional area of tribal sovereignty, as tribes have long been deemed divested of such authority.

Defendants further argue that the Nation's position "is incompatible with *Castro-Huerta*'s core premise that a State has 'criminal jurisdiction in Indian country unless that jurisdiction is *preempted*,'" such that it "would flip that presumption on its head[.]" Kunz.Br.26. But *Castro-Huerta* expressly affirms that some forms of state jurisdiction are preempted by virtue of their impact on tribal self-government, *e.g.*, 597 U.S. at 639 n.2, and in such situations an act of Congress is necessarily required for the state to obtain jurisdiction. Nowhere does *Castro-Huerta* say that *Bracker* balancing is the only way to determine whether

state jurisdiction would unlawfully infringe on tribal sovereignty, and a reading of the case as effectuating such radical change is untenable. Opening.Br.38-39.

### C. In the Criminal Context, Non-Member Indians Are Situated Like Tribal Members.

Defendants also argue that even if a categorical rule exists precluding state criminal jurisdiction over tribal members, *Bracker* balancing is required for any assertion of state power over non-member Indians. Kunz.Br.21-23. They cite multiple civil cases, Kunz.Br.18, and note that in that context the Supreme Court has reasoned that "non-members are not constituents of the governing Tribe" and thus "[f]or most practical purposes … stand on the same footing as non-Indians," Kunz.Br.22 (quoting *Colville*, 447 U.S. at 161).

However, as discussed above, in the criminal context Congress has expressly affirmed that tribal jurisdiction over non-member Indians is an important power of "self-government," 25 U.S.C. § 1301(2), and in doing so has rejected *Colville*'s logic that non-member Indians are equivalent to non-Indians because they "are not constituents of the governing Tribe," 447 U.S. at 161. Moreover, two centuries of court decisions and federal statutes have treated "Indian," not "member," as the relevant category for federal, tribal, and state criminal jurisdiction. Indeed, Defendants would concede that "Indian" is the relevant category for federal jurisdiction (the GCA and MCA cover "Indians"), for tribal jurisdiction (*Oliphant* denies tribal jurisdiction over "non-Indians," and the *Duro* Fix affirms tribal

jurisdiction over "all Indians"), and for much state jurisdiction (Defendants argue the MCA preempts state jurisdiction over "any Indian" for major crimes, Kunz.Br.24). Accordingly, for criminal jurisdiction, non-member Indians stand on the "same footing" as tribal members vis-à-vis all three sovereigns, and it would be passing strange to treat them differently *only* for state jurisdiction over non-major crimes.

## V. Oklahoma Is Not Immune from the Legal Principles Governing Indian Country.

Defendants argue that even if the categorical rule exists, it should not apply in eastern Oklahoma. Kunz.Br.38-42. They point to the large non-Indian population, the sizeable amount of non-Indian fee land, the long absence of tribal courts, and the State's provision of services to Indians as reasons to treat Oklahoma differently. *Id.* The argument cannot be confined to eastern Oklahoma, and it runs directly counter to precedent.

In *McGirt*, Oklahoma contended that its "long historical prosecutorial practice of asserting jurisdiction over Indians in state court," the "speedy and persistent movement of white settlers onto Creek lands," and present-day demographics weighed against continued recognition of the Creek Reservation. 591 U.S. at 917, 922, 933. The Court held that allowing such considerations to deprive the Nation of its territorial sovereignty "would be the rule of the strong, not the rule of law." *Id.* at 924. And in response to Oklahoma's similar consequence-

based arguments for why the MCA does not apply in Oklahoma, it reaffirmed that "a clear expression of the intention of Congress" is required "before the state or federal government may try Indians for conduct on their lands." *Id.* at 929 (citation omitted).

*Oklahoma Tax Commission v. United States*, 319 U.S. 598 (1948), Kunz.Br.39, does not help Defendants. The decision assumed the Nation had no sovereignty over its lands, in part because they were "held in fee." *Id.* at 603. The enactment of 18 U.S.C. § 1151 eviscerated that assumption by clarifying that all lands within a reservation are "Indian country," and *McGirt* confirms that the entire Creek Reservation remains Indian country today.

The Supreme Court has also rejected similar arguments regarding reservations outside Oklahoma. For example, *Moe v. Confederated Salish and Kootenai Tribes of Flathead Reservation*, 425 U.S. 463, 466-67 (1976), concerned a reservation where over eighty percent of residents were non-Indians, over half the land was owned in fee, and the state provided services to Indians. Writing for a unanimous Court, Justice Rehnquist rejected Montana's argument that these facts meant the normal rule against state taxation of tribal members should not apply. *Id.* at 476.

There is no principled way to confine Defendants' argument to Oklahoma. Numerous reservations exist where most residents are non-Indians, *United States v.*

*Cooley*, 593 U.S. 345, 353 (2021) ("[M]ost of those who live on Indian reservations are non-Indians[.]"); where most land is owned in fee, *e.g.*, *Moe*, 425 U.S. at 466-467; where states erroneously treated land for many decades as if it were not Indian country, *e.g.*, *Nebraska v. Parker*, 577 U.S. 481, 493 (120-year period); and where tribal courts were long absent, *see McGirt*, 591 U.S. at 931 ("Many tribal courts across the country were absent or ineffective during the early part of the last century[.]"). Yet neither this Court nor the Supreme Court has excepted any such reservation from the rule against state criminal jurisdiction over Indians—because only Congress may do so.[4]

## VI. If *Bracker* Balancing Applies, Defendants' Assertion of Criminal Jurisdiction Is Still Preempted.

Even if this Court concludes that Defendants are not categorically barred from asserting criminal jurisdiction over Indians, the "tradition of Indian sovereignty" as "reflected and encouraged in … congressional enactments,"

[4] Contrary to Kunz.Br.40, the Court in *Puyallup Tribe, Inc. v. Department of Game*, 433 U.S. 165 (1977), did not suggest that significant non-Indian ownership translates to broad-based state jurisdiction, but rather recognized that P.L. 280 generally provided for state criminal jurisdiction on the reservation and recognized the narrow conservation-necessity exception for hunting and fishing discussed above. *Id.* at 175 & n.14. And while *Mescalero Apache* cites the tribe's ownership of land as favorable to preemption of state *civil* jurisdiction (reasoning that tribal civil authority over non-members is strongest on tribally owned land, 462 U.S. at 330-331), it nowhere suggests that a high proportion of fee land could justify the exercise of state *criminal* jurisdiction over Indians (for which tribal jurisdiction indisputably exists on *all* land within a reservation).

*Bracker*, 448 U.S. at 143, is at the very least highly relevant to the interest balancing that Defendants insist should decide this case. Such balancing takes place "under the 'backdrop' of Indian sovereignty," *Pruitt*, 669 F.3d at 1170 (quoting *Bracker*, 448 U.S. at 143), which entails examining "relevant federal statutes and treaties in light of the broad policies that underlie them and the notions of sovereignty that have developed from historical traditions of tribal independence," *id.* (citation modified).

Here, in contrast to *Castro-Huerta*, federal statutes and historical notions of sovereignty establish a strong tradition of tribal independence. *See supra* pp. 6-11. Congress has jealously guarded tribal criminal authority by carefully limiting federal and state intrusions on that authority. *See supra* pp. 7-8. Assessed against this backdrop, the balance of interests clearly precludes Defendants' assertion of jurisdiction.

### A. Tribal Interests

Defendants' assertion of jurisdiction over non-member Indians significantly interferes with the Nation's sovereignty, and Defendants' contrary arguments conflict with case law, congressional policy, and common sense. *See supra* pp. 12-15; *see also* Opening.Br.46-49. The Nation will not repeat that discussion here, other than to underscore that *neither* of *Castro-Huerta*'s reasons for deeming tribal interests minimal—that the case did not involve "the exercise of state power over

any Indian" and that the tribe itself lacked jurisdiction over non-Indians, 597 U.S. at 650—applies here.

### B. State Interests

Defendants argue that they must exercise jurisdiction to protect public safety and ensure criminals are punished. Kunz.Br.43-45. But they provide no evidence to support this argument, and the uncontroverted facts undermine it. As another district court recently found, and Defendants have not contested (either in this Court or below), "the Nation's justice system handles more than 1,000 felony cases and more than 2,200 traffic citations each year under rules of evidence and procedure substantially identical to those in state and federal courts … [I]ts courts are fully staffed, conduct jury and bench trials, and provide appointed counsel to defendants …. and full due process[.]" *Muscogee (Creek) Nation v. City of Henryetta*, 25-CV-227-JAR, 2026 WL 1336060, at *13 (E.D. Okla. May 13, 2026); *see also id.* at *2-5 (making detailed findings regarding effectiveness of Nation's criminal justice system); Opening.Br.3-7 (presenting similar facts based on district court record here). Nor do Defendants contest that other district attorneys within the Creek Reservation have successfully protected public safety without prosecuting non-member Indians, Opening.Br.7.

Defendants point out that federal law limits tribal prison sentences to a maximum of three years per count (and nine years total). Kunz.Br.48. Citing child

pornography as an example, they insist that "the sentences the Creek Nation could impose are significantly shorter than those the people of Oklahoma have deemed necessary." *Id.* But this ignores the role of federal prosecutors, who can prosecute Indians for major crimes under the MCA, non-major crimes under the GCA under certain circumstances, *and* crimes under federal criminal laws applicable beyond federal enclaves.[5] This latter category includes child pornography crimes,[6] which federal prosecutors regularly charge with the Nation's support.[7] Hence, while Defendants cite testimony from the Nation's Deputy Attorney General agreeing that three years is insufficient for child pornography offenses, Kunz.Br.48 (citing D.Ct.Dkt.86 at 166), they omit what she said next: "[T]hat's where I rally hard with and appreciate the collaboration and the dual prosecution with federal prosecutors." Defendants give no reason to believe that the tribe and federal government are failing to protect public safety in their prosecution of child pornography charges or any other offense.

---

[5] https://www.justice.gov/archives/jm/criminal-resource-manual-678-general-crimes-act-18-usc-1152.

[6] https://www.justice.gov/criminal/criminal-ceos/citizens-guide-us-federal-law-child-pornography.

[7] *E.g.*, https://www.justice.gov/usao-ndok/pr/tulsa-couple-sentenced-coercing-minor-child-having-sex-and-recording-it (describing recent federal child pornography conviction resulting from investigation by the Nation's Lighthorse Police).

Defendants also argue that regardless of whether the Nation and the federal government are effectively prosecuting non-member Indians and protecting public safety, the state has a sovereign interest in "enforcing its own criminal laws" and that this interest "is, by definition, an interest that no other sovereign can vindicate." Kunz.Br.47. But the same can be said of any case involving a state assertion of authority in Indian country. If such an interest merited much weight, it would turn *Bracker* balancing into a recipe for automatic state victory.

Finally, Defendants argue that the State has an interest in "undifferentiated enforcement" of its criminal justice system "regardless of tribal affiliation." Kunz.Br.45. That is akin to saying that the State has an interest in elimination of tribal sovereignty and affiliations. Criminal justice in Indian country is already differentiated in the sense that Indian status affects which sovereigns may prosecute an individual. Defendants' position, not the Nation's, would exacerbate an already-complicated matrix of jurisdictional rules by turning non-member Indians into a unique class subject to the criminal jurisdiction of three sovereigns for non-major crimes. *See supra* pp. 20-21.

### C. Federal Interests

Defendants argue that their assertion of jurisdiction furthers federal interests by protecting Indian victims and facilitating effective law enforcement. Kunz.Br.46-47. But as discussed above, they present no good reason to believe that

the close cooperation between the Nation and the federal government is insufficient to protect public safety. *Supra* pp. 25-26.

Defendants also fault the Nation for citing tribal self-government as a federal interest, reasoning that this argument "recycles" the Nation's argument about tribal interests. Kunz.Br.52. But tribal self-government is an extraordinarily important federal concern. The Supreme Court has "repeatedly recognized the Federal Government's longstanding policy of encouraging tribal self-government," specifically emphasizing that "[t]ribal courts play a vital role in tribal self-government, and the Federal Government has consistently encouraged their development." *Iowa Mut. Ins. Co. v. LaPlante*, 480 U.S. 9, 14 (1987) (citations omitted). Thus, unlike in *Castro-Huerta* where there was no tribal jurisdiction to safeguard, Defendants' assertion of jurisdiction interferes with a tribal sovereign power that federal policy is committed to protecting.

## VII. The Remaining Equitable Factors Favor Injunctive Relief.

Defendants do not contest that if the Nation is right on the merits, the three remaining equitable factors favor injunctive relief. *See* Kunz.Br.11. They mount no defense of the district court's reasoning in this regard and accordingly have waived any argument against relief based on those factors, *see Frasier v. Evans*, 992 F.3d 1003, 1033 (10th Cir. 2021) (failure to pursue issue in response brief constitutes waiver).

## VIII. The Nation's Claims Extend to Sheriff Regalado's Conduct.

Sheriff Regalado contends that his dismissal by the district court was proper "because county sheriff[s] do not make prosecutorial decisions[.]" Regalado.Br.1. But the Nation's opening brief clearly explains that "the Nation filed suit to stop *any* unlawful assertion of criminal jurisdiction by the defendants, not just the filing of charges," Opening.Br.54 (citing App.17-19), and cites this Court's clear precedents establishing that assertions of state police power—including arresting suspects for violations of state law—implicate the categorical rule, Opening.Br.54-56. The Sheriff fails to engage with any of those cases, and neither did the district court.

*Walden* further confirms the district court's error. It explains that with respect to Indians in Indian country, state law enforcement officers have only a limited ancillary authority to "stop [an Indian suspect], detain him while conducting an initial investigation, and then either hold him until the arrival of tribal officers or transport him to tribal authorities," *id*. at *5.

Sheriff Regalado's actions go far beyond that ancillary authority. Sheriff Regalado does not deny instituting a policy that non-member Indians "will not be booked or charged into tribal courts but rather STATE court and booked into [the Tulsa County Jail] as any other citizen" and that "[t]he only tribal arrests that will take place will be Creek Citizens …. All others will be booked into [the Tulsa

County Jail] and charged in Tulsa Co. District Court." App.73; *see* Regalado.Br.6 (describing policy as one of "administrative classification"). And while he points out that his department did not make the arrest in any of the five example cases mentioned in the complaint, Regalado.Br.8-11, he does not deny that his department is detaining and arresting Indian suspects so they can be prosecuted by State, rather than tribal, agencies, nor does he point to a single case suggesting that his officers may do so. Numerous decisions of this Court make plain that they cannot. *See* Opening.Br.55; *Walden*, 2026 WL 2329610, at *2, *5.

## CONCLUSION

For the foregoing reasons, the Nation urges this Court to reverse the district court.

Dated: August 21, 2026

Respectfully submitted,

_/s/ Riyaz A. Kanji_
Riyaz A. Kanji
David A. Giampetroni
Joshua C. Handelsman
KANJI & KATZEN, P.L.L.C.
P.O. Box 3971
Ann Arbor, MI 48106
(734) 769-5400
rkanji@kanjikatzen.com

Philip H. Tinker
KANJI & KATZEN, P.L.L.C.
12 N. Cheyenne Avenue, Suite 220
Tulsa, OK 74103

Geraldine Wisner
Deputy Attorney General
MUSCOGEE (CREEK) NATION
P.O. Box 580
Okmulgee, OK 74447

O. Joseph Williams
O. JOSEPH WILLIAMS LAW OFFICE, PLLC
The McCulloch Building
114 N. Grand Avenue, Suite 520
P.O. Box 1131
Okmulgee, OK 74447

*Counsel for Appellant Muscogee (Creek) Nation*

## CERTIFICATE OF SERVICE

I hereby certify that on August 21, 2026, I electronically filed the foregoing using the Court's CM/ECF system, which will send notification of such filing to the following:

Trevor S. Pemberton, trevor@permbertonlawgroup.com

Phillip G. Whaley, pwhaley@ryanwhaley.com

Grant M. Lucky, glucky@ryanwhaley.com

Patrick R. Pearce, Jr., rpearce@ryanwhaley.com

Kannon K. Shanmugam, kshanmugam@davispolk.com

William Thomas Marks, wmarks@paulweiss.com

Conrad Scott, scscott@paulweiss.com

Keith A. Wilkes, kwilkes@hallestill.com

By: */s/ Riyaz A. Kanji*
Riyaz A. Kanji
KANJI & KATZEN, P.L.L.C.
P.O. Box 3971
Ann Arbor, MI 48106
(734) 769-5400
rkanji@kanjikatzen.com

*Counsel for Appellant*
*Muscogee (Creek) Nation*

## CERTIFICATE OF COMPLIANCE

1. This brief complies with the type-volume limitations of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 6,473 words, excluding the parts of the document exempted by Federal Rule of Appellate Procedure 32(f) and 10th Circuit Rule 32(B).

2. This document complies with the typeface and type style requirements of Federal Rule of Appellate Procedure 32(a)(5) and 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word 365 in 14-point Times New Roman font.

3. I hereby certify that the document was filed using the CM/ECF system, no privacy redactions are required for this filing, the electronic copy of this filing was scanned for viruses using Microsoft Defender (updated on 08/21/2026), and no viruses were detected.

Date: August 21, 2026

By: *<u>/s/ Riyaz A. Kanji</u>*
Riyaz A. Kanji
KANJI & KATZEN, P.L.L.C.
P.O. Box 3971
Ann Arbor, MI 48106
(734) 769-5400
rkanji@kanjikatzen.com

*Counsel for Appellant Muscogee (Creek) Nation*